**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

SOUTHEASTERN CONSULTING &
DEVELOPMENT COMPANY, INC.,

       Debtor.

Case No. 11-40398-LMK

Chapter 11 Case

_____/

**DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION**

**JULY 24, 2012**

**BERGER SINGERMAN**
Attorneys for Debtor
Brian G. Rich
125 South Gadsden Street, Suite 300
Tallahassee, FL  32301
Telephone:  (850) 561-3010
Facsimile:  (850) 561-3013
Email:  *brich@bergersingerman.com*

> **THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

## DEBTOR'S DISCLOSURE STATEMENT

Southeastern Consulting & Development Company, Inc. (the "Debtor", or "Southeastern") together with the Proponent, Phoenix Realty Partners, Inc. ("Phoenix", or the "Proponent"), provides this Disclosure Statement to all known creditors of the Debtor in order to disclose the information deemed to be material, important, and necessary for the creditors to arrive at a reasonably informed decision in exercising their right to either abstain from voting or to vote for acceptance or rejection of the Plan of Reorganization (the "Plan") proposed by the Debtor.  A copy of the Plan accompanies this Disclosure Statement as Exhibit "A".

Capitalized terms used herein have the meanings assigned to them in this Disclosure Statement, or in the Definitions section in the Plan.  Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain holders of Claims against and Interests in the Debtor in accordance with the requirements of section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Code").  Section 1125 of the Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the debtor's creditors and interest holders, to make an informed judgment whether to accept or reject a plan.  This Disclosure Statement may not be relied upon for any purpose other than that described above.

**This Disclosure Statement and the Plan are an integral package, and they must be considered together for the reader to be adequately informed.  This introduction is qualified in its entirety by the remaining portions of this Disclosure Statement (including its Exhibits), and this Disclosure Statement in turn is qualified in its entirety by the Plan. This Disclosure Statement contains only a summary of the Plan.  You are strongly urged to review the Plan, a copy of which is provided herewith, before casting a Ballot.**

**No representations concerning the Debtor (particularly as to the values of its property) are authorized other than as set forth in this Disclosure Statement.  You should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in this Disclosure Statement, and such additional representations and inducements should be reported to Debtor's counsel, who will in turn deliver such information to the proper authorities for such action as may be appropriate.**

**The information contained in this Disclosure Statement, including any exhibits concerning the financial condition of the Debtor, has not been subjected to an audit or independent review except as expressly set forth herein.  The Debtor has endeavored in good faith to be accurate in this Disclosure Statement.**
**The statements contained in this Disclosure Statement, including asset valuations, are made as of the date of this Disclosure Statement unless another time is specified.  There**

**is no guaranty that facts will not change after this Disclosure Statement was filed; and it must be assumed that some facts will indeed change from that time until the hearing on the approval of the Disclosure Statement (discussed below), and thereafter during the periods in which the Debtor makes payments under the Plan.**

**This Disclosure Statement is presented by the Debtor and should in no way be interpreted as a waiver by any of the creditors, claimants or stakeholders of any of their respective rights, claims and privileges against the Debtor or other creditors, claimants or stakeholders unless the treatment of such claim, right or privilege is approved upon the confirmation of the Plan.**

**This Disclosure Statement was prepared in accordance with section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring claims against, interests in or securities of, the Debtor should evaluate this disclosure statement only in light of the purpose for which it was prepared. This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission and the Securities and Exchange Commission has not passed upon the accuracy or adequacy of the statements contained herein. Nor may this Disclosure Statement be construed to be advice on the tax, securities or other legal effects of the Plan. You should, therefore, consult with your own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan or the transactions contemplated thereby.**

## I.    OVERVIEW OF CHAPTER 11

Chapter 11 comprises the chapter of the Code primarily used for business reorganization. Formulating a plan to restructure a debtor's finances forms a fundamental purpose of a case under chapter 11 of the Code. Businesses also sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the Debtor seeks to reorganize or liquidate, a chapter 11 plan sets forth and governs the treatment and rights creditors and interest holders will receive with respect to their claims against and equity interests in a debtor's bankruptcy estate.

The Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject the plan. The Code conclusively presumes that holders of unimpaired claims or equity interests (i.e., the holders of the common stock of the Debtor, herein) under a proposed plan have accepted the plan and need not vote on it. There are a total of ten (10) classes of claims or interests in this Plan, excluding United States Trustee Fees, Administrative Claims and Unsecured Priority Tax Claims, all of which are not classified. All of the ten (10) classes of claims are impaired claims and may vote either to accept or reject the Plan. The equity interests are presumed to have voted in favor of the plan. The Debtor has enclosed a Ballot with this Disclosure Statement to solicit the votes of the Creditors in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10. Those Creditors may vote on the Plan by completing the enclosed Ballot and mailing it to the following address:

**BERGER SINGERMAN**
Attorneys for Debtor
Brian G. Rich
125 South Gadsden Street, Suite 300
Tallahassee, FL 32301
Telephone:  (850) 561-3010
Facsimile:  (850) 561-3013
Email:  *brich@bergersingerman.com*

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.  You may <u>not</u> cast Ballots or vote orally or by facsimile.  **For your Ballot to be considered by the Bankruptcy Court, it must be received at the above address by 5:00 p.m. (prevailing Eastern time) by the date fixed by the Bankruptcy Court on the accompanying scheduling order (the "<u>Voting Deadline</u>").**  If you are a Creditor in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10 and you did not receive a Ballot with this Disclosure Statement, please contact:

**BERGER SINGERMAN**
Attorneys for Debtor
Brian G. Rich
125 South Gadsden Street, Suite 300
Tallahassee, FL 32301
Telephone:  (850) 561-3010
Facsimile:  (850) 561-3013
Email:  *brich@bergersingerman.com*

A ballot that does not indicate acceptance or rejection of a plan will not be considered. An impaired class of claims accepts a plan if at least 2/3 in amount and more than 1/2 in number of the allowed claims in the class that actually vote are cast in favor of the plan.  A class of interests accepts a plan if at least 2/3 in amount of the allowed interests of such class that actually vote are cast in favor of the plan.  Whether or not you vote, you will be bound by the terms and treatment set forth in the Plan if the Bankruptcy Court confirms the Plan.  The Bankruptcy Court may disallow any vote accepting or rejecting the Plan if the vote is not cast in good faith.

Once it is determined which impaired classes have accepted a plan, the bankruptcy court will determine whether the plan may be confirmed.  For a plan to be confirmed, the Code requires, among other things, that the plan be proposed in **good faith** and comply with the other applicable provisions of chapter 11 of the Code, including a requirement that at least one class of impaired claims accept the plan, and that confirmation of the plan is not likely to be followed by the need for further financial reorganization.  The bankruptcy court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Code have been met.  The Debtor believes that the Plan satisfies all of the requirements for confirmation.

One requirement for confirmation of a plan is called the "**best interests test**." Notwithstanding acceptance of the plan by each impaired class of claims, in order to confirm a plan, if even one member of an impaired class votes to reject the plan, the bankruptcy court must determine that the plan is in the best interests of each holder of a claim or interest in such class. The best interests test requires that the bankruptcy court find that the plan provides to each

member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the Effective Date of the Plan (generally, 30 days after confirmation), at least equal to the value of the distribution that each such class member would have received if the Debtor's assets were liquidated under chapter 7 of the Code on such date.

The Bankruptcy Code also requires that, in order to confirm a plan, the Court must find that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor ("**financial feasibility test**"). For a plan to meet this test, the Court must find that the Debtor's estate and the Reorganized Debtor possess the capital and should generate the other resources to meet their respective obligations under the Plan. The Plan Proponent believes that following confirmation of the Plan, the Reorganized Debtor will be able to fully perform all obligations under the Plan without any need for liquidation or further financial reorganization.

The bankruptcy court may confirm a plan notwithstanding the plan's rejection by some impaired classes, if the bankruptcy court finds that at least one impaired class of claims (not including any acceptances by "insiders" as defined in section 101(31) of the Code) has accepted the plan and that the plan satisfies certain additional conditions. This provision, found in section 1129(b) of the Code, is generally referred to as the "cramdown" provision. Pursuant thereto, the bankruptcy court may confirm a plan over the rejection by a class of secured claims if the plan is fair and equitable and satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Code (otherwise known as "**cram down**"). Likewise, the bankruptcy court may confirm a plan over the rejection by a class of unsecured claims if the plan is fair and equitable and if the non-accepting claimants will receive the full value of their claims, or (even if the non-accepting claimants receive less than full value), if no class of junior priority will receive or retain anything on account of its pre-petition claims or interests.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY. THE PLAN PROPONENT EXPECTS THAT IT MAY HAVE TO RELY UPON THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE CODE IN ORDER TO CONFIRM THE PLAN.**

The Court has set a hearing on confirmation of the Plan for _____ at _____, Room _____, Tallahassee, Florida. Creditors may vote on the Plan by filling out and mailing the accompanying ballot form to the Bankruptcy Court. Your Ballot must be filed on or before _____ __, 2012.

## II.    PRELIMINARY STATEMENT AND HISTORY AND FINANCIAL CONDITION OF DEBTOR

The following sections of this Disclosure Statement provide a brief overview of the Debtor's corporate history, key aspects of the Debtor's business operations, a summary of the Debtor's current capital structure and the events precipitating the Chapter 11 Cases.

A.    **Corporate History.**

Southeastern Consulting & Development Company, Inc. (the "Debtor"), a Florida corporation, was incorporated on August 23, 2001 by Stephen C. Riggs, who from the time of the Debtor's incorporation to May 1, 2011, was the sole shareholder of the Debtor  ("Riggs"). On February 16, 2010, Mr. Riggs filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Northern District of Florida, Pensacola Division under case number 10-bk-30236.  A Suggestion of Bankruptcy was recorded in the public records of Okaloosa County on February 23, 2010 at Book 2925, Page 1843.

The Debtor's property is located on Highway 85 in Crestview, Okaloosa County, Florida. The Debtor maintains offices at 11716 Rock Lake Terrace, Boynton Beach, FL 33473, with a mailing address at 6615 W. Boynton Beach Blvd, Suite 396, Boynton Beach, FL 33437.

The Debtor has outstanding ten thousand (10,000) shares of common stock.  Nine thousand (9,000) shares are owned by the Proponent and 1,000 shares are owned by Riggs. There are no securities or classes of stock outstanding other than the common stock.  The Debtor believes that the 1,000 shares of the Debtor's common stock owned by Riggs were pledged to one or more of his creditors.

The Debtor operates as a developer of "for sale" residential and commercial property. Southeastern buys land, creates value through the entitlement process by effecting zoning and/or density changes, makes infrastructure improvements and either sells developed lots or the project to another entity.  The Debtor's operations have historically been centered in Bay, Okaloosa and Santa Rosa counties in northwest Florida.

Since its inception, the Debtor has developed four (4) communities:

East Bay Preserve:  The Debtor acquired East Bay Preserve ("East Bay"), a failed real estate development located in Bay County, Florida, for $650,000.  Immediately following the purchase, the Debtor removed and replaced installed amenities and then successfully increased density and completed the site infrastructure, including roads, seawalls, underground utilities, landscaping and fencing.  The project yielded a profit of $2,500,000.00 to the Debtor.

Heritage Park:  The Debtor purchased Heritage Park, an unimproved 35 acre tract of land in Santa Rosa County, Florida. As part of its development plan, the Debtor obtained a zoning and density change with Santa Rosa County and designed several features into the overall concept, including waterfalls, pavers and a 1,000 foot brick fence at the entrance. The Debtor also designed the site for the clubhouse and common area pool to be on a waterfront lot to increase the value of interior lots.  Heritage Park generated $2,100,000 in profits to the Debtor.

Heritage Manor:  The Debtor purchased its third real estate subdivision, Heritage Manor, in two separate land transactions for a total of $1,500,000.  Heritage Manor is located in north Okaloosa County, Florida.  Following a zoning change, the Debtor obtained the required permits, designed the development, built the roads and installed underground utilities, brick fencing and amenities as part of its development plan to develop and build a 62 lot subdivision. Upon completion of the site development, the Debtor sold the project and a second parcel that was part of the initial purchase, generating $3,100,000 in profit.

Heritage Plantation: The Debtor holds title to the various properties within the Heritage Plantation community and conducts a variety of business ventures that have in the past and will in the future generate substantial income for the Debtor. The Debtor acquired all of the lands it owns from different sellers in four (4) land purchases from April 2004 to September 2004 for an aggregate purchase price of $3,168,260. The land purchases were financed partially with cash and through four (4) loans with Destin Bank (now Whitney National Bank) secured by mortgages on certain real property. These original acquisition loans have been refinanced through subsequent conventional financing. In the aggregate, the land acquisition consisted of approximately 990 acres that would become Heritage Plantation, a master-planned community. Heritage Plantation as it sits today represents the culmination of years of planning, negotiations, settlements and assemblage efforts by the Debtor and the Debtor's team of professionals. Since the start of the Heritage Plantation Development, the Debtor has developed and constructed the golf course, the infrastructure for almost 300 homes, including the integrated pipeline system to facilitate the removal of waste and distribution of "re-use" water for irrigation onto the golf course, common areas and the Lots (the "System Assets"). In addition, the Debtor has sold fifty-six (56) lots.

A summary of the financial history of the Debtor, including Gross Revenues and Net Income from the date of incorporation to December 31, 2011 is as follows:

| FYE | Revenues | Net Income |
|---|---|---|
| 12/31/01 | $0 | $0 |
| 12/31/02 | $680 | $ (28,320) |
| 12/31/03 | $5,965,882 | $1,694,865 |
| 12/31/04 | $6,725,168 | $2,058,714 |
| 12/31/05 | $8,505,568 | $3,386,780 |
| 12/31/06 | $3,061,000 | $1,085,925 |
| 12/31/07 | $1,914,500 | ($1,695,883) |
| 12/31/08 | $549,708 | ($3,360,601) |
| 12/31/09 | $162,411 | ($2,230,146) |
| 12/31/10 | $1,070,700 | ($168,535) |
| 04/30/11 | $5 | ($5,182) |
| 12/31/11 | $0 | ($930,594) |

**B.    Overview of Business Operations**.

**1.    Heritage Plantation Master Planned Development.**

The Debtor owns and operates the fully integrated, premier master-planned residential golf course community known as "Heritage Plantation" in northwestern Florida. Heritage Plantation ("Heritage Plantation" or the "Development") encompasses approximately 990 acres and is situated on the west side of State Road No. 85 near the town of Auburn, Florida. Located north of Bill Lundy Road and south of Senterfitt Road and approximately eight (8) miles north of Interstate 10, the Development is in Sections 2, 3, 4, and 34, Township 4 and 5 North, Range 23 West in the north end of Okaloosa County in an area that has experienced rapid and continuing growth over the past twenty (20) years. Highway 85 traverses the Development and connects to both Interstate 10 and Highway 90 which is approximately 8.3 miles south of the Development.

The majority of the Development is situated within the Heritage Plantation Community Development District (the "District"), which encompasses approximately 913 of the Development's acres.

Crestview, Florida is one of the fastest growing areas in the United States. As part of the 2005 Base Realignment and Closure round, Crestview's population growth increased as the U.S. Army's 7th Special Forces Group relocated from Fort Bragg, North Carolina to a newly built cantonment facility on the northern end of the Eglin Air Force Base reservation, approximately six miles south of the city. These troops are stationed approximately 5 miles south of Crestview, Florida and approximately 15 miles from Heritage Plantation. The general growth of the military and the population growth of retired families in Florida bode well for this area of the state, generally, and Heritage Plantation, specifically.

Crestview's rapid growth is evidenced by new residential developments and expanded shopping but still has land area to grow. As of the census of 2000, there were 14,766 people, 5,297 households, and 3,893 families residing in the city. The population estimate for 2005 was 17,707 people. According to the U.S Census estimates of 2010, the city had a population of 18,987. It has, as of July 2007, become the largest city in Okaloosa County.

As of 2008, the median income for a household in the city was $23,122, and the median income for a family was $31,824. Males had a median income of $27,829 versus $19,261 for females. The per capita income for the city was $14,479. About 45.2% of families and 59.7% of the population were below the poverty line, including 56.2% of those under age 18 and 30.4% of those age 65 or over.

The Development is within five and one half (5.5) miles to existing grocery stores (i.e., Winn Dixie), pharmacies, restaurants, the US Post Office and many banks. North Okaloosa Medical Center is eight (8) miles south of the Development. There are two major employers in the area: Crestview Aerospace, located six (6) miles away, and Eglin Air Force Base, located twenty (20) miles away from the Development. Also, the Development is seven (7) miles away from the local Crestview [Bob Sikes] Airport (10,000 foot long runway) and approximately thirty (30) miles away from the Fort Walton Beach Regional Airport. The beach community Destin, Florida and the Gulf of Mexico beaches are approximately thirty-eight (38) miles away. Heritage Plantation is 5.5 miles from Crestview High School and Davidson Middle School.

Heritage Plantation is a golf course community approved to include approximately 780 residential units consisting of 205 golf course units, 54 lakefront units and 521 non-golf course units, subject to a final amendment of the Development Agreement. The amenities package and related resources includes an eighteen (18) hole championship golf course, a 10,000 square foot meeting space and an eco-friendly system to convert waste into "re-use" water and dispose of bio-solids substantively comprised of the System Assets. Heritage Plantation is planned to include a 25,000 square foot clubhouse with a pro shop, restaurant, tennis courts; swimming pool; bike and walking trails; approximately 10 community parks scattered around the development; a community center with a fitness center and day spa; jogging paths; children's playgrounds; and soccer fields. Residents of Heritage Plantation drive through the meeting space, a 9,500 square foot entrance building/sales center, when entering and exiting the development (the "Gatehouse").

As one of its sources of revenues, the Debtor is selling lots to builders and directly to end users.  As of May 1, 2012, fifty-six (56) lots of the total 172 lots in Phase I have been sold and closed.  Recently, an affiliate of the Debtor, Turner Heritage Homes, Inc. ("Turner") purchased for minimal consideration four (4) of the lots and is in the process of acquiring three (3) others.

The table below illustrates the total residential units planned for the development, subject to the completion of the fourth amendment to the Development Agreement, as amended, as more fully detailed herein.  Construction of the recreational facilities is planned for the last phase of development.

| | |
|---|---|
| Phase 1 | 172 Units |
| Phase 2 | 125 Units |
| Phase 3 | 219 Units |
| Phase 4 | <u>483 Units</u> |
| Total | 989 Units |

### (i)     Zoning Ordinance; Development Agreement and Amended Development Agreement

Heritage Plantation was rezoned from Agricultural to Residential Suburban Single (RSS) pursuant to Ordinance No. 04-53 on September 7, 2004 and Ordinance No. 05-31 on March 1, 2005 (collectively, the "Zoning Ordinance").  In addition to the Zoning Ordinance, the Development is also governed by a development agreement from Okaloosa County dated May 17, 2005 (the "Development Agreement").  The Development Agreement establishes certain development uses and rights; reserves traffic capacity; requires certain agency approvals and permits; and determines the public facilities and services that will serve the Development.

In its current form and without further amendment, the Development Agreement, as amended, allows for a maximum single-family residential density of 900 dwelling units, golf course and other recreational facilities.  The Debtor is currently in compliance with all terms and conditions of the Development Agreement and Zoning Ordinance.

The Debtor is working with Okaloosa County to amend the Development Agreement as more fully detailed in Article III, Section B hereof.

### (ii)     Developer Financing

Prior to the filing of its petition under Chapter XI of the U.S. Bankruptcy Code, the Debtor has expended approximately $23,427,499 in project related and/or development costs. Such costs were funded with cash, project revenues, funds advanced from conventional bank financing and from the District.  The following table summarizes the aggregate project related costs:

| | |
|---|---|
| Land | $3,284,284 |
| Architecture & Engineering | $1,065,025 |
| Development Cost | $7,489,051 |
| Golf Course | $3,683,852 |
| Irrigation | $2,183,331 |

| | |
|---|---:|
| Gatehouse | $2,607,635 |
| Permits | $153,949 |
| Equipment | $285,906 |
| Golf Course Equipment | $890,873 |
| Wastewater Treatment Plant | $1,392,147 |
| Professional Fees | $391,445 |
| | $23,427,499 |

### (iii)    Residential Community and Recreational Amenities

Heritage Plantation has been designed to appeal to a variety of local, military, retiree and second home buyers.  The Development's architectural theme is Southern traditional.  Residents will enjoy an extensive amenities package planned to include an eighteen (18) hole championship golf course designed by Bill Bergin; a 25,000 square foot clubhouse with a pro shop and restaurant; the Gatehouse; tennis courts; pool; a community center with a fitness center; jogging paths; children's playgrounds; and soccer fields.

Construction of the recreational facilities is expected to commence simultaneous with the construction of homes in Phase III/IV and be completed within one (1) year of the start of construction of these phases.  Renovation of the golf course has commenced and is expected to be completed by the end of the third quarter of 2013.

Residents will pay an optional fee, presently contemplated to be $50 per month, for the use of the community center and pool.  The golf course will be open to the public and private equity or golf and social memberships will be available.  Prices for annual dues and other fees related to the golf course are still to be determined.  The Debtor, as more fully detailed in section B3 of this Article II and Section D2(v) of Article III of this Disclosure Statement, intends to sell the Golf Course to the Heritage Plantation Homeowner's Association, Inc. (the "HOA", or the "Association"), which will own, operate and maintain the golf course pursuant to a lease/management agreement with a local service provider.

### (iv)    Lot/Product Offerings

Following approval of the final amendment to the Development Agreement and subject to the confirmation of the Plan, the Debtor will have a diverse mix of lot types.   The following table summarizes the lot types planned for Heritage Plantation and the respective approximate end user retail prices for lots in Phases I and II, only.  Except as to Phase III, which lots sizes will provide for 1/6 acre lots and townhouses, average lot sizes will be approximately 100' x 175' and square footages for homes are contemplated to range from approximately 1,800 to 2,700 square feet.

| | | | |
|---|---|---|---|
| Interior Preserve | $35,000 | Golf Course | $45,000 |
| Valley View | $40,000 | Lake | $60,000 |

Future Phases

| | | |
|---|---|---|
| One Acre | Half Acre | Quarter Acre |

Townhome                    Apartment                    Bed & Breakfast
Assisted Living             Office

### (v)    Contracts

The Debtor has sold and will continue to sell developed lots directly to end users as well as to builders, who will in turn sell finished homes to end users.  As of the date of this Disclosure Statement, the Debtor has sold fifty-six (56) lots, the owners of which will select their own custom builders.   Approximately seven (7) of these lots have changed hands recently, or are about to and are now or will be titled in the name of Turner.

The Debtor has entered into an agreement with Pelican Real Estate and Development Company, Inc. ("Pelican") to market the lots on behalf of the Debtor.  By order of the U.S. Bankruptcy Court, this agreement has been approved.   Pelican's marketing plan is to be presented to the Debtor upon approval of its employment by the Bankruptcy Court, but is generally described as a "Builder Platform", whereby upon Confirmation, the Debtor plans to execute one or more agreements in connection with the take-down of lots in Phases I and II of the Development (the "Builder Agreements").  In summary, the terms of the Builder Agreements shall be as follows:

> (a)    A Gross Base Purchase Price for each Single Family Lot, inclusive of the lot cost, sewer tap fee and re-use water hook up fee, but exclusive of closing costs and HOA charges, which Gross Base Purchase Price shall increase each year of an individual take-down agreement;

> (b)    An initial closing on twenty (20) Single Family Lots and ten (10) additional Single Family Lots on each subsequent Takedown Period of 1 year;

> (c)    The Builder shall be permitted to lease space at the Gatehouse for marketing purposes;

> (d)    The Builder shall be provided sewer capacity at each closing; and

> (e)    The initial closing shall not take place until the Debtor's Plan of Reorganization is confirmed by the U.S. Bankruptcy Court, Northern District of Florida, Tallahassee Division.

### (vi)    Projected Absorption

The Debtor does not expect to develop additional lots until Phase I and Phase II are substantially sold.   In Phase I and Phase II, the Debtor anticipates that it will close on approximately fifty (50) home sites the first year following the reopening of the golf course and seventy-five (75) home sites each year thereafter.   These anticipated absorption rates are based upon estimates and assumptions made by the Debtor that are inherently uncertain, though considered reasonable by the Debtor, and are subject to significant business, economic and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond the control of the Debtor.   As a result, there can be no assurance such absorption rates will occur or be realized in the time frames anticipated.

(vii)   **Marketing Plan**

Initially, as part of its agreement with the Debtor, Pelican plans to advertise locally in Okaloosa County to attract local buyers interested in moving to a golf course community.  The Debtor expects future residents to be from the local area and to consist of retirees and homeowners moving to Florida and retirees moving from other Florida locations.  Accordingly, Pelican, as supplemented by the Debtor, plans to advertise Heritage Plantation in the Wall Street Journal, in golf magazines, retirement magazines and in publications that advertise in the South such as Southern Living to draw homeowners from the Southeast as they migrate to Florida. Pelican and the Debtor also plan to advertise in communities that have been battered by hurricanes to encourage migration from those areas.

Pelican will design and construct an on-site sales center, which will contain displays, a topography table, and other marketing material for the community.  The on-site sales center will be constructed on the first floor of the Gatehouse.  Pelican plans to open the sales center by December 31, 2012.  In addition to the sales center, approximately four (4) model homes are planned by Pelican to be constructed by Builders in partnership with existing lot owners to restart marketing for the remaining Phase I lots.  The model homes are expected to open to the public by the end of the first quarter of 2013 and will be staffed seven (7) days per week.  In addition to Pelican's and the Debtor's marketing efforts, the manager of the golf course and each participating builder will implement their own marketing plans, which will include the construction and staffing of model homes.

## 2.   Heritage Plantation Community Development District (the "District")

The Heritage Plantation Community Development District (the "District") was established May 31, 2005 pursuant to Florida Statute 190 (the "Act").  The District is located within the Heritage Plantation Development and is comprised of 913 acres out of a total of 990 acres.  The 77 acres, located out of District boundaries, but within the development, consists of wetlands and open space, and currently no plans for residential development are anticipated for this land.

As provided for in the Act, the District's Board duly adopted Resolutions 2005-20, 2006-06, 2006-09 and 2007-01 (collectively, the "Resolutions"), which authorized and approved, among other things, the Master Trust Indenture dated as of November 1, 2005 between the District and the Indenture Trustee (as supplemented and amended from time to time in accordance with its terms, the "District I Master Indenture"), and the issuance of special assessment revenue bonds in one or more series under the District I Master Indenture.

The District issued and sold special assessment revenue bonds pursuant to the Resolutions and the District Master Indenture, and related resolutions and documents.  The District was planned to be developed in several phases according to the Development Agreement/Master Plan that has been approved by Okaloosa County.

At the time of the filing of this Disclosure Statement, Infrastructure Improvements for Phases I and II have been completed.  The Phase I and Phase II final plats have been recorded.

Following is a description and cost for the qualified public improvements within the District that have been financed with the District's Special Assessment Revenue Bonds (the "Bonds") that have been issued in two (2) series. The costs detailed herein are estimates for the buildout of all of the improvements of the District.

Bond proceeds were utilized to finance improvements enjoyed by the public including the SR 85 turn lanes, traffic light, divided entry boulevard, major storm drainage piping and basins. They also financed onsite internal public improvements within the platting limits, including roadways, sidewalks, stormwater inlets, and piping.

Because the utility companies, Auburn Water System Inc. (potable water) and Water Reclamation of Northwest Florida LLC. (sewer), are private, the District did not finance onsite or offsite potable water and domestic wastewater construction. These water and sewer utilities, as well as security and landscaping, have been funded by and, in the case of the System Assets, owned by the Debtor, though there were ancillary agreements by and between the Debtor and the District governing the respective rights of the parties related to the operation and purchase/sale of these water reclamation and wastewater treatment assets.

Auburn Water System ("Auburn"), a private company, signed a concurrency reservation for 900 Equivalent Dwelling Units (EDUs) on February 17, 2005. Infrastructure for the development was funded by the Debtor and ownership of the Phase I water distribution system has been transferred to and shall be maintained by Auburn Water System. The Phase II water distribution system has been completed and inspected for acceptance by Auburn, but has not been transferred pending payment of a maintenance bond by the Debtor to Auburn, which is an unsecured obligation of the Debtor. According to the Engineer's Report submitted as part of the bond financing, the potable water portion of Phase I construction was approximately $400,000; Phase II was $300,000; and Phase III/IV is estimated at $1,200,000.

In the aggregate, Construction Costs which have been or were contemplated to be incurred by the District aggregate to the amount of $29,490,804 related to roadway construction, stormwater management facilities, recreational facilities, other utilities, and environmental mitigation.

Finally, the District incurred, or shall incur Design Costs in the amount of $814,000 inclusive of professional fees for surveying, environmental consulting, land planning, traffic consulting, civil engineering, geotechnical engineering, platting, construction stake-out, and certified as-builts.

Finally, the District incurred or shall incur Permitting Fees in the amount of $75,500, which include review fees to Okaloosa County, FDEP, FDOT, and USCOE.

The Construction Costs are inclusive of the following:

(i)     Roads, which are to be owned and maintained by the District following completion of the improvements, in the amount of $18,150,467 include construction of turn lanes and a traffic light on SR85, the entrance boulevard with a median, roads, sidewalks adjacent to the entry boulevard and some common areas throughout the neighborhood, street signs, pavement striping and signage, earthwork for road construction, and sodding/seeding/mulching

of the right-of-way.  Sidewalks in the front of lots are not included, and will be paid for by the individual homeowner/lot contractor.  All roads in platted public right-of-ways are included.

(ii)    Stormwater Management, which systems are to be owned and maintained by the District following completion of the improvements, in the amount of $8,621,373 include storm drainage pipes, culverts, curb inlets, mitered end sections, control structures, earthwork for retention/detention basins, sodding of basin slopes, and erosion control are included in this category.  Also included are any retaining walls, bulkheads, and water wells/pumps necessary for retention/detention basins.

(iii)    Recreational Facilities, which are to be owned and maintained by the County following completion of the improvements, in the amount of $1,383,537 include (but have not yet been funded by the District) soccer fields and accompanying parking lot, road, and connection to SR85.  Golf course, clubhouse, pro shop, tennis complex and swimming pool, are not included since they will be directly funded by the Debtor.

(iv)    Electrical Power, which is to be owned and maintained by Choctawatchee Electric Cooperative ("Chelco") following completion of the improvements, in the amount of $1,383,537 include $815/lot cost for the undergrounding of electric throughout the subdivision and $1,100 per street light.  This category also includes an estimated cost of $300/lot for installation of chase pipe and coordination with cable, gas, and telephone companies.

(v)    Environmental Mitigation in the amount of $83,500 includes wetlands impacts such as road crossings and golf course.  All other wetlands will be preserved in a conservation easement of approximately 168 acres.  This category includes wetland delineation and permitting fees.

The Developer funded the cost of landscaping at the entrance of Heritage Plantation and along the perimeter of the Property.  The Developer retains ownership of these improvements, which shall be maintained by the District, or the Association pursuant to agreement.  The Entry feature and gates were also funded and constructed by the Developer, and subject to the approval of the Plan, ownership of these improvements shall be transferred to the HOA, which shall be responsible for the maintenance thereof.  Commitments of capacity have been received from all applicable utilities.  There are no concurrency obligations.  Following is a list of improvements with the entity responsible for each:

| IMPROVEMENT | CONSTRUCTED BY | OWNERSHIP/ MAINTENANCE |
| --- | --- | --- |
| Roadway Systems- right-of-way; including curb, pavement, sidewalks, etc. | CDD | CDD |
| Stormwater Management- inlets, ponds, piping | CDD | CDD |
| Water Distribution System | Developer | Auburn Water System |

| | | |
|---|---|---|
| Sanitary Sewer Collection and Transmission System | Developer | Developer |
| Landscaping at entrance and perimeter of project | Developer | CDD |
| Open Space | CDD | CDD |
| Entry Feature and Gates | Developer | HOA |
| Recreational Facility (fields) | CDD | CDD (dedicated to Okaloosa County within 24 months of construction) |

To clarify, the Debtor funded the design, permitting, and construction of the on-site sewer infrastructure, system of lift stations, off-site transmission line and re-use water line and the irrigation system, all of which comprise the System Assets and which are owned by the Debtor unencumbered.  The Debtor was also responsible to fund the design, permitting and construction of the treatment plant, the first phase of which was completed to service up to 125 residential units.  Accordingly, the ownership and maintenance of the System Assets is in the name of the Debtor, with the District contemplated to take over as the collection agency/retail provider pursuant to an operating lease or as the owner of the System Assets and treatment assets, subject to and upon confirmation of the Plan.

All landowners within the District are subject to annual County property taxes, special assessments for debt service and operation and maintenance of the District and homeowner's association fees as described in more detail below.

The current approximate millage rate for the area of the County where the District is located varies from year to year and is set by Okaloosa County.

All Landowners will be subject to an annual HOA fee that currently averages $900.  In addition to the HOA fees, all residences within the District are presently subject to annual long-term assessments of approximately $1,200, which is an amount levied by the District for the retirement of the District's Series of bonds.  For the existing fifty-six (56) lot owners other than the Debtor, such long term assessments are not contemplated to change as a result of these chapter 11 proceedings and the Debtor's proposed Plan.  All landowners will also be subject to annual O & M assessments that have averaged approximately $400 for the operation and maintenance of the District, but which are subject to change depending upon the costs of operating and maintaining the property within the District.  Accordingly, the debt service component per unit is a fixed annual amount depending upon the principal amount of Series Bonds and other obligations issued, which may increase to reflect development projects or other capital expenditures undertaken by the District.  The operation and maintenance assessment will be subject to fluctuation based upon the budget the District adopts in any given year.

The estimated cost of living in the District to the typical homeowner (excluding their mortgage payments, property taxes and optional recreational and golf course fees) is as follows.

| Estimated Annual Assessments and Fees | |
|---|---|
| Long-term Assessments | $1,200 |
| Homeowner's Association Fee | $900 |
| Ownership & Maintenance Fee | $400 |
| *Total* | $2,541 |

It was contemplated by and between the District and the Bond Underwriter, and understood and acknowledged by the purchasers of the District Bonds that the District would lease the wastewater treatment plant from Water Reclamation of NWF, LLC. ("WRNWF"), and the wastewater collection system constructed and owned by the Debtor. Further, the District and the Debtor had a purchase option and a put option, respectively with respect to the sale of such wastewater assets to the District by the Debtor.

Accordingly, the Debtor entered into a tentative agreement with the District on or about November, 2011, for the transfer to the District of the System Assets, such transfer to be subject to the confirmation of the Plan. Pursuant to the contemplated transfer, the Debtor reclassified the System Assets so that they would be nominally held in the name of the WRNWF.

The Debtor has been unable to finalize its tentative agreement to transfer to the District the Debtor's System Assets, following which determination, the Debtor has restored to its balance sheet those items that comprise the ownership the System Assets and treatment assets as have been paid for by the Debtor and which remain the unencumbered property of the Debtor.

In addition, the Debtor has determined that WRNWF does not have sufficient liquidity to close on its contract to purchase the Carter Property (the "Carter Contract") on which the wastewater treatment plant to service Heritage Plantation is to be constructed. The Proponent has funded all of the obligations under the Carter Contract to date. As a result, WRNWF, at the direction of the Debtor, has assigned to Turner in exchange for $50,000 the Carter Contract together with the permit issued by the Florida Department of Environmental Protection ("FDEP") (the "FDEP Permit") to own, construct and operate the Wastewater Treatment Plant on the Carter Property effective April 1, 2012 (the "Assignment"). The Assignment has been finalized pursuant to the approval of the FDEP and Okaloosa County. Notwithstanding this disclosure, the Debtor intends to seek express approval from the Court for this transfer.

As detailed in Article III of this Disclosure Statement, and subject to the confirmation of the Plan, Turner shall further assign the Carter Contract and the FDEP Permit and the Reorganized Debtor shall sell and convey all the System Assets to the District in exchange for the consideration provided. The District will benefit from lower costs associated with the buildout of infrastructure for the future phases of the Development and an additional revenue stream to meet operating and maintenance requirements.

The District, in contemplation of the receipt of the System Assets owned by the Debtor, has applied for funding from the Department of Water Facilities Funding of the Florida Department of Environmental Protection. The District has been granted preliminary funding for the design of a permanent facility in the amount of approximately $380,000.00.

3.      **The Golf Course.**

(i)      **Management of the Course.**

As more fully detailed in Section D2(vi) of Article III hereof, the Debtor shall sell the Golf Course to the HOA on the Effective Date.   Prior to the sale of the Golf Course to the HOA, the Debtor plans to enter into an agreement with a local manager to lease and operate the Golf Course, as well as the "Irrigation System", as herein defined, and oversee its renovation to restore it to playable condition (the "Golf Course Lease") and the HOA shall assume the Golf Course Lease as the subsequent lessor.  Restoration of the Golf Course is integral to the success of the Development and the marketing of Heritage Plantation's residential lots to Builders and ultimately to end users.

(ii)      **Competition.**

There are 21 golf course facilities located in Okaloosa and Walton counties only 4 of which are located near or just north of interstate 10.  The remaining 17 facilities are located on or near the coastline, where the majority of population and tourism exists.   The 3 facilities considered "comparable" to Heritage Plantation in geography and demographics are Foxwood Country Club, Blackstone Golf Course and Defuniak Springs Country Club.

Of these competitive courses, only Foxwood Country Club of Crestview and one other, Shoal River Country Club, are golf course communities within close proximity to the Development.  Homes in both the Foxwood and Shoal River communities have been fully sold out for the past 15 years; therefore, competition will only arise from resales within these communities.  Otherwise, there are no large golf course communities with amenities in the local area that could pose primary competition to Heritage Plantation.

(iii)      **Golf Course Architect.**

Bill Bergin, Georgia, designed this player's course.   Forward tees are in place for higher handicap players and there is room to insert tees for juniors. The property is very pretty overall with a mixture of pine and hardwood trees.  All greens are relatively flat but feature subtle movement and the course features quite a few carries over wetland gulches, which are unique.  In addition, the elevation changes and rolling terrain add depth which requires golfers to take a moment or two to think before committing to the shot. The routing of the course is very good, giving you a feeling not usually experienced in Florida.

(iv)      **Summary – Present Course Condition.**

Every hole is covered in various types of broadleaf weeds, but close mowing would eliminate most.   No evidence of sedges, goosegrass or crabgrass is present, but these plants might be in a dormant state because of the extremely dry conditions. All green surfaces are Tifeagle which are expired and would require replanting.  The rest of the course is 419 Bermuda and tees are capped with greens mix.  All bunkers still hold their integrity but have liners and are full of weeds.   There is a mixture of soils, including hard pan sands and clay throughout the property.

The following programs would be needed to reopen the golf course:

- An aggressive post and pre-emergent herbicide plan
- A grow-in fertilizer and soil amendment plan
- A fire ant control and eradication plan
- A slice aerification plan throughout re-establishment
- Re-grassing the greens and other areas mentioned above in the hole-by-hole report.

  (Note: Stripping the greens of expired turf and biomass and the addition of some greens mix is all that would be required.)

- Soil testing would be needed on each hole since the soil types vary throughout the course.

### (v)     Irrigation System Summary.

Heritage Plantation features a fully integrated irrigation system (the "Irrigation System"), which serves the property of the HOA, the District, the lots and the Golf Course. Based on Rainbird Serus (electric valve-in head) technology, the Irrigation System relies on re-use water from the Wastewater Treatment Plant, as herein defined, as its main water source. The Irrigation System is computer controlled with a maxi-communication wire feeding each satellite field controller and also has a hand-held radio feature, where the satellites have the capability to be stand-alone in case of computer malfunction. All satellites appear to be in good shape, but damage from lighting would have to be assessed. All sprinklers appear to be intact, as well and the greens have outward and inward sprinklers. Testing of solenoids is required when power is available. The Pump Station has a VFD with about 3K GPM and an operating pressure of almost 160 psi. It is located at the entrance of the property to the right of Hole #2.

For the Irrigation System to be fully operational, the HOA will follow the steps detailed below:

1. Turn on five (5) electric meters;
2. Check Clay liner on main retention lake;
3. Turn on three (3) wells at main retention lake;
4. Turn on/repair transfer pumps at wastewater treatment plant lake;
5. Turn on two (2) wells at the wastewater treatment plant lake;
6. Start filling main retention lake;
7. Set up room with A/C at Maintenance Area and utilize phone line for Rainbird support and to tie in the computer & MIM into the system;
8. Place main pump station and weather station on line;
9. Test/repair and place on-line thirty (30) plus pedestals on the golf course; and
10. Turn on/repair all sprinkler heads.

4.      **The Wastewater Treatment Plant; Wastewater Collection Operations**

On or about May 2, 2006, the First Amendment to Development Agreement was approved by the Okaloosa County Board of County Commissioners (the "First Amendment"), which permitted the Debtor to (i) build a wastewater treatment plant (the "Wastewater Treatment Plant") and related improvements (ii) collect wastewater on the Heritage Plantation property and (iii) build a transmission system to send raw waste to the Wastewater Treatment Plant and return "re-use water" to Heritage Plantation and link to the Development's retention ponds and Irrigation System in order to provide irrigation to the Golf Course, common area, District Property and the Lots.

On May 3, 2006, the Debtor formed Water Reclamation of NWF, LLC, ("WRNWF") pursuant to the First Amendment.  Immediately thereafter, on May 5, 2006, WRNWF purchased a forty-two acre property located approximately one half mile south of Heritage Plantation (the "Carter Property") for $2 million, comprised of $500,000 cash and a purchase money mortgage in the amount of $1.5 million (the "Carter Note").

On March 7, 2007, the FDEP issued the FDEP Permit for the construction and operation of Phase I of the Wastewater Treatment Plant.    The FDEP Permit was set to initially expire in March 2012; the Debtor has received approval from the FDEP that the FDEP Permit has been transferred to Turner and extended for another five (5) year term.

The Plant was originally contemplated to be constructed in two phases; the first phase was completed approximately in March 2007 and consisted of a temporary package plant that was to serve approximately 125 lots in Phase I of the Development.  On or about 2008, WRNWF completed construction of Phase I of the Wastewater Treatment Plant, the "Package Plant", at an additional cost of approximately $750,000

Simultaneous with the assembly of the Package Plant, WRNWF commenced engineering for Phase II of the Wastewater Treatment Plant.  It was initially contemplated that construction on Phase II was to have commenced at or about the time that the Package Plant was at sixty (60%) percent of its capacity, or when sixty-two (62) homes were connected.  Phase II was to have had capacity for the entire. Costs are estimated at $4,000,000 for the second phase to permit treatment of wastewater for Heritage Plantation.    The second phase will require FDEP Wastewater Permits.

In and around May 2008, WRNWF defaulted on the Carter Note and the Carter Property was foreclosed on by the former owner and a certificate of title issued to Richard Carter in and around August 2009.

On or about May 11, 2011, WRNWF entered into a contract to repurchase the Carter Property from its owner for the sum of $650,000.00.

In addition to the Wastewater Treatment Plant, SCDC has constructed its integrated system for the transport and treatment of waste as well as the distribution of "re-use" water for irrigation purposes back onto the Heritage Plantation property.  The system, herein referred to as the System Assets, is comprised of sanitary sewer lines to collect waste, a series of minor lift stations which facilitate the flow of waste to the System's master lift station and a force main to

collect wastewater from Heritage Plantation and pump sewage from the development to the Wastewater Treatment Plant.  This permanent station will serve both phases of the Wastewater Treatment Plant.  The master lift station will collect sewage from the dwelling units and related amenities and improvements on-site, and the force main will transmit sewage to the wastewater treatment plant.  This master lift station and force main project was designed by CDG Engineering.  The half-mile transmission line and master lift station comprising the improvements have been constructed and are operational with permits issued in October 2006.

At the present time the package plant is non-operational owing to vandalism and poor maintenance.  In addition, the package plant is out of compliance with permits issued by FDEP. On June 29, 2011, FDEP, following a Compliance Evaluation Inspection, issued its Wastewater Compliance Inspection Report, which determined that the Wastewater Treatment Plant is significantly out of compliance.  FDEP has provided in its permit extension that remediation efforts of the wastewater site can be held in abeyance until plant startup.

On March 1, 2012, the FDEP's Bureau of Water Facilities Funding notified the District of its approval for preconstruction funding related to the design of a wastewater treatment plant in the amount of approximately $375,000.  The District has submitted its loan application; release of the funds is subject to final approval by FDEP and overall approval for the construction of the Plant.  The District anticipates that this approval process shall be completed by the end of the 3rd quarter of 2012.

At the present time, wastewater service continues to be supplied by the HOA to the four (4) homes at Heritage Plantation pursuant to a "Pump & Haul Agreement" (Permit FLA010194) permitted by the FDEP, with service provided by Fowler Septic.  The Pump & Haul Agreement was recently extended on May 21, 2012 for another one (1) year period by the FDEP.  In continuing the Pump & Haul arrangement, the HOA has been frustrated by interrupted service and non-payment of assessments and wastewater service fees by the residents.  The Debtor is coordinating with the FDEP, State Health Department and Okaloosa County's Water & Sewer Department, as well as the Debtor's consultants to have the HOA install individual septic tanks to provide a near term solution for the residents that would also enable the HOA and the 4 lot owners to avoid the extraordinary cost of the Pump & Haul Agreement.

This solution requires existing homeowners to place "temporary" septic tanks on their property (or on an adjacent lot) and permit an initial number of homes to be built also using septic with the understanding that all lots/homes would switch to centralized sewer when available.

5.    **The Debtor's Senior Management.**

The Proponent, Phoenix Realty Partners, Inc., is a Florida corporation whose mission is to guide Property Owners and Business Owners in restructuring their debt and business obligations to mitigate losses for creditors, lenders and other stakeholders.  Phoenix works to restructure the financial obligations of its clients so as to enable them to retain an equity interest in the future value of their business and/or property, while meeting their obligations and preserving their financial relationships.

On May 1, 2011, Phoenix entered into an Interim Management and Restructuring Services Agreement ("IMSA") with the Debtor. Pursuant to the IMSA, Phoenix was retained to assist with a reorganization of the Debtor, including, but not limited to, identifying other development projects, re-establishing the marketing and golf operations at Heritage Plantation, satisfying the foreclosure judgment in favor of the District related to a portion of the Debtor's property, arranging to repurchase the Carter Property and the Wastewater Treatment Plant, which is integral to the Development, renewing the Permit, completing the entitlement process for the Development, amending the Development Agreement and extending development related agreements, permits and orders, executing loan modifications with the Debtors lenders, repositioning product, establishing marketing programs to restart and increase sales velocity, expanding vendor and trade relationships to improve quality and increase capacity and to initiate financial channels to ensure financing for home buyers.

Upon the execution of the IMSA, Riggs resigned as President and sole director of the Debtor. As the shareholder of the Debtor, Riggs appointed Louis S. Weltman and Douglas E. Turner as the two (2) new officers and directors of the Debtor. Louis S. Weltman was appointed President of the Debtor and Doug Turner was appointed Vice President. There are no other officers or directors of the Debtor.

The IMSA contemplated minimal cash compensation to Phoenix. No cash payments have been made since the IMSA was executed, including during these chapter 11 proceedings. As part of the IMSA, in order to provide for Phoenix's standard fees, Phoenix received an option to acquire shares of the Debtor's common stock. Phoenix exercised the option on May 5, 2011 and pursuant to such exercise, obtained shares of common stock with an agreed upon value of Nine Thousand ($9,000.00) by forgoing a portion of the cash payments that were due to it (the "Southeastern Shares"). Phoenix obtained the Southeastern Shares on May 5, 2011.

Phoenix's President is Louis S. Weltman. Phoenix's Development and Building operations are led by its co-founder, Douglas E. Turner, who serves as president of Turner, Phoenix's building and development subsidiary. Mr. Turner has specialized in single family and multi-family development and homebuilding for more than twenty-five years in the Tallahassee and Emerald Coast Markets.

## C.    The Debtor's Prepetition Secured Lenders.

The Debtor has the following prepetition secured creditors: (i) Branch Banking & Trust ("BB & T") (ii) Trustmark National Bank ("Trustmark"), (iii) John Deere Credit, (iv) First Florida Bank and (v) the Heritage Plantation Community Development District (the "District") (collectively the "Prepetition Secured Lenders"). As set forth below, each of the Prepetition Secured Lenders asserts a mortgage or other lien on certain property included in Heritage Plantation and owned by the Debtor. The mortgage and other liens asserted by the Prepetition Secured Lenders significantly overlap as the Prepetition Secured Lenders financed the same parcels of land and improvements except as to two (2) of the Debtor's assets, the Gatehouse and the System Assets.

> *As such, no one Prepetition Secured Lender asserts a unique and independent lien on all of the assets and property comprising Heritage Plantation.*

1.      **Branch Banking & Trust ("BB & T"):**

On September 12, 2011, Branch Banking & Trust ("BB & T") filed its Proof of Claim in these chapter 11 proceedings in the amount of Sixteen Million One Hundred and Fifty-five Thousand Eight Hundred and Ninety-five Dollars ($16,155,895.00).

The BB & T Claim is secured by liens of varying priority in connection with certain collateral of the Debtor, comprised of certain real property and improvements of that portion of the Heritage Plantation Property consisting of the following:

(i) One hundred and twenty-five (125) developed lots located in Phase II of Heritage Plantation, (the "Phase II Lots Collateral");

(ii) Undeveloped property of the Debtor known as Phase III of Heritage Plantation (the "Undeveloped Lots Collateral");

(iii) One hundred and sixteen (116) developed lots located in Phase I of Heritage Plantation (the "Phase I Lots Collateral"), and

(iv)  The Heritage Plantation Golf Course comprising one hundred and twenty-five (125) acres of Heritage Plantation (the "Golf Course Collateral").

BB & T holds a first lien on the Golf Course Collateral and the Undeveloped Lots Collateral; a first lien on the Phase II Collateral, subject to the lien of the holders of property tax certificates (the "Property Tax Certificate Holders") and the District; a second lien on the Phase I Lots Collateral, subject to the lien of Property Tax Certificate Holders, the District and Trustmark.

On or about November 2011, BB & T assigned its claim to HP Land, LLC.  No evidence of a transfer of the Claim has been filed in this Bankruptcy Case.

On or about January 2012, the Debtor and HP Land as successor to BB & T, entered into a settlement agreement related to the BB & T Claim, the detailed terms of which are set forth in Article III, Section D2(iii) hereof (the "HP Land Settlement").

On or about April 2012, the Debtor filed a motion on negative notice with the Bankruptcy Court for the approval of the HP Land Settlement.

On or about May 2012, Heritage FFH, LLC. filed a motion in this Bankruptcy Case objecting to the approval of the HP Land Settlement.  Heritage FFH's suit is based upon allegations of a breach of fiduciary duty owed to Samuel Heath Owens by HP Land and one or more of its principals.  The Objection is filed as document 55 in these bankruptcy proceedings.

Heritage FFH's objection was heard at a hearing on June 14, 2012; a ruling was deferred until a future hearing following discovery as agreed between the parties.  It is the Debtor's position that Heritage FFH has no standing in this matter and its objection should be dismissed by the Bankruptcy Court.  Louis S. Weltman's deposition was held on July 18, 2012.  It is the

Debtor's intention to renew its Motion for approval of the HP Land Settlement and move to dismiss Heritage FFH's objection on grounds that Heritage FFH has no standing in these chapter 11 proceedings and that the HP Land Settlement is in the best interest of the estate.

### 2.    Trustmark National Bank ("Trustmark")

On September 14, 2011, Trustmark National Bank ("Trustmark") filed three (3) Proofs of Claim in these chapter 11 proceedings in the aggregate amount of Seven Million Nine Hundred and Twenty-four Thousand Four Hundred and Six Dollars and 10/00 ($7,924,406.10), comprised of an unsecured claim in the amount of $198,212.84, an unsecured claim in the amount of $2,620,215.33 and a secured claim in the amount of $5,105,978.04.

The Trustmark Claim is secured by liens of varying priority in connection with certain collateral of the Debtor, comprised of certain real property and improvements of that portion of the Heritage Plantation Property consisting of the Phase I Lots Collateral, the Phase II Lots Collateral, the Undeveloped Lots Collateral, and the Golf Course Collateral.

Trustmark's lien priority varies with the different collateral.  Trustmark holds a second lien on the Golf Course and the Undeveloped Lots Collateral, subject to the first lien of BB & T; a second lien on the Phase II Collateral, subject to the lien of Property Tax Certificate Holders, the District and the first lien of BB & T and a first lien on the Phase I Lots Collateral, subject to the lien of Property Tax Certificate Holders and the District.

Trustmark's only first position lien claim is related to the Gatehouse, which has a value of approximately $74,000.00

### 3.    John Deere Credit

On August 24, 2011, Deere Credit, Inc. filed multiple Proofs of Claim (the "Deere Claims") in these chapter 11 proceedings in the aggregate amount of Five Hundred and Thirty-Eight Thousand Three Hundred and Seventy-six Dollars and 65/00 ($538,376.65).

The Deere Claims arise from the deficiencies related to lease agreements with the Debtor for golf course equipment following Deere's repossession of such equipment pursuant to its security interest thereof.

### 4.    First Florida Bank

On September 14, 2011, First Florida Bank filed its Proof of Claim (the "First Florida Claim") in these chapter 11 proceedings in the aggregate amount of One Million Two Hundred and Twelve Thousand Nine Hundred and Eighty-seventy Dollars and 33/00 ($1,212,987.33). The First Florida Claim is comprised of a secured component in the amount of Eight Hundred Thousand Dollars ($800,000.00) and an unsecured component in the amount of Four Hundred and Twelve Thousand Nine Hundred and Eighty-seven and 33/00 Dollars ($412,987.33).

The First Florida Claim arises from a loan made to the Debtor on certain real property located in Okaloosa County.  The property has been returned to First Florida Bank, leaving the unsecured deficiency claim related to the loan

5.      **Claims of the District.**

The District filed three (3) proofs of claim in this Chapter 11 Case setting forth the amounts of the "District Claims", which are based on bond debt assessments ("Bond Debt Assessments") levied by the District with regard to each Series of Bonds issued by the District, together with the outstanding amount of O&M assessments as of the Petition Date.    The aggregate amount of the District Claims is Thirty-two Million Eight Hundred and Ninety-six Thousand Two Hundred and Seventy-two Dollars and 71/XX ($32,896,272.71), which is comprised of an unsecured claim in the amount of $380,509.81, an unsecured claim in the amount of $19,305,816.00 and a secured claim in the amount of $13,209,946.90, in connection with the Bond Claims and the O & M Claims described in this section 5 below.

As discussed elsewhere in this Disclosure Statement, the Bonds issued by the District funded public improvements that benefit the residents and properties within the District, such as roadways, utilities, earthwork and clearing, water and storm water management, roadway lighting, landscaping, security, wetlands mitigation and monitoring, irrigation, and other infrastructure and improvements.  The Bonds are secured by, and paid from, special assessments (the "Bond Debt Assessments") levied by the District on the real property within the District benefitted by the Bond-financed infrastructure and improvements.  Pursuant to Section 170.09 of the Florida Statutes, the Bond Debt Assessments constitute liens upon the assessed land coequal with the lien of all state, county, district, and municipal liens, superior in dignity to all other liens, titles, and claims, until paid.

Both pre- and post-petition, the Debtor failed to pay Bond Debt Assessments levied by the District upon its properties. Accordingly, such unpaid Bond Debt Assessments are due and outstanding to the District, and the District is in turn indebted to the Indenture Trustee on behalf of the Bondholders.

> *The Debtor asserts that it has no obligations to the Indenture Trustee or the Bondholders.*

Certain of the properties of the Debtor are subject to the liens of the Bond Debt Assessments, levied by the District and pledged by the District to the Indenture Trustee, for the benefit of the Bondholders, to secure the payment of the principal of and interest on the Bonds.

The Debtor has analyzed the proofs of claim filed by the District and the public records in Okaloosa County, Florida.  The District Claims are comprised generally of the following claims:

(a)      **Bond Claims -** means the Claims of the District against the Debtor related to *non ad valorem* special assessments imposed by the District against the real property of the Debtor related to and measured or determined by the payment of principal and interest/debt service owed by the District to the Indenture Trustee in connection with the Bonds issued by the District for the benefit of the real property of the Debtor.

(b)      **O&M Claims** - means the Claims of the District against the Debtor related to *non ad valorem* special assessments imposed by the District against the real property of the Debtor

related to the payment of operational and maintenance obligations of the District for the benefit of the real property of the Debtor.

## D.    SUMMARY OF REASONS FOR FILING PETITION

### 1.    Adverse Market Conditions

The homebuilding industry in the United States has experienced a significant downturn in the demand for new homes and an oversupply of new and existing homes available for sale. The negative impact of these events and trends was worsened by the turmoil in the mortgage and credit markets in late 2008, which continued through 2009, adversely impacting the Debtor's continued access to needed financing.

Developers and homebuilders throughout the United States have reported the negative impact of current conditions in the industry. The downtown has been particularly steep in Florida where an excess supply of new homes has led to downward pricing pressure for residential homes as well as improved and unimproved land and softening in the pace of home sales. The poor financial performance of the real estate industry during this past year has by no means been limited to the homebuilding sector but affected all financial areas of our national economy.

Like other homebuilders who purchased land near or at the peak of the economic boom, the land comprising Heritage Plantation was acquired in 2004. Notwithstanding, the Debtor's management team carefully developed and marketed the project successfully by requiring purchasers to acquire lots and then construct homes within the time constraints imposed by the Declaration of Covenants & Restrictions related to the Heritage Plantation Homeowner's Association, Inc. (the "Declaration") The Debtor's financial difficulties were not caused by mismanagement but by the failure of the market, the failed agreements of future financing by its lenders, as well as the financial credit crunch that affected all sectors of the economy starting in 2008 and continuing to today. These financial difficulties were highlighted when certain of the Debtor' lenders experienced financial difficulties themselves, which prevented them from providing additional loans to and/or restructuring existing loans with the Debtor.

The Debtor's operations were profitable from inception until about late 2007 when BB & T refused to extend its loan.  By this time, the Golf Course was operating and enjoying acceptance and success in the market.  Notwithstanding, BB & T refused to extend its loans.  The timing of BB & T's refusal to extend its loans coincided with market reversals, which dramatically and significantly impacted marketing efforts. Sales declined followed by a drop in closings and corresponding revenues.  The Debtor was unable to rationalize its organization to align overhead to contracting revenues.  Unable to reduce operating costs fast enough; the Debtor found District assessments and debt service obligations further eroding its cash position.

Initially, operating losses were funded by operating cash flow and infusions from Riggs.

Ultimately, several of the Debtor's trade vendors, equipment lessors and lenders, including Trustmark National Bank, Branch Banking & Trust, First Florida Bank, Deere Credit and the District, filed actions seeking to foreclose on the Debtor's personal and real property, including lot inventory, the Debtor's primary revenue generating asset.

The Debtor's management team requested extensions and renewals of the Prepetition Secured Lenders' loans.  Operating on parallel tracks, the Debtor's management team also retained the services of a mortgage broker to seek alternative sources of financing for the project. However, despite the valiant efforts made by the Debtor's management team to restructure or seek additional working capital from its various lenders and other financing sources, the downturn in the world financial markets precluded any ability to borrow monies from banks and/or other financial institutions.

In 2008, the real estate assets of the Debtor had a sell through value of $70.124 million based on profit from lots sales of more than $88 million, net of development costs, less capital costs related to amenities and infrastructure improvements in the amount of approximately $18 million. In stark contrast, as of the writing of this Disclosure Statement, the Debtor has determined the total bulk sale discounted values of its wastewater and irrigation assets to be approximately $4.373 million, collectively; its real estate assets to be approximately $1.241 million and total obligations of more than $37 million, comprised of $24 million of related mortgage debt and the special assessment lien of $13 million, which clearly illustrates how the real estate assets of the Debtor have been adversely impacted by the downturn in the real estate sector, the complete lack of liquidity in the financial markets and the overall economy.

Another significant reason for the Debtor' bankruptcy filing was a need to seek additional sources of financing for the project as a result of the failure and refusal of purchasers under contract to build on lots the infrastructure for which had already been constructed and for which the Debtor had to construct with its own resources a golf course, an irrigation system and a wastewater collection, distribution and treatment system.  Significantly, the Bond Purchase Agreement executed by the District with its underwriter contemplated that the District would fund the cost of the recreational facilities that would attract purchasers as well as assume operating responsibility for the Wastewater Treatment Plant and that the District would purchase the Wastewater Treatment Plant Assets from the Developer.  As a result of the downturn in the economy and real estate markets and the District's refusal to meet its obligation to fund construction of the recreational facilities and purchase the Wastewater Treatment Plant Assets from the Debtor, the Debtor lacked the resources and liquidity to continue with the Development as was contemplated. Despite continuing to see positive trends in the operation of the Golf Course and aggressively cutting costs and expenses, and without the reimbursement to the Debtor of the funds used to purchase the Carter Property and construct the first phase of the Wastewater Treatment Plant in the aggregate amount of $2.8 million, the Debtor expended the remainder of its cash reserves by December 2008.

## 2.    **The Debtor's Cost Saving Initiatives and Efforts.**

In light of the sharp industry downturn, the Debtor began in late 2007 to take action to maximize revenues with a focus on the Golf Course and to minimize cash outflows. As part of these initiatives, the Debtor took steps to reduce general and administrative expenses and to streamline its operations and increase efficiencies. The cost reduction efforts included, among other things, (i) reducing the workforce at all levels, (ii) eliminating certain contracts and indirect costs, and (iii) revising the marketing and advertising budget.

3.        **Significant Prepetition Litigation**

In 2009, the District initiated foreclosure proceedings in the First Judicial Circuit of the State of Florida, in and for Okaloosa County, Florida (the "Court") against the Debtor in connection with the Bond Debt Assessments comprised of unpaid O & M Assessments and Bond Assessments (the "Bond Assessments").  The O & M Assessments and the Bond Assessments are collectively referred to as the "District Claims".  The Court, in response to a Joint Stipulation regarding the District's Motion for Summary Judgment, issued a Final Judgment of Foreclosure on November 23, 2010, pursuant to which a foreclosure sale was set for January 5, 2010. Subsequently, the Court, upon consent of the District and the Debtor, continued the foreclosure sale to May 18, 2011.  These Chapter 11 Bankruptcy proceedings commenced on May 15, 2011 resulting in an automatic stay of the foreclosure sale.

Other pre-petition litigation is as follows:

(i)      The Water Spigot, Inc. v. Southeastern Consulting & Development Company; Case No. 09-1330-CC, which was a Collection Proceeding in Bay County, Florida for which a Final Judgment was entered on June 24, 2009.

(ii)     Trustmark National Bank v. Southeastern Consulting & Development Company and Stephen C. Riggs; Case No. 2009 CA 003395 S, which was a Foreclosure Action in the Circuit Court in and for Okaloosa County, Florida for which a Stipulated Final Judgment was entered on January 4, 2010.

(iii)    Trustmark National Bank v. Southeastern Consulting & Development Company, Stephen C. Riggs, Branch Banking and Trust Company, The Water Spigot, Inc. and Yamaha Motor Corporation, U.S.A.; Case No. 2010 CA 000837 S, which was a Foreclosure Action in the Circuit Court in and for Okaloosa County, Florida for which a Final Judgment was entered on September 13, 2010.

(iv)     Regions Bank v. Southeastern Consulting and Development Company, Heritage Plantation Homeowners' Association, Inc., etc.; Case No. 2009 CA 003356 C, which was a Foreclosure Action in the Circuit Court in and for Okaloosa County, Florida.

(v)      The McPherson Companies, Inc., as assignee of T-Gill Fuels, Inc. v. Southeastern Consulting & Development Company and Stephen C. Riggs; Case No. 2010 SC 000169 S, which was a Collection Proceeding in County Court in and for Okaloosa County, Florida for which a Final Judgment was entered on February 22, 2010.

(vi)     Deere Credit, Inc. v. Southeastern Consulting & Development Company a/k/a Southeastern Consulting & Development Company, Inc. and Stephen C. Riggs; Case No. 2010-CA-61-S, which was a Collection Proceeding in the Circuit Court of Okaloosa County, Florida, which matter was resolved.

(vii)    First Florida Bank f/k/a Destin First Bank v. Southeastern Consulting & Development Company, The Water Spigot, Inc., Yamaha Motor Corporation, USA, Stephen C. Riggs, III, Larry Pyatt and Trustmark National Bank; Case No. 2010-CA 639, which was a

Foreclosure Action in the Circuit Court in and for Okaloosa County, Florida for which a Final Summary Judgment was entered on July 16, 2010.

(viii)   Auto Owners Insurance Company v. Southeastern Consulting & Development Company; Case No. 2010 SC 000484 S, which was a Collection Proceeding in the County Court in and for Okaloosa County, Florida for which a Default Final Judgment was entered on May 14, 2010.

(ix)   ADM Alliance Nutrition, Inc., Archer-Daniels-Midland Company v. Southeastern Consulting & Development Company; Case No. 2010-CC-00708, which was a Collection Proceeding in the County Court in and for Okaloosa County, Florida for which a Default Final Judgment was entered on August 30, 2010.

(x)   Branch Banking and Trust Company v. Southeastern Consulting & Development Company, Stephen C. Riggs, Water Reclamation of NWF, LLC, The Water Spigot, Inc., Yamaha Motor Corporation, U.S.A. and Trustmark National Bank, which was a Foreclosure Action in the Circuit Court in and for Okaloosa County, Florida for which an Agreed Partial Final Judgment of Foreclosure was filed on March 31, 2010.

(xi)   Yamaha Motor Corporation, U.S.A. v. Southeastern Consulting and Development Company; Case No. 2009 CA 002509, which was a Breach of Contract; Repossession action in the Circuit Court in and for Okaloosa County, Florida for which a Final Default Judgment was entered on July 22, 2009.

## E.   SOURCE OF FINANCIAL INFORMATION

The source of financial information for this Disclosure Statement and Plan is from reports from Debtor's officers.   The financial information contained herein, including the exhibits annexed to this Disclosure Statement, has not been audited.

## III.   DEBTOR'S OPERATION AND STRUCTURE

## A.   SYNOPSIS OF OPERATION IN CHAPTER 11

### 1.   Retention of Bankruptcy Counsel.

On May 18, 2011, the Debtor filed its application to retain Berger Singerman, P.A. ("BSPA") to represent the Debtor in this case, *nunc pro tunc*, to the Petition Date.   BSPA accepted a fee retainer from the Debtor in the amount of $25,000.00 (the "BSPA Prepetition Retainer").   Berger Singerman filed its Application for Compensation and Expenses with the Bankruptcy Court and upon a hearing, Berger Singerman's Application was approved on June 14, 2012.

### 2.   Operation of Business.

The Debtor continues to manage its assets.   The Debtor has filed this Disclosure Statement and the Plan in an effort to start the reorganization process.   The Debtor recognizes that it is in all constituents best interest to emerge from Chapter 11 as quickly as possible.

As of the Petition Date, the Debtor declared assets with a value of Four Million Two Hundred and Seventy-five Thousand Five Hundred and Twenty-four and 85/XX Dollars ($4,275,524.85), excluding the System Assets and scheduled mortgage debt of Twenty One Million Dollars ($21,000,000.00), not including District Bond Assessments.    Chapter 11 provides the most efficient and timely process for the Debtor to restructure its debt and bring its capital structure in line with today's market realities.

The values set forth in the Article III, Section A2 are based on (i) recent recorded sales transactions at Heritage Plantation, which is the best indicator of value for the Lots, (ii) an opinion of value of Bradley Adkins, a land expert associated with the national commercial brokerage firm of Marcus & Millichap and (iii) the appraised value of the various properties owned by the Debtor as determined by the Okaloosa County Property Appraiser.

It is important to note that the Debtor has resolved its petition for a reduction of property taxes on its real property.  In October 2011, the Debtor reached an agreement with the Property Appraiser of Okaloosa County and contemporaneously, withdrew its petition.  According to the Okaloosa County Property Appraiser, Phase I and Phase II lots have a value of $1,000.00 as compared to recent sales where transactions have been recorded on Phase I lots at $10.00 per lot. The Phase I and Phase II lot values as determined by the Okaloosa County Property Appraiser do not take into consideration property tax arrearages of more than $4,000.00 per lot.

The Debtor reached a settlement with HP Land in connection with the BB & T Claim, the detailed terms of which are set forth in Article III, Section D2(iii) hereof (the "HP Land Settlement").   The Debtor's motion to approve the HP Land Settlement has been filed and one objection has been filed by Heritage FFH, LLC.  Heritage FFH's objection was heard at a hearing on June 14, 2012; a ruling was deferred until a future hearing following discovery as agreed between the parties.  It is the Debtor's position that Heritage FFH has no standing in this matter and its objection should be dismissed by the Bankruptcy Court.

Louis S. Weltman's deposition was held on July 18, 2012.  It is the Debtor's intention to renew its Motion for approval of the HP Land Settlement and move to dismiss Heritage FFH's objection on grounds that Heritage FFH has no standing in these chapter 11 proceedings.

The Debtor has reached a settlement with the Association in connection with the Association's Claim, the detailed terms of which settlement are set forth in Article III, Section D2(vi) hereof (the "Association Settlement").   The Debtor intends to file a motion to approve the Association Settlement.

The Debtor's assets are comprised of the following:

(i)      a 100.00% membership interest in WRNWF, with no value at the present time,

(ii)     Entitlements with an undetermined value,

(iii)    The Debtor's cash deposit with the Choctawatchee Electric Cooperative has been forfeited pursuant to the agreement between the parties and has no value, and

(iv)    real property assets, as follows:

(a)    the System Assets with a value of $4.373 million, comprised of the Debtor's Wastewater Collection Assets with a value of $2.118 million and the Debtor's Irrigation Assets with a value of $2.255 million;

(c)    a Golf Course with a value of $1.0 million, net of renovation costs and an assessed value of $546,356;

(d)    a Gatehouse with no inherent value and an assessed value of $74,032;

(e)    116 Developed Phase I lots with a $1,000 per lot value, or a total of $116,000 and an assessed value of $797 per lot, or a total assessed value of $92,000;

(f)    125 Developed Phase II lots with a $1,000 per lot value, or a total of $225,000 and an assessed value of $797 per lot, or a total assessed value of $100,000;

(g)    Subject to the Bankruptcy Court's approval of the HP Land Settlement, approximately 276 of the Debtor's 500 undeveloped lots are collateral for HP Land's secured position; the undeveloped lots have no inherent value and an aggregate assessed value of $236,471; and

(h)    Timber Rights of no value to the Debtor based on an assignment of the Timber Rights pursuant to the HP Land Settlement.

**3.    Repurchase of the Wastewater Treatment Plant by Turner as assignee of WRNWF. and related permit and operational issues.**

On or about May 11, 2011, WRNWF entered into a contract to repurchase the Carter Property from its owner for the sum of $650,000.00. See Article II, Section B4 for a detailed discussion of the Wastewater Treatment Plant.

Recently, WRNWF assigned the Carter Contract and the FDEP Permit to Turner. Closing on the Carter Contract is not required until December 31, 2012 subject to the satisfaction of three (3) conditions:  (i) FDEP approval of the permit extension, (ii) execution of an Amended Development Agreement between the Debtor and Okaloosa County and (iii) confirmation of the Debtor's Plan.

**B.    Amendment to the Development Agreement with Okaloosa County**

As of the filing of this Disclosure Statement, the Debtor is in compliance with the Development Agreement with Okaloosa County as well as relevant jurisdictional agencies.  The Debtor has initiated discussions with the Okaloosa County Office of Growth Management to amend the existing Development Agreement in order to ensure that the Development Agreement (the "Amended Development Agreement") provides for the following:

(i)       Mixed Use zoning consistent with the County's Future Land Use Map ("FLUM"), which has already been approved by the Okaloosa County Board of County Commissioners,

(ii)      An extension of the duration of the Development,

(iii)     Satisfaction and extension of all concurrency requirements,

(iv)     Approval of the Debtor's modified site plan to reduce lot sizes, incorporate alternative land uses and increase density, and

(v)      An extension of the date by which certain requirements of the Development Agreement shall be met; specifically, the Debtor is obligated to construct a Recreation Area on certain property within the District, which was to have been funded by the District.  The Debtor is requesting an extension of the timeline for construction and dedication of recreation area so that construction is to begin simultaneous with request for the 500th building permit at Heritage Plantation thereby linking construction to population growth.  In connection with the recreational area, the Debtor has acknowledged (a) its obligation to fund the cost of construction of recreation area; (b) that the Recreation Area is to be dedicated to, operated and maintained by the Okaloosa County Parks department immediately upon it being certified complete; and (c) there shall be no bonding requirements for the Debtor in connection with the Recreation Area.

## C.       Developments During the Chapter 11 Case

### 1.       Filing of the Debtor' Schedules and Statement of Financial Affairs, Establishment of Deadlines to Submit Proof of Claim

#### (i)       Debtor' Schedules and Statement of Financial Affairs

On May 31, 2011, the Debtor filed its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and SOFA").  The Schedules and SOFA provides information concerning the Debtor's assets, liabilities (including accounts payable), executory contracts and other financial information as of the Petition Date, all as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 of the Federal Rules of Bankruptcy Procedure.

#### (ii)      Bar Date

On May 18, 2011, a Notice of Commencement was entered establishing the deadline for filing proofs of claim against the Debtor (the "Bar Date").  The deadline established by the Bankruptcy Court is September 14, 2011for claims, excluding claims of governmental units as to which the bar date is 180 days from the date of the filing.  The date established by Section 502(a)(9) of the Bankruptcy Code as the last day for a Governmental Unit to file a Proof of Claim against the Debtor in the Bankruptcy Cases is December 12, 2011 (the "Governmental Bar Date").

#### (iii)     Claims Filed Against the Debtor

As of September 27, 2011, a total of 23 claims have been filed against the Debtor on an aggregate basis (the "Claims").  The Claims are comprised of approximately $5,543.38 in

priority claims; $36,686,001.21 in secured claims and $22,535,451.39 in unsecured claims. As authorized by the Bankruptcy Court, the Debtor reserves the right to object to claims, such as claims without basis, misclassified claims, general unsecured claims filed as unsecured priority or secured claims, and any other applicable basis for asserting objections.

<strong>(iv)   Approval of settlement with HP Land, LLC.</strong>

The Debtor has reached a settlement with HP Land in connection with the BB & T Claim, the detailed terms of which are set forth in Article III, Section D2(iii) hereof (the "HP Land Settlement"). The Debtor's motion to approve the HP Land Settlement has been filed and one objection has been filed by Heritage FFH, LLC. Heritage FFH's objection was heard at a hearing on June 14, 2012; a ruling was deferred until a future hearing following discovery as agreed between the parties. It is the Debtor's position that Heritage FFH has no standing in this matter and its objection should be dismissed by the Bankruptcy Court.

<strong>(v)   Approval of settlement with the Heritage Plantation Homeowner's Association, Inc.</strong>

The Debtor has reached a settlement with the Association in connection with the Association Claim, the detailed terms of which are set forth in Article III, Section D2(vi) hereof (the "Association Settlement"). The Debtor intends to file a motion to approve the Association Settlement.

<strong>2.   APPOINTMENT OF COMMITTEE</strong>

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable. No such committee has been appointed in these chapter 11 proceedings.

**D.   Summary of Plan of Reorganization**

The Plan provides for the reorganization of the Debtor, the emergence of the Debtor from the Bankruptcy Case as the Reorganized Debtor and the treatment of Allowed Claims against the Debtor and Allowed Equity Interests in the Debtor as provided in the Plan. Pursuant to the Plan, as of the Effective Date, Southeastern Consulting & Development Company, Inc. will be substantively consolidated with and merged into Losowe Capital, Inc., an affiliate of Phoenix ("Losowe"), pursuant to the terms of the Plan. Hereinafter, Losowe and the Reorganized Debtor shall be referred to as the Reorganized Debtor.

Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall upon the Effective Date and the effectiveness of the filing of applicable Articles of Merger with the Secretary of State of the State of Florida, become obligations of the Reorganized Debtor and be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of

classes of Claims against and Equity Interests in the Debtor.  A Claim or Equity Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(2), 507(a)(3) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in paragraph 1 of this section of the Disclosure Statement.

      1.      **Unclassified Claims.**  Holders of Allowed Administrative Claims, United States Trustee Fees and Allowed Priority Tax Claims shall receive the following treatment.

      (i)      **Administrative Claims.**

Each holder of an Allowed Administrative Claim (including Allowed Administrative Claims of Professionals) shall be paid (a) an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Administrative Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, on the later of (i) the Effective Date, or as soon thereafter as reasonably practicable, or (ii) as soon as practicable after the date of a Final Order Allowing such Administrative Claim, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

All Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Bankruptcy Case shall be paid by Reorganized Debtor (a) in the ordinary course of business in accordance with contract terms, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

      (ii)      **United States Trustee's Fees.**

All unpaid fees and charges assessed against the Debtor under Chapter 123 of title 28, United States Code, 28 U.S.C. §1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the United States Trustee by the Reorganized Debtor by no later than 30 days following the Effective Date.  At the time of such payment, the Reorganized Debtor shall provide to the United States Trustee an affidavit indicating the disbursements made by the Debtor for the relevant periods, if requested by the United States Trustee. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Cases shall be paid by the Reorganized Debtor, until the earlier of (i) the closing of the Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code.  Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).  At the time of each such payment, the Reorganized Debtor shall provide an affidavit indicating the disbursements for the relevant period, if requested by the United States Trustee.

(iii)    **Priority Tax Claims.**

Each Holder of an Allowed Unsecured Priority Tax Claim shall receive from the Reorganized Debtor, on account of such Allowed Unsecured Priority Tax Claim, regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code commencing on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Unsecured Priority Tax Claim. Notwithstanding the above, each Holder of an Allowed Unsecured Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Unsecured Priority Tax Claim and the Debtor or the Reorganized Debtor, as the case may be. The Reorganized Debtor shall have the right to prepay such Allowed Unsecured Priority Tax Claims at any time, in whole or in part, without penalty or premium.

**2.    Treatment of Classified Claims and Equity Interests.** The Treatment of Classified Claims and Equity Interests of the Debtor is described in more detail below.

(i)    **Class I: Priority Property Tax Claims. This Class is Impaired.**

Class I is comprised of the holders of property tax claims, whether in the name of Okaloosa County or a holder of property tax certificates issued by Okaloosa County. The aggregate amount of such claims is approximately $875,805.89 based on the Proof of Claim filed by Okaloosa County.

In full satisfaction of the Class I Claim,

(a)    the Debtor shall convey to the District the System Assets on the Effective Date subject to the confirmation of the Plan for consideration in the amount of $4.373 million (the "System Assets Purchase Price") payable in the form a note to be issued by the District to the Debtor in the amount of the System Assets Purchase Price (the "System Assets Note"), such System Assets Note to bear interest at the rate of 4% per annum and to be repaid from connection fees collected by the District from and at the time of the transfer of each of the Phase I Lots Collateral and Phase II Lots Collateral. Each such connection fee shall be in the amount of $18,145.00. The District shall have lien rights against the Phase I and Phase II Collateral to the extent of the System Assets Note (the "District Lien Rights"), which District Lien Rights shall be superior to any and all other liens and the connection fees shall be for the sole benefit of the Debtor expressly and limited to supporting the repayment of the System Assets Note; and either option (b) or (c), as follows:

(b)    The holder of the Allowed Priority Property Tax Claim shall have its "Class I Collateral", comprised of the Phase I Lots Collateral and the Phase II Lots Collateral, returned to it subject to the District Lien Rights against each of the 241 lots that comprise the Class II Collateral but otherwise free and clear of any other encumbrances whatsoever all upon confirmation of the Plan, whereby the Class I Collateral shall be conveyed at the time of final confirmation of the Plan into a special purpose entity owned by the Class I Claimants prorata (the "SPE") pursuant and subject to the following:

(i) the Bankruptcy Code,

(ii) the recorded Declaration of Covenants and Restrictions of the HOA,

(iii) the Development Agreement, and

(iv) a marketing agreement between the SPE and the Debtor restricting the bulk sale of the Class I Collateral for a five (5) year period following such conveyance (the "Marketing Agreement"), and which Marketing Agreement shall provide for the Debtor to provide future services to the SPE and in exchange therefor receive a marketing fee of twenty-five (25%) percent of the proceeds from the sale of the Class I Collateral less normal and customary brokerage commissions and closing costs, whether the lots are sold individually by lot or in the aggregate

or

(c) as otherwise authorized by the Bankruptcy Code or agreed to by the Debtor or the Reorganized Debtor and each such Holder prior to the Confirmation Date.

Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class I Claim is allowed by a Final Order and shall be in full satisfaction, release and discharge of such Class I Claim. Class I is Impaired.  As a result, each Holder of a Class I Claim is entitled to vote to accept or reject the Plan.

### (ii)    Class II:  District Bondholders Bond Debt Assessment Lien.  This Class is Impaired.

Class II is comprised of the Bond Debt Assessment of the District, which secured the Bond obligations owing by the District to its Bondholders.  The aggregate amount of such claims is approximately $13,209,946.90 based on the Proof of Claim filed by the District.

In full satisfaction of the Class I Claim, the holder of the Allowed Class II Secured Claim shall have its Class II Secured Claim restructured, as follows:

The Debtor proposes to restructure the Bond Debt Assessments principally through an exchange of the developer related to both the existing Series A and Series B 2006 Bonds (collectively, the "Series 2006 Bonds") for one (1) new series, ie the Series 2012 Bonds.  The principal amount of the District's Series 2006 Bonds to be exchanged and thereby redeemed in full is $10,520,000.00.

The principal amount of Series 2012 Bonds to be issued by the District in exchange for the Series 2006 Bonds is $1,665,024.00.  The Series 2012 Bonds shall mature fifteen (15) years following their issuance and carry an interest rate of 3%.

The principal amount of the Series 2012 Bonds was determined as follows:

| | |
|---|---|
| ➢ Outstanding 2006 Bonds | $11,360,000.00 |
| ➢ Incomplete construction Credit | ($1,490,000.00) |
| ➢ Principal Reduction of 2006 Bonds | ($9,000,000.00) |
| ➢ Unpaid Interest | $1,362,521.00 |
| ➢ Accrued Interest (05/01/12 to 11/01/12) | $272,503.00 |

| | | |
|---|---|---|
| ➤ (Less) Series 2006 Bonds to remain outstanding | | ($840,000.00) |
| Total Series 2012 | | $1,665,024.00 |

As summarized in the above table, in connection with the proposed restructure of the District Claims under the Plan, the Debtor proposes that the District shall make various adjustments to the principal amount outstanding on the Series 2006 Bonds in order to arrive at the principal amount of the Series 2012 Bonds to be issued by the District. Such adjustments include a principal reduction amount, a reduction for incomplete construction obligations of the District and an increase in the principal balance thereof by the unpaid and accrued interest on such Claims. The term "unpaid interest" shall mean interest that has not been paid by the Debtor on the District Claims through the Filing Date. The term "accrued interest" shall mean interest on the District Claims that will accrue from and after the Filing Date up to and including the Effective Date. The Debtor's Plan provides for an interest forbearance period, namely the period from the Effective Date through the date of the first payment on the Series 2012 Bonds, which is two years from the Effective Date.

Based on a principal amount of the Series 2012 Bonds to be issued by the District, the principal of such bonds to be allocated to each lot in Phase I and Phase II of the Development, excluding lots which have an allocated amount of the Series 2006 Bonds attached to them, is $6,908.81. The corresponding annual assessment on each lot to be used to retire the Series 2012 Bonds upon payment to the District thereof shall be $460.58. Accordingly, the District shall receive annual assessment revenues, excluding interest, in the amount of $111,001.59, before approximate collection costs of 6%.

As of the date hereof, the Debtor understands that none of the bondholders who own or control the underlying Bonds issued by the District have consented to the proposed restructure of the District Claims. Moreover, if such bondholders do not consent to a restructuring of the District Claims, then such bondholders, or the Indenture Trustee for such bondholders, may seek to enforce their rights against the District and take the position that the District remains in default under its obligations to the Indenture Trustee.

**(iii)    Class III:  HP Land, LLC as the successor to the Branch Banking & Trust Secured Claim.  This Class is Impaired.**

Class III is comprised of the claim of HP Land, LLC., as the successor to the secured claim of Branch Banking & Trust (the "Class II Secured Claim"). The amount of the Class II Secured Claim is $16,155,895.00 based on the Proof of Claim filed by Branch Banking & Trust.

In full and final satisfaction of the Class II Secured Claim, HP Land and the Debtor have agreed (the "Settlement Agreement"), subject to confirmation of the Plan, to modify and combine the existing mortgages on its collateral (the "Collateral"), as follows:

1.    HP Land shall record a new mortgage:

      a.    The term shall be for 10 years (the "Term").
      b.    No interest shall accrue and no payments shall be due during the Term.
      c.    There shall be a balloon payment due at end of the Term.

d.    The Term shall commence from the Effective Date.

e.    HP Land's mortgage (the "Mortgage") shall encompass the 280 acres of developable property that are part of the Undeveloped Property, as more fully detailed on Exhibit A of the Settlement Agreement between the Debtor and HP Land, a hearing upon which Settlement Agreement is scheduled for June 14, 2012 (defined therein as, the "Developable Property").

f.    The Mortgage shall contain the following release provisions for the Developable Property (the "Modified Collateral"):

    i.    HPL shall receive the greater of (i) $12,000 per acre; or (ii) the value determined by the following formula: the extrapolated selling price per acre less $33,000 (representing the development costs), multiplied by 50%. HPL shall agree to pro rata release for sales of less than one acre. HPL shall have the right of first refusal for the sales, evidenced by a recorded document in the public records of Okaloosa County, Florida. There shall also be a true-up of development costs to reflect the actual development costs in the release equation.

    ii.    Exhibit A attached hereto represents the land that is the developable acres and the legal description of the Modified Collateral, which is comprised of Sections A, B, C and D. Take-down shall be accomplished on a section by section basis and payment shall be based upon the number of acres in each section as more fully described in Exhibit A.

2.    The Debtor shall cause the Declaration to be amended so that HP Land shall not be liable for assessments in the event that HP Land forecloses on the Collateral by way of making HP Land a co-Declarant.

3.    HP Land shall agree to support and shall affirmatively support the Debtor's Plan of Reorganization that contains the terms of the Settlement Agreement.

4.    The Parties shall agree to the form of a stay relief order to be submitted to the Bankruptcy Court, including provisions for events of default under the Mortgage, Debtor's conveyance to HP Land of clear title to 80 acres to the north of Heritage Plantations developable property (the legal description of which is attached to the Settlement Agreement as Exhibit B thereto), and modification of the Declaration in which HP Land will join as mortgagee. HP Land shall be entitled to full relief from the automatic stay to continue the foreclosure sale for the Collateral under the existing mortgages if the Debtor does not file its Disclosure Statement and a Plan that includes the terms set forth herein within 1 year from the date of this Settlement Agreement. HP Land shall be in default and not entitled to continue the foreclosure sale if it does not vote in favor of the Debtor's Plan.

5.    All property subject of the First, Second and Third Mortgage, excluding the Modified Collateral shall be excluded from the Mortgage and shall be released.

6.      The Parties shall work cooperatively on the form of the Mortgage and related documents.

7.      HP Land shall have the right to enter on the lands of the Debtor to harvest merchantable timber and vegetation, and on the platted lots, to clear lots of vegetation and trees in accordance with applicable covenants and contracts between the Parties.  Such activity benefits the Debtor's plans for development and is in the ordinary course of the Debtor's business as a subdivision developer.

**(iv)     Class IV:  Trustmark National Bank Secured Claim.  This Class is impaired.**

Trustmark National Bank's Class IV Secured Claim is comprised of its secured claim in the amount of $5,105,978.04.  There is no value in the collateral related to its Secured Claim, except for the Gatehouse, which for purposes of treatment under the Plan, is assigned a value of $74,000.00.

In full satisfaction of the Class IV Claim, the Debtor shall pay the full amount of such Allowed Class IV Secured Claim the value of the collateral in the amount of $74,034.00 by way of assigning to Trustmark the Gatehouse Mortgage as set forth in Section D2(v)(c)(1) of this Article III .

**(v)     Class V:  Judgment and Deficiency Claims.  This Class is Impaired.**

Class V is comprised of holders of judgment and deficiency claims against the Debtor (the "Class V Claims").  The aggregate amount of the Class V Claims is $28,462,095.91 based on the Proofs of Claim filed by the claimants in this Class V, as follows:

a.      Trustmark National Bank's Class V Claim in the aggregate amount of $7,924,406.12 is comprised of an unsecured claim in the amount of $198,212.84, an unsecured claim in the amount of $2,620,215.33 and a secured claim in the amount of $5,105,978.04.   There is no value available to Trustmark in the collateral related to its Secured Claim, except for the Gatehouse, which is therefore a part of this Class V;

b.      Heritage Plantation Community Development District's Class V Claim is $19,586,325.81, comprised of two separate claims in the amounts of $380,509.81 and $19,305,816.00;

c.      Deere Credit, Inc's. Class V Claim is $538,376.65; and

d.      Florida First Bank's Class V Claim is $412,987.33.

In full satisfaction of the Class V Claim, at the election of the claimant's holding at least 66.67% of the value of such Class V Claims, the Class V Claims shall be treated pursuant to one of the two treatments outlined below as Option A or Option B.  The Class V Claimants shall make the election in writing to the Debtor within thirty (30) days of the Effective Date or the

Class IV Claims shall automatically be treated pursuant to Option B.

Option A:  The Debtor shall pay to each Class V Claimant an amount equal to one half of one percent (0.5%) percent (the "Class V Cash Payment") of their respective Class V Claims in full satisfaction of each such Class V Claim, such amount to be paid as follows:  5% of the Class V Cash Payment within thirty (30) days of the Effective Date; 5% of the Class V Cash Payment on or before the date that is 180 days from the first payment hereunder; 25% of the Class V Cash Payment on or before the date that is 180 days from the second payment hereunder and the balance within 360 days of the third payment hereunder.

Option B:  The Debtor to issue to each Class V Claimant an unsecured note in an amount equal to one (1%) of its claim (the "Class V Notes").  The Class V Notes shall not bear interest and shall be repaid from the sale of the Undeveloped Lots, through release payments on each such closing in the amount of $600.00 per lot.  The Class V Notes issued in connection with this Option B shall be unsecured and post-confirmation, shall be subordinate to any financing related to the development of infrastructure or construction financing required by the Debtor to construct improvements on the Lots.

### (vi)     Class VI:  Heritage Plantation Homeowner's Association, Inc.'s Unsecured Claim.  This Class is Impaired.

Class VI is comprised of the unsecured claims of the Heritage Plantation Homeowner's Association, Inc. (the "HOA") (the "Class VI Claim").  The amount of the Class VI Claim is undetermined at the time of the writing of this Disclosure Statement and is based on the Proof of Claim filed by the HOA.

In full satisfaction of this Class VI Claim, the Debtor shall on the Effective Date:

(a)     issue to the HOA an unsecured note of Two Hundred Thousand Dollars ($200,000.00) (the "HOA Note").  The HOA Note shall not bear interest and shall be repaid from the sale of Undeveloped Lots through release payments on each such closing in the amount of $400.00 per lot.  The HOA Note issued in connection with this Class V shall be unsecured and post-confirmation, shall be subordinate to any development financing to prepare lots for sale and construction financing required by the Debtor to construct improvements on the Undeveloped Lots;

(b)     convey to the HOA the Golf Course in exchange for the sum of $1 million (the "Golf Course Purchase Price") with the Golf Course Purchase Price payable by the HOA to the Debtor, as follows:

(1) a note and mortgage in the amount of $1 million, such mortgage only to be paid from capital contributions to the HOA from future lots closings with no interest thereupon, plus
(2) the HOA's promise to restore the Golf Course to playable condition;

(c)    convey to the HOA the Gatehouse (the "Gatehouse") for an amount equal to the assessed value of the Gatehouse, or $74,034.00 (the "Gatehouse Purchase Price") payable, as follows:

(1) a note and mortgage in the amount of $74,034.00 (the "Gatehouse Mortgage"), such mortgage only to be paid from capital contributions to the HOA from future lots closings with no interest thereupon, plus
(2) the HOA's promise to restore the Gatehouse to useable condition

### (vii)    Class VII:  Auburn Water System, Inc.'s Unsecured Claim.  This Class is Impaired.

Class VII is comprised of the unsecured claims of Auburn Water System, Inc. ("Auburn") (the "Class VII Claim").  The amount of the Class VII Claim is $164,292.50 in connection with the unpaid maintenance bond for the Phase II potable water improvements to be conveyed to Auburn pursuant to the executory contract between Auburn and the Debtor.  As at the time of the writing of this Disclosure Statement, Auburn had not timely filed a Proof of Claim.

In full satisfaction of this Class VII Claim, the Debtor to issue to Auburn an unsecured note in an amount equal to $164,292.50 (the "Auburn Note").  The Auburn Note shall bear interest at the rate of four (4%)_ percent per annum on the outstanding balance with the Auburn Note amount to be paid from the operations of the Debtor over seven (7) years with equal annual principal reductions in arrears, commencing thirteen (13) months from the Effective Date.  The Auburn Note issued in connection with this Class VII Claim shall be unsecured and post-confirmation, shall be subordinate to any construction financing required by the Debtor to construct improvements on the Lots.

### (viii)    Class VIII:  Trade Claims: This Class is Impaired.

Class VIII is comprised of the unsecured trade claims of the Debtor with claim amounts in excess of $10,000.00 (the "Class VIII Claims").  The aggregate amount of the Class VI Claims is $188,028.46 based on the Debtor's Schedule F, as adjusted by such Proofs of Claim filed by the Class VI Claimants.

In full satisfaction of the Class VIII claims, the Debtor to issue to each Class VIII Claimant an unsecured note in an amount equal to twenty-five (25%) percent of its claim (the "Class VIII Notes").  The Class VIII Notes shall bear interest at the rate of four (4%) percent per annum on the outstanding balance with the Class VIII Notes amount to be paid from the operations of the Debtor over seven (7) years with equal annual principal reductions in arrears, commencing thirteen (13) months from the Effective Date.  The Class VIII Notes issued in connection with this Option B shall be unsecured and post-confirmation, shall be subordinate to any construction financing required by the Debtor to construct improvements on the Lots.

(ix)    **Class IX:  Convenience Claims: This Class is Impaired.**

Class IX is comprised of the unsecured trade claims of the Debtor with claim amounts less than $10,000.00 (the "Class IX Claims").  The aggregate amount of the Class IX Claims is $271,398.48 based on the Debtor's Schedule F, as adjusted by such Proofs of Claim filed by the Class IX Claimants.

In full satisfaction of the Class IX claims, the Debtor shall pay to each Class IX Claimant an amount equal to twenty-five (25%) percent (the "Class IX Cash Payment") of their respective Class IX Claims in full satisfaction of each such Class IX Claim, such amount to be paid as follows:  5% of the Class IX Cash Payment within thirty (30) days of the Effective Date; 5% of the Class IX Cash Payment on or before the date that is 180 days from the first payment hereunder; 25% of the Class IX Cash Payment on or before the date that is 180 days from the second payment hereunder and the balance within 360 days of the third payment hereunder.

(x)    **Class X:  Equity Interests.  This Class is Impaired.**

Class X is comprised of the Equity Interests of the Debtor.  Class X is represented by the 10,000 shares of the Debtor's pre-petition common stock owned by Riggs and Phoenix, which are forfeited.

Phoenix shall retain one hundred percent of the equity interests of Losowe Capital, Inc. ("Losowe"), following the merger of the Reorganized Debtor with Losowe, whereby Losowe shall be the surviving entity and succeed to all right, title and interest of the assets of the Reorganized Debtor subject to the treatment of all of the Reorganized Debtor's Claims as set forth in the Disclosure Statement and the Plan.

3.    **OBJECTIONS TO CLAIMS**

The Debtor may object to scheduled claims or Proofs of Claim filed against the Debtor. Such an objection shall preclude the consideration of any such claims as "allowed" for the purposes of timely distribution in accordance with the Plan.  The Debtor does not anticipate filing significant objections to claims.

4.    **PRESERVATION OF ACTIONS AND CAUSES OF ACTIONS**

From and after the Effective Date, to the extent not otherwise adjudicated or settled prior to or as a part of the Plan, all rights pursuant to sections 502, 510, 541, 544, 545 and 546 of the Bankruptcy Code; all preference claims pursuant to section 547 of the Bankruptcy Code; all fraudulent transfer claims pursuant to section 544 or 548 of the Bankruptcy Code; all claims relating to post-petition transactions under section 549 of the Bankruptcy Code; all claims recoverable under section 550 of the Bankruptcy Code; and, all claims (including claims arising at common law or equity) against any person, entity, etc., on account of any debt, other claim or right in favor of the Debtor are hereby preserved, retained and assumed for enforcement by the Debtor, who shall, at its election, have the right to prosecute or settle, to execute and enforce any judgment or settlement agreement therein and to exercise all such avoidance powers.

Based upon transactions completed and payments made prior to the filing of the Petition Date, the Debtor anticipates no avoidance actions and no new causes of action.

## IV.    IMPLEMENTATION OF THE PLAN OF REORGANIZATION

### 1.    Assumption of Executory Contracts and Unexpired Leases.

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity shall be assumed by the Debtor as of the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend the Plan to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed (if added) or rejected (if deleted). The Debtor shall provide notice of any amendments to the Plan to the parties to the executory contracts and unexpired leases affected thereby. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtor shall be deemed to be executory contracts and Assumed Contracts, and (ii) except as provided in the Plan, all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed by the Debtor for the benefit of a third party shall be deemed to be executory and Rejected Contracts.

### (i)    Rejection of Executory Contracts and Unexpired Leases.

All executory contracts and unexpired leases existing but not listed in the Plan shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease that has been assumed or rejected in accordance with a Final Order entered on or before the Confirmation Date.

### (ii)    Approval of Assumption or Rejection

Entry of the Confirmation Order constitutes: (a) the approval under Bankruptcy Code § 365 of the assumption or assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned under the Plan or otherwise during the Chapter 11 Cases; and (b) the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan or otherwise during the Chapter 11 Cases. Notwithstanding anything contained in this Section or the Plan to the contrary, the Debtor retains the right to add or change the treatment (assumed or rejected) of any executory contract or unexpired lease in the schedules filed with the Bankruptcy Court as part of a Plan Supplement, thus changing the treatment of the contract or lease under the Plan, at any time within thirty (30) days after the Effective Date.

### (iii)    Cure of Defaults

Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract as contemplated by Section 365(b) of the Bankruptcy

Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. The Reorganized Debtor shall not, and need not as a condition to assuming or assuming and assigning any executory contract or unexpired lease under the Plan, Cure any default relating to a Debtor's failure to perform a nonmonetary obligation under any executory contract or unexpired lease.

Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor or the Reorganized Debtor or its Property. The Reorganized Debtor shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than the date which is six (6) months after the Effective Date, the Reorganized Debtor shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto or as may otherwise be agreed to by the parties.

### (iv)    Rejection Claims Bar Date.

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor or the Reorganized Debtor or its Property. With respect to the Rejected Contracts or unexpired leases, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date (the "Rejection Bar Date"). The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims. Any such Claims that become Disputed Claims shall be Disputed Claims in the Unsecured Claims Class for purposes of administration of Distributions under the Plan to Holders of Allowed Unsecured Claims.

### (v)    Inclusiveness.

Unless otherwise specified in the Plan, each executory contract and unexpired lease shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in the Plan.

2.    **CLAIMANTS AND IMPAIRED INTEREST HOLDERS**

Claimants and interest holders entitled to vote under the Plan must affirmatively act in order for the Plan to be confirmed by the Court.  According to the Debtor's Plan, all Classes of claims are "impaired" classes within the meaning of § 1124 of the Bankruptcy Code.  These classes, accordingly, must vote to accept the Plan in order for the Plan to be confirmed without a cram down.  A Claimant who fails to vote to either accept or reject the Plan will not be included in the calculation regarding acceptance or rejection of the Plan.

A ballot to be completed by the holders of Claims and/or Interests is included herewith. Instructions for completing and returning the ballots are set forth thereon and should be reviewed at length.  The Plan will be confirmed by the Bankruptcy Court and made binding upon all Claimants and interest holders if (a) with respect to impaired Classes of Claimants, the Plan is accepted by holders of two-thirds (2/3) in amount and more than one-half (½) in number of Claims in each such class voting upon the Plan and (b) with respect to classes of interest holders, if the Plan is accepted by the holders of at least two-thirds (2/3) in amount of the allowed interests of such class held by holders of such interests.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may, nevertheless, confirm the Plan if it finds that the Plan accords fair and equitable treatment to any class rejecting it.  Your attention is directed to Section 1129 of the Bankruptcy Code for details regarding the circumstances of such "cram down" provisions.

3.    **THE PLAN VS. LIQUIDATION ANALYSIS AND FEASIBILITY**

All payments as provided for the in the Debtor's Plan shall be funded by the Reorganized Debtor's cash on hand, the sale of non-core assets of the Reorganized Debtor, revenue from Phase I and Phase II lot sales, revenue from the sale of the Undeveloped Property, revenue from the repayment from the HOA of the mortgages on the Gatehouse and the Golf Course, the repayment from System Connection fees collected by the District related to the value of the Debtor's System Assets to be conveyed to the District, and equity contributions or loans from the Proponent and its affiliates.  The Debtor represents that this Plan of Reorganization provides fair value for all claims of creditors and is in the best interest of creditors.

As with any Plan, an alternative would be a conversion of the Chapter 11 case to a Chapter 7 case and subsequent liquidation of the Debtor by a duly appointed or elected trustee. In the event of a liquidation under Chapter 7, the following is likely to occur:

(a)    An additional tier of administrative expenses entitled to priority over general unsecured claims under § 507(a)(1) of the Bankruptcy Code would be incurred.  Such administrative expenses would include Trustee's commissions and fees to the trustee's accountants, attorneys and other professionals likely to be retained by said trustee for the purposes of liquidating the assets of the Debtor.

(b)    Further claims would be asserted against the Debtor with respect to such matters as income and other taxes associated with the sale of the assets.

An analysis of the Plan compared to liquidation follows in the form of a Liquidation Analysis, which is also used to satisfy the "Best Interest Test" requirement of confirmation.

Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis follows the typical distributions in a Chapter 7 case in which the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reason: all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation, which is demonstrated below, in balance sheet format.

## ASSETS VALUE AT LIQUIDATION VALUES:

| | | |
|---|---|---:|
| a. | Cash on hand | $0.00 |
| b. | Accounts receivable | $0.00 |
| c. | Irrigation System | $ 2,255,000.00 |
| d. | Wastewater Assets | $ 2,118,000.00 |
| e. | Phase I Lots | $ 116,000.00 |
| f. | Phase II Lots | $ 125,000.00 |
| g. | Undeveloped Land | $ 0.00 |
| h. | Gatehouse | $ 74,034.00 |
| i. | Golf Course | $ 1,000,000.00 |
| j. | Lawsuits or other claims against third-parties (net of legal fees) | $ 0.00 |
| k. | Other intangibles (such as avoiding powers actions) | $ 0.00 |
| | ***Total Assets at Liquidation Value*** | $ 5,688,034.00 |
| **Less:** | Priority Unsecured creditors' recoveries | ($ 5,543.38) |
| **Less:** | Secured creditors' recoveries (Based on Proofs of Claim filed) | ($36,686,001.21) |
| **Less:** | Chapter 7 trustee fees and expenses | ($ 192,421.02) |
| (1) | Balance for unsecured claims | ($31,293,930.31) |
| (2) | Total dollar amount of unsecured claims (Based on Proofs of Claim | $22,535,451.39 |

filed)

Percentage of Claims Which Unsecured Creditors Would
Receive Or Retain in a Chapter 7 Liquidation:                    0%  [Divide (1) by (2)]

Percentage of Claims Which Unsecured Creditors Will
Receive or Retain under the Plan:                               3%  to 100%

In a chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy estate in an amount not to exceed 25% of the first $5,000 of all moneys disbursed, 10% on any amount over $5,000 but less than $50,000, 5% on any amount over $50,000 but not in excess of $1 million, and 3% on all amounts over $1 million.

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

**On Hand:**   Cash or equivalents on the Effective Date - $974,034.00

**To Pay:**   Administrative claims - $10,000.00

**To Pay:**   Statutory costs & charges - $5,000.00

**To Pay:**   Other Plan Payments due within 30 days of Effective Date - $81,131.00

**Reserve:**   Additional first year plan payments on all Plan obligations - $54,069.00

**Balance:**   After paying these amounts - $838,834.00

The sources of the cash Debtor will have on hand by the Effective Date are:

$      0.00       Cash in DIP Account now

+$      0.00       Additional cash DIP will accumulate from net earnings between now and Effective Date

+$      0.00       Connection Fees; Lot Sales

+$      0.00       Borrowing

+$  900,000.00       Losowe Capital

$ 900,000.00        **Total**

The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments. The Proponent has provided projections, which demonstrate cash flow that exceeds the requirements of the Plan. The Plan Proponent contends that Debtor's financial projections are feasible. Please refer to Exhibit "B" attached hereto.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE PROJECTIONS.

Predicated upon the foregoing, it is management's opinion that the liquidation value of the Debtor would be insufficient to pay its secured creditors. Accordingly, there would be insufficient proceeds in a liquidation to pay any amount in respect to the claims of the junior classes of creditors.

The Court has set September 14, 2011 as a Claims Bar Date. All indebtedness scheduled by the Debtor as not disputed, contingent or unliquidated or any indebtedness set forth in a properly executed and filed Proof of Claim shall be deemed an Allowed Claim unless the same is objected to, and the objection thereto is sustained by the Court.

## V.        RISK ANALYSIS

The Debtor believes there is minimal risk to the creditors if the Plan is confirmed. The risks that could occur include, but are not limited to, the following:

1.        **The Debtor fails to meet its revenue projections;**

2.        **The Debtor is unable to sell the Lots;**

3.        **The Debtor fails to obtain construction financing to continue to build homes pursuant to contracts.**

## VI.        U.S. FEDERAL INCOME TAX CONSIDERATIONS

**THERE ARE NO FEDERAL TAX CLAIMS. OTHERWISE, NO REPRESENTATIONS ARE MADE REGARDING THE TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS OR INTERESTS.**

## VII.        POST-CONFIRMATION STRUCTURE

Upon the Effective Date, the Debtor will make disbursements pursuant to the Plan. In accordance with, and subject to, the provisions of the Plan, the Reorganized Debtor shall continue to conduct the day-to-day operations of its business. The Debtor contemplates continued management by the Debtor through Louis S. Weltman for the necessary operation of the Reorganized Debtor's business. No compensation is anticipated for Mr. Weltman.

## VIII.   CONFIRMATION BY CRAM DOWN

The Debtor reserves the right, in the event that impaired classes reject the Plan, to seek confirmation of the Plan if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each dissenting class.

The Plan is deemed fair and equitable if it provides (i) that each holder of a Secured Claim retains its lien and receives deferred cash payments totaling at least the allowed amount of its claim, of a value, as of the effective date of the Plan, of at least the value of its secured interest in the property subject to his lien, and (ii) that each holder of an Unsecured Claim receives property of a value equal to the allowed amount of its claim, or no holder of a junior claim receives or retains any property.

## IX.   MISCELLANEOUS PROVISIONS

1.      Notwithstanding any other provisions of the Plan, any Claim which is scheduled as disputed, contingent, or unliquidated or which is objected to in whole or in part on or before the date for distribution on account of such claim shall not be paid in accordance with the provisions  of the Plan until such claim has become an Allowed Claim by a final Order.  If allowed, the Claim shall be paid on the same terms as if there had been no dispute.

2.      At any time before the Confirmation Date, the Debtor may modify the Plan, but may not modify the Plan so that the Plan, as modified, fails to meet the requirements of § 1122 and § 1123 of the Bankruptcy Code.  After the Debtor files a modification with the Bankruptcy Court, the Plan, as modified, shall become the Plan.

3.      At any time after the Confirmation Date, and before Substantial Consummation of the Plan, the Debtor may modify the Plan with permission of the Court so that the Plan, as modified, meets the requirements of § 1122 and §1123 of the Bankruptcy Code.  The Plan, as modified under this paragraph, shall become the Plan.

4.      After the Confirmation Date, the Debtor may, with approval of the Bankruptcy Court, and so long as it does not materially and adversely affect the interest of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Order of Confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

5.      The Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6), within ten (10) days from the entry of an order confirming this Plan, for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period.  The Debtor, as a reorganized debtor, shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. §1930(a)(6), based upon post-confirmation disbursements made by the reorganized debtor, until the earlier of the closing of this case by the issuance of a final decree by the Bankruptcy Court, or upon the entry of an order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the reorganized debtor shall provide to the United States Trustee upon the payment of each post-

confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

## X.    CONCLUSION

Under the Debtor's Plan, all Creditors and interest holders of Debtor will participate in some manner in the distribution to be made thereunder.  Debtor believes that the distributions contemplated in its Plan are fair and afford all Claimants and interest holders equitable treatment. ACCORDINGLY, DEBTOR RECOMMENDS THAT ALL CLAIMANTS AND INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.

DATED: July 24,  2012.

**SOUTHEASTERN CONSULTING & DEVELOPMENT COMPANY, INC.**

By: _Louis S. Weltman_
Louis S. Weltman, President

**BERGER SINGERMAN**
Attorneys for Debtor
Brian G. Rich
125 South Gadsden Street, Suite 300
Tallahassee, FL  32301
Telephone:  (850) 561-3010
Facsimile:  (850) 561-3013
Email:  *brich@bergersingerman.com*

/s/  Brian G. Rich
By: _____
Brian G. Rich, Esq.
Florida Bar No.  __38229__

## Exhibits

Exhibit "A" – Plan of Reorganization

Exhibit "B" – Financial Projections

**EXHIBIT "A"**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


SOUTHEASTERN CONSULTING &
DEVELOPMENT COMPANY, INC.,

                Debtor.

Case No. 11-40398-LMK

Chapter 11 Case

_____/


**PLAN OF REORGANIZATION**

**JULY 24, 2012**



**BERGER SINGERMAN**
Attorneys for Debtor
Brian G. Rich
125 South Gadsden Street, Suite 300
Tallahassee, FL  32301
Telephone:  (850) 561-3010
Facsimile:  (850) 561-3013
Email:  *brich@bergersingerman.com*

Southeastern Consulting & Development Company, Inc., the Debtor in these proceedings

(the "Debtor"), pursuant to 11 U.S.C. §1121, proposes the following Plan of Reorganization:

ARTICLE 1    Definitions

As used in this Plan, the following terms shall have the respective meanings set forth below, and such meanings shall be equally applicable to the singular and plural forms of the terms defined unless the context requires otherwise.

1.01    Actions

All actions that a trustee or debtor-in-possession is empowered to bring pursuant to 11 U.S.C. Sections 542-553 of the Code (as hereinafter defined), and any other cause of action, lawsuit, adversary proceeding, contested matter, claim objection, or right of the Debtor or the Estate against any Person.

1.02    Administrative Claim

A Claim for payment of an administrative expense under Section 503 of the Code that is entitled to priority under Section 507(a)(1) of the Code and any fees or charges assessed against the Estate pursuant to 28 U.S.C. 1930.

1.03    Administrative Claimant

The holder of an Administrative Claim.

1.04    Allowed Amount

With respect to a Claim, (a) the amount of a Claim that was listed in the Debtor's Schedules (as originally filed in the Case) as not disputed, contingent or unliquidated, if the holder of such Claim has not filed a proof of claim with the Court within the applicable period of limitation fixed by the Court pursuant to Rule 3003(c)(3) of the Rules, or (b) if a holder of a Claim has filed a proof of claim with the Court within the applicable period of limitation fixed by the Court pursuant to Rule 3003(c)(3) of the Rules:  (i) the amount stated in such proof of claim or in the Schedules if no objection to such proof of claim or amount listed in the Schedules has been interposed within the applicable period of limitation fixed by the Code or Rules, or as otherwise fixed by the Court, or (ii) such amount as shall be fixed by an order of the Court which has become a Final Order, if an objection has been interposed within the applicable period of limitation fixed by the Code, the Rules, or the Court, or (c) with respect to a Fee Request, such amount as shall be fixed by an order of the Court which has become a Final Order.  In no event shall the Allowed Amount of any Priority Claim or Unsecured Claim include interest accrued on such Claim after the Filing Date.

1.05    Allowed Claim

Any Claim which is not a Disputed Claim for which an Allowed Amount has been finally determined in such or any portion thereof, Allowed Amount.  Any such claim shall be an Allowed Claim as to the undisputed portion or amount.  The Allowed Amount of each Secured Claim shall not include, pursuant to Section 506(b) of the Code, interest on such Claim, and any reasonable fees, costs, or charges provided for under the agreement(s) under which such Claim arose incurred as a result of any breach or default, act or omission occurring through the Effective Date or by reason of the Plan, Confirmation or Substantial Consummation.

1.06    Allowed Interest.

Any Interest which has not been timely disputed, or if timely disputed, which has been allowed by order of the Court which has become a Final Order.

1.07    Article

One of the numbered Articles of the Plan.

1.08    Assets

All of the right, title and interest of the Debtor in and to property of any type or nature.

1.09    Assumed Contract

An Executory Contract (as modified or amended pursuant to the Plan, prior order of the Court or by agreement of the parties) that is assumed by the Debtor pursuant to the Plan or by order of the Court.

1.10    Business Day

A day other than a Saturday, a Sunday or a day on which commercial banks in Tallahassee, Florida are authorized or required to close.

1.11    Case

This Chapter 11 Case No. 11-40398-LMK pending in the United States Bankruptcy Court for the Northern District of Florida.

1.12    Claim

(a)    A right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or

unsecured; (c) without limiting the generality of the foregoing, all Administrative Claims, Priority Claims, Secured Claims and Unsecured Claims.

1.13    Class

A group of Claims or Interests classified together pursuant to Article 2 of the Plan.

1.14    Class 1

The Claim of holders of property tax claims related to the Phase I Lots Collateral, Phase II Lots Collateral, Undeveloped Lots Collateral and the rest of the real property assets of the Debtor, as described, classified and treated in Section 2.01 of the Plan.

1.15    Class 2

The Bond Debt Assessment of the Heritage Plantation Community Development District, (or any successor of such claims), as described, classified and treated in Section 2.02 of the Plan.

1.16    Class 3

The Allowed Secured Claim of HP Land, LLC., as successor to BB & T (or any successor of such claims), as described, classified and treated in Section 2.03 of the Plan.

1.17    Class 4

The Allowed Secured Claim of Trustmark National Bank (or any successor of such claims), as described, classified and treated in Section 2.04 of the Plan.

1.18    Class 5

The Allowed Judgment and Deficiency Claims (or any successor of such claims) against the Debtor as described, classified and listed in Section 2.05 of the Plan.

1.19    Class 6

The Allowed Unsecured Claim of the Heritage Plantation Homeowner's Association, Inc. (or any successor of such claims) against the Debtor as described, classified and listed in Section 2.06 of the Plan.

1.20    Class 7

The Allowed Unsecured Claim of Auburn Water System, Inc. (or any successor of such claims) against the Debtor as described, classified and listed in Section 2.07 of the Plan.

1.21    Class 8

The Unsecured Trade Claims of the Debtor (or any successor of such claims) as described, classified and listed in Section 2.08 of the Plan.

1.22    Class 9

The Unsecured Trade Claims of the Debtor (or any successor of such claims) with claim amounts less than $10,000.00 as described, classified and listed in Section 2.09 of the Plan.

1.23    Class 10

The Allowed Equity Interests of the Debtor as described, classified and treated in Section 2.10 of the Plan.

1.24    Code

The Bankruptcy Code, 11 U.S.C. Section 101 et. seq.

1.25    Confirmation

The entry by the Court of the Confirmation Order.

1.26    Confirmation Date

The date on which the Clerk of the Court enters the Confirmation Order on the docket.

1.27    Confirmation Hearing

A hearing held by the Court on confirmation of the Plan pursuant to Section 1128 of the Code.

1.28    Confirmation Order

The order entered by the Court confirming the Plan, which shall contain such provisions as the Proponent desires and shall otherwise be in form and substance satisfactory to the Proponent.

1.29    Court

The United States Bankruptcy Court, Northern District of Florida, including any Bankruptcy Judge thereof and any court having competent jurisdiction to hear appeals from the Bankruptcy Judges thereof.

1.30    Creditor

Any Person holding a Claim or Interest, including Administrative Claimants and Claims of the kind specified in Sections 502(b), 502(h) and 502(i) of the Code, and such Person's heirs, successors, assigns, executors and personal representatives.

1.31    Debtor or Debtor in Possession

SOUTHEASTERN CONSULTING & DEVELOPMENT COMPANY, INC.   Any reference in the Plan to the "Debtor" shall also include the Debtor in its capacity as debtor in possession in the Case, and vice versa.

1.32    Disclosure Statement

The Disclosure Statement filed by the Proponent in connection with the Plan and approved by the Court for submission to Creditors as the same may be amended.

1.33    Disputed Amount

With respect to a particular Disputed Claim, that amount which is equal to the difference, if any, between the Face Amount of such Claim and the amount, if any, of such Claim which the party objecting thereto concedes.

1.34    Disputed Claim

Any Claim for which an Allowed Amount has not yet been determined and with respect to which an objection has been interposed on or prior to the Confirmation Date or such other date as may be fixed by the Court.

1.35    Effective Date

The tenth day after the Confirmation Order becomes final.

1.36    Estate

The estate created in the Case pursuant to Section 541 of the Code.

1.37    Executory Contract

A contract or unexpired lease to which Debtor is a party and that is executory within the meaning of Section 365 of the Code.

1.38    Face Amount

With respect to a particular Claim, (a) if the holder of such Claim has not filed a proof of claim with the Court within the applicable period of limitation fixed by the Court pursuant to Rule 3003(c)(3) of the Rules, the amount of such Claim that was listed in the Schedules (as

originally filed in the Case) as not disputed, contingent or unliquidated; or (b) if the holder of such Claim has filed a proof of claim with the Court within the applicable period of limitation fixed by the Court pursuant to Rule 3003(c)(3) of the Rules, the amount stated in such proof of claim, or (c) with respect to a Fee Request, the net amount to which the applicant would be entitled if its application were to be granted in full.

1.39    Fee Request

An application or request for payment by the Estate of fees, compensation for services rendered or reimbursement of expenses, pursuant to Rule 2016 of the Rules or other applicable provision of the Code or the Rules.

1.40    Filing Date

May 16, 2011, the date the Debtor filed its Chapter 11 petition with the Court.

1.41    Final Order

An order or judgment of the Court as entered on the docket that has not been reversed, stayed, modified or amended, and respecting which the time to appeal, petition for certiorari or seek reargument, review or rehearing has expired and as to which no appeal, reargument, petition for certiorari, review or rehearing is pending or as to which any right to appeal, reargue, petition for certiorari or seek review or rehearing has been waived in writing in a manner satisfactory to the Proponent, or, if any appeal, reargument, petition for certiorari, review or rehearing thereof has been denied, the time to take any further appeal or to seek certiorari or further rehearing, review of reargument has expired.

If any provision of the Plan requires the entry of a Final Order as a condition to the occurrence or performance of an act, Proponents may jointly waive such requirement.

1.42    Lien

A charge against or interest in any item of Property of the Estate to secure payment of a debt or performance of an obligation.

1.43    Ordinary Course Administrative Claims

Administrative Claims for the provision of goods or services that are incurred by the Debtor in the ordinary course of business.

1.44    Person

Any individual, sole proprietorship, partnership (general or limited), joint venture, trust, unincorporated organization, association, corporation, institution, entity or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body, political subdivision or department thereof).

1.45   Plan

This Plan of Reorganization in the present form or as it may be modified, amended or supplemented from time to time.

1.46   Priority Claim

A Claim (other than an Administrative Claim) that is entitled to priority under Section 507 of the Code.

1.47   Priority Tax Claim

A Claim (other than an Administrative Claim) that is entitled to priority under Section 507(a)(8) of the Code.

1.48   Property

The Debtor's real property and business assets.

1.49   Pro Rata

Proportionately, so that the ratio of the amount of consideration distributed on account of a particular Allowed Claim to the Allowed Amount of such Claim is the same as the ratio of the amount of consideration distributed on account of all Allowed Claims of the Class in which the particular Claim is included to the amount of all Allowed Claims of that Class.  Whenever a Disputed Claim has not been finally resolved, an appropriate reserve for payment of such Disputed Claim shall be established so that there will be sufficient monies available to make a Pro Rata distribution to the holder of such Disputed Claim upon final resolution of the dispute.

1.50   Property of the Estate

The property defined in Section 541 of the Code and any other property right or interest of the Debtor.

1.51   Rejected Contract

An Executory Contract that is rejected at any time during the Case or pursuant to Section 3.07 of the Plan.

1.52   Rejection Claim

A Claim arising under Section 502(g) of the Code in its Allowed Amount.

1.53   Rules

The Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure and/or the Local Rules of the Court.

1.54   Rules of Construction and Interpretation

The following rules of construction shall be applicable for all purposes of the Plan unless the context clearly requires otherwise:

a)     The terms "include", "including" and similar terms shall be construed as if followed by the phrase "without being limited to".

b)     Words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders, and words importing the singular number shall mean and include the plural number, and vice versa.

c)     All article, section and exhibit or appendix captions are used for convenience and reference only and in no way define, limit or describe the scope or intent of, on in any way affect, any such article, section, exhibit or appendix.

1.55   Schedules

The schedules of assets and liabilities originally filed by the Debtor with the Court and not as the same may be amended from time to time.

1.56   Section

A numbered subsection of any Article of the Plan (for example, this numbered subsection of Article 1 of the Plan would be referred to as Section 1.56).

1.57   Secured Claim

A Claim secured by a lien on property in which the Estate has an interest or that is subject to set-off under Section 553 of the Code to the extent of the value of the interest attributable to such Claim in the Estate's interest in such property or to the extent of the amount subject to set-off.

1.58   Secured Creditor

The holder of a Secured Claim.

1.59   Substantial Consummation

Following the occurrence of Confirmation, the date of the first distribution to any one or more of the creditors.

1.60    Unsecured Claim

A Claim other than a Secured Claim, a Priority Claim or an Administrative Claim.

1.61    Unsecured Creditor

The holder of an Unsecured Claim.

ARTICLE 2    Classification, Treatment and Impairment of Claims and Interests

2.01    Class I - Priority Property Tax Claims

(a)    Description.    Class I is comprised of the holders of property tax claims, whether in the name of Okaloosa County or a holder of property tax certificates issued by Okaloosa County.  The aggregate amount of such claims is approximately $875,805.89 based on the Proof of Claim filed by Okaloosa County.

(b)    Treatment.  In full satisfaction of the Class I Claim,

(a)    the Debtor shall convey to the District the System Assets on the Effective Date subject to the confirmation of the Plan for consideration in the amount of $4.373 million (the "System Assets Purchase Price") payable in the form a note to be issued by the District to the Debtor in the amount of the System Assets Purchase Price (the "System Assets Note"), such System Assets Note to bear interest at the rate of 4% per annum and to be repaid from connection fees collected by the District from and at the time of the transfer of each of the Phase I Lots Collateral and Phase II Lots Collateral.  Each such connection fee shall be in the amount of $18,145.00.  The District shall have lien rights against the Phase I and Phase II Collateral to the extent of the System Assets Note (the "District Lien Rights"), which District Lien Rights shall be superior to any and all other liens and the connection fees shall be for the sole benefit of the Debtor expressly and limited to supporting the repayment of the System Assets Note; and either option (b) or (c), as follows:

(b)    The holder of the Allowed Priority Property Tax Claim shall have its "Class I Collateral", comprised of the Phase I Lots Collateral and the Phase II Lots Collateral, returned to it subject to the District Lien Rights against each of the 241 lots that comprise the Class II Collateral but otherwise free and clear of any other encumbrances whatsoever all upon confirmation of the Plan, whereby the Class I Collateral shall be conveyed at the time of final confirmation of the Plan into a special purpose entity owned by the Class I Claimants prorata (the "SPE") pursuant and subject to the following:

      (i) the Bankruptcy Code,
      (ii) the recorded Declaration of Covenants and Restrictions of the HOA,
      (iii) the Development Agreement, and
      (iv) a marketing agreement between the SPE and the Debtor restricting the bulk sale of the Class I Collateral for a five (5) year period following such conveyance (the "Marketing Agreement"), and which Marketing Agreement shall provide for the Debtor to provide future services to the SPE and in exchange therefor receive a marketing fee of

twenty-five (25%) percent of the proceeds from the sale of the Class I Collateral less normal and customary brokerage commissions and closing costs, whether the lots are sold individually by lot or in the aggregate

or

(c) as otherwise authorized by the Bankruptcy Code or agreed to by the Debtor or the Reorganized Debtor and each such Holder prior to the Confirmation Date.

Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class I Claim is allowed by a Final Order and shall be in full satisfaction, release and discharge of such Class I Claim. Class I is Impaired. As a result, each Holder of a Class I Claim is entitled to vote to accept or reject the Plan.

(c)     <u>Impairment.</u> Class I is impaired.

2.02    Class II - District Bondholders Bond Debt Assessment Lien

(a)     <u>Description.</u> Class II is comprised of the Bond Debt Assessment of the District, which secured the Bond obligations owing by the District to its Bondholders. The aggregate amount of such claims is approximately $13,209,946.90 based on the Proof of Claim filed by the District.

(b)     <u>Treatment.</u> In full satisfaction of the Class I Claim, the holder of the Allowed Class II Secured Claim shall have its Class II Secured Claim restructured, as follows:

The Debtor proposes to restructure the Bond Debt Assessments principally through an exchange of the developer related to both the existing Series A and Series B 2006 Bonds (collectively, the "Series 2006 Bonds") for one (1) new series, ie the Series 2012 Bonds. The principal amount of the District's Series 2006 Bonds to be exchanged and thereby redeemed in full is $10,520,000.00.

The principal amount of Series 2012 Bonds to be issued by the District in exchange for the Series 2006 Bonds is $1,665,024.00. The Series 2012 Bonds shall mature fifteen (15) years following their issuance and carry an interest rate of 3%.

The principal amount of the Series 2012 Bonds was determined as follows:

| | |
|---|---|
| ➢ Outstanding 2006 Bonds | $11,360,000.00 |
| ➢ Incomplete construction Credit | ($1,490,000.00) |
| ➢ Principal Reduction of 2006 Bonds | ($9,000,000.00) |
| ➢ Unpaid Interest | $1,362,521.00 |
| ➢ Accrued Interest (05/01/12 to 11/01/12) | $272,503.00 |
| ➢ (Less) Series 2006 Bonds to remain outstanding | ($840,000.00) |
| Total Series 2012 | $1,665,024.00 |

As summarized in the above table, in connection with the proposed restructure of the

District Claims under the Plan, the Debtor proposes that the District shall make various adjustments to the principal amount outstanding on the Series 2006 Bonds in order to arrive at the principal amount of the Series 2012 Bonds to be issued by the District.  Such adjustments include a principal reduction amount, a reduction for incomplete construction obligations of the District and an increase in the principal balance thereof by the unpaid and accrued interest on such Claims. The term "unpaid interest" shall mean interest that has not been paid by the Debtor on the District Claims through the Filing Date. The term "accrued interest" shall mean interest on the District Claims that will accrue from and after the Filing Date up to and including the Effective Date. The Debtor's Plan provides for an interest forbearance period, namely the period from the Effective Date through the date of the first payment on the Series 2012 Bonds, which is two years from the Effective Date.

Based on a principal amount of the Series 2012 Bonds to be issued by the District, the principal of such bonds to be allocated to each lot in Phase I and Phase II of the Development, excluding lots which have an allocated amount of the Series 2006 Bonds attached to them, is $6,908.81.  The corresponding annual assessment on each lot to be used to retire the Series 2012 Bonds upon payment to the District thereof shall be $460.58.  Accordingly, the District shall receive annual assessment revenues, excluding interest, in the amount of $111,001.59, before approximate collection costs of 6%.

As of the date hereof, the Debtor understands that none of the bondholders who own or control the underlying Bonds issued by the District have consented to the proposed restructure of the District Claims. Moreover, if such bondholders do not consent to a restructuring of the District Claims, then such bondholders, or the Indenture Trustee for such bondholders, may seek to enforce their rights against the District and take the position that the District remains in default under its obligations to the Indenture Trustee.

(c)     Impairment.  Class II is impaired.

2.03    Class III - HP Land, LLC as successor to Branch Banking & Trust's Secured Claim

(a)     Description.  Class III is comprised of the claim of HP Land, LLC., as the successor to the secured claim of Branch Banking & Trust (the "Class II Secured Claim").  The amount of the Class II Secured Claim is $16,155,895.00 based on the Proof of Claim filed by Branch Banking & Trust.

(b)     Treatment.  In full and final satisfaction of the Class II Secured Claim, HP Land and the Debtor have agreed (the "Settlement Agreement"), subject to confirmation of the Plan, to modify and combine the existing mortgages on its collateral (the "Collateral"), as follows:

1.     HP Land shall record a new mortgage:

a.     The term shall be for 10 years (the "Term").
b.     No interest shall accrue and no payments shall be due during the Term.
c.     There shall be a balloon payment due at end of the Term.

d. The Term shall commence from the Effective Date.

e. HP Land's mortgage (the "Mortgage") shall encompass the 280 acres of developable property that are part of the Undeveloped Property, as more fully detailed on Exhibit A of the Settlement Agreement between the Debtor and HP Land, a hearing upon which Settlement Agreement is scheduled for June 14, 2012 (defined therein as, the "Developable Property").

f. The Mortgage shall contain the following release provisions for the Developable Property (the "Modified Collateral"):

   i. HPL shall receive the greater of (i) $12,000 per acre; or (ii) the value determined by the following formula: the extrapolated selling price per acre less $33,000 (representing the development costs), multiplied by 50%. HPL shall agree to pro rata release for sales of less than one acre. HPL shall have the right of first refusal for the sales, evidenced by a recorded document in the public records of Okaloosa County, Florida. There shall also be a true-up of development costs to reflect the actual development costs in the release equation.

   ii. Exhibit A attached hereto represents the land that is the developable acres and the legal description of the Modified Collateral, which is comprised of Sections A, B, C and D. Take-down shall be accomplished on a section by section basis and payment shall be based upon the number of acres in each section as more fully described in Exhibit A.

2. The Debtor shall cause the Declaration to be amended so that HP Land shall not be liable for assessments in the event that HP Land forecloses on the Collateral by way of making HP Land a co-Declarant.

3. HP Land shall agree to support and shall affirmatively support the Debtor's Plan of Reorganization that contains the terms of the Settlement Agreement.

4. The Parties shall agree to the form of a stay relief order to be submitted to the Bankruptcy Court, including provisions for events of default under the Mortgage, Debtor's conveyance to HP Land of clear title to 80 acres to the north of Heritage Plantations developable property (the legal description of which is attached to the Settlement Agreement as Exhibit B thereto), and modification of the Declaration in which HP Land will join as mortgagee. HP Land shall be entitled to full relief from the automatic stay to continue the foreclosure sale for the Collateral under the existing mortgages if the Debtor does not file its Disclosure Statement and a Plan that includes the terms set forth herein within 1 year from the date of this Settlement Agreement. HP Land shall be in default and not entitled to continue the foreclosure sale if it does not vote in favor of the Debtor's Plan.

5.      All property subject of the First, Second and Third Mortgage, excluding the Modified Collateral shall be excluded from the Mortgage and shall be released.

6.      The Parties shall work cooperatively on the form of the Mortgage and related documents.

7.      HP Land shall have the right to enter on the lands of the Debtor to harvest merchantable timber and vegetation, and on the platted lots, to clear lots of vegetation and trees in accordance with applicable covenants and contracts between the Parties.  Such activity benefits the Debtor's plans for development and is in the ordinary course of the Debtor's business as a subdivision developer

        (c)      Impairment.  Class III is impaired.

2.04    Class IV - Trustmark National Bank Secured Claim

        (a)      Description.    Trustmark National Bank's Class IV Secured Claim is comprised of its secured claim in the amount of $5,105,978.04.   There is no value in the collateral related to its Secured Claim, except for the Gatehouse, which for purposes of treatment under the Plan, is assigned a value of $74,000.00.

        (b)      Treatment.  In full satisfaction of the Class IV Claim, the Debtor shall pay the full amount of such Allowed Class IV Secured Claim the value of the collateral in the amount of $74,034.00 within thirty (30) days of the Effective Date.

        (c)      Impairment.  Class IV is impaired.

2.05    Class V - Judgment and Deficiency Claims

        (a)      Description.   Class V is comprised of holders of judgment and deficiency claims against the Debtor (the "Class V Claims").  The aggregate amount of the Class V Claims is $28,462,095.91 based on the Proofs of Claim filed by the claimants in this Class V, as follows:

                i.      Trustmark National Bank's Class V Claim in the aggregate amount of $7,924,406.12 is comprised of an unsecured claim in the amount of $198,212.84, an unsecured claim in the amount of $2,620,215.33 and a secured claim in the amount of $5,105,978.04.  There is no value available to Trustmark in the collateral related to its Secured Claim, except for the Gatehouse, which is therefore a part of this Class V;

                ii.     Heritage Plantation Community Development District's Class V Claim is $19,586,325.81, comprised of two separate claims in the amounts of $380,509.81 and $19,305,816.00;

                iii.    Deere Credit, Inc's. Class V Claim is $538,376.65; and

                iv.     Florida First Bank's Class V Claim is $412,987.33.

(b)    Treatment.  In full satisfaction of the Class V Claim, at the election of the claimant's holding at least 66.67% of the value of such Class V Claims, the Class V Claims shall in the discretion of such claimants, be treated pursuant to one of the two treatments outlined below as Option A or Option B.  The Class V Claimants shall make the election in writing to the Debtor within thirty (30) days of the Effective Date or the Class IV Claims shall automatically be treated pursuant to Option B.

Option A:  The Debtor shall pay to each Class V Claimant an amount equal to one half of one percent (0.5%) percent (the "Class V Cash Payment") of their respective Class V Claims in full satisfaction of each such Class V Claim, such amount to be paid as follows:  5% of the Class V Cash Payment within thirty (30) days of the Effective Date; 5% of the Class V Cash Payment on or before the date that is 180 days from the first payment hereunder; 25% of the Class V Cash Payment on or before the date that is 180 days from the second payment hereunder and the balance within 360 days of the third payment hereunder.

Option B:  The Debtor to issue to each Class V Claimant an unsecured note in an amount equal to one (1%) of its claim (the "Class V Notes").  The Class V Notes shall not bear interest and shall be repaid from the sale of the Undeveloped Lots, through release payments on each such closing in the amount of $600.00 per lot.  The Class V Notes issued in connection with this Option B shall be unsecured and post-confirmation, shall subordinate to any financing related to the development of infrastructure or construction financing required by the Debtor to construct improvements on the Lots.

(c)    Impairment.  Class V is impaired.

2.06    Class VI - Heritage Plantation Homeowner's Association, Inc.'s Unsecured Claim

(a)    Description.  Class VI is comprised of the unsecured claims of the Heritage Plantation Homeowner's Association, Inc. (the "HOA") (the "Class VI Claim").  The amount of the Class VI Claim is undetermined at the time of the writing of this Disclosure Statement and is based on the Proof of Claim filed by the HOA.

(b)    Treatment.  In full satisfaction of this Class VI Claim, the Debtor shall on the Effective Date:

(i)    issue to the HOA an unsecured note of Two Hundred Thousand Dollars ($200,000.00) (the "HOA Note").  The HOA Note shall not bear interest and shall be repaid from the sale of Undeveloped Lots through release payments on each such closing in the amount of $400.00 per lot.  The HOA Note issued in connection with this Class V shall be unsecured and post-confirmation, shall subordinate to any development financing to prepare lots for sale and construction financing required by the Debtor to construct improvements on the Undeveloped Lots;

(ii)     convey to the HOA the Golf Course in exchange for the sum of $1 million (the "Golf Course Purchase Price") with the Golf Course Purchase Price payable by the HOA to the Debtor, as follows:

(1) a note and mortgage in the amount of $1 million, such mortgage only to be paid from capital contributions to the HOA from future lots closings with no interest thereupon, plus

(2) the HOA's promise to restore the Golf Course to playable condition;

(iii)     convey to the HOA the Gatehouse (the "Gatehouse") for an amount equal to the assessed value of the Gatehouse, or $74,034.00 (the "Gatehouse Purchase Price") payable, as follows:

(1) a note and mortgage in the amount of $74,034.00 (the "Gatehouse Mortgage"), such mortgage only to be paid from capital contributions to the HOA from future lots closings with no interest thereupon, plus

(2) the HOA's promise to restore the Gatehouse to useable condition

(c)     Impairment.  Class VI is impaired.

2.07    Class VII - Auburn Water System, Inc.'s Unsecured Claim

(a)     Description.  Class VII is comprised of the unsecured claims of Auburn Water System, Inc. ("Auburn") (the "Class VII Claim").  The amount of the Class VII Claim is $164,292.50 in connection with the unpaid maintenance bond for the Phase II potable water improvements to be conveyed to Auburn pursuant to the executory contract between Auburn and the Debtor.  As at the time of the writing of this Disclosure Statement, Auburn had not timely filed a Proof of Claim.

(b)     Treatment.  In full satisfaction of this Class VII Claim, the Debtor to issue to Auburn an unsecured note in an amount equal to $164,292.50 (the "Auburn Note").  The Auburn Note shall bear interest at the rate of four (4%)_ percent per annum on the outstanding balance with the Auburn Note amount to be paid from the operations of the Debtor over seven (7) years with equal annual principal reductions in arrears, commencing thirteen (13) months from the Effective Date.  The Auburn Note issued in connection with this Class VII Claim shall be unsecured and post-confirmation, shall be subordinate to any construction financing required by the Debtor to construct improvements on the Lots.

(c)     Impairment.  Class VII is impaired.

2.08    Class VIII -  Trade Claims

(a)    <u>Description.</u>  Class VIII is comprised of the unsecured trade claims of the Debtor with claim amounts in excess of $10,000.00 (the "Class VIII Claims").  The aggregate amount of the Class VI Claims is $188,028.46 based on the Debtor's Schedule F, as adjusted by such Proofs of Claim filed by the Class VI Claimants.

(b)    <u>Treatment.</u>  In full satisfaction of the Class VIII claims, the Debtor to issue to each Class VIII Claimant an unsecured note in an amount equal to twenty-five (25%) percent of its claim (the "Class VIII Notes").  The Class VIII Notes shall bear interest at the rate of four (4%) percent per annum on the outstanding balance with the Class VIII Notes amount to be paid from the operations of the Debtor over seven (7) years with equal annual principal reductions in arrears, commencing thirteen (13) months from the Effective Date.  The Class VIII Notes issued in connection with this Option B shall be unsecured and post-confirmation, shall be subordinate to any construction financing required by the Debtor to construct improvements on the Lots.

(c)    <u>Impairment.</u>  Class VIII is impaired.

2.09    Class IX -  Convenience Claims

(a)    <u>Description.</u>  Class IX is comprised of the unsecured trade claims of the Debtor with claim amounts less than $10,000.00 (the "Class IX Claims").  The aggregate amount of the Class IX Claims is $271,398.48 based on the Debtor's Schedule F, as adjusted by such Proofs of Claim filed by the Class IX Claimants.

(b)    <u>Treatment.</u>  In full satisfaction of the Class IX claims, the Debtor shall pay to each Class IX Claimant an amount equal to twenty-five (25%) percent (the "Class IX Cash Payment") of their respective Class IX Claims in full satisfaction of each such Class IX Claim, such amount to be paid as follows:  5% of the Class IX Cash Payment within thirty (30) days of the Effective Date; 5% of the Class IX Cash Payment on or before the date that is 180 days from the first payment hereunder; 25% of the Class IX Cash Payment on or before the date that is 180 days from the second payment hereunder and the balance within 360 days of the third payment hereunder.

(c)    <u>Impairment.</u>  Class IX is impaired.

2.10    Class X -  Equity Interests

(a)    <u>Description</u>.  Class X is comprised of the Equity Interests of the Debtor. Class X is represented by the 10,000 shares of the Debtor's pre-petition common stock owned by Riggs and Phoenix, which are forfeited.

(b)    <u>Treatment</u>.  Phoenix shall retain one hundred percent of the equity interests of Losowe Capital, Inc. ("Losowe"), following the merger of the Reorganized Debtor with Losowe, whereby Losowe shall be the surviving entity and succeed to all right, title and

interest of the assets of the Reorganized Debtor subject to the treatment of all of the Reorganized Debtor's Claims as set forth in the Disclosure Statement and the Plan.

      (c)      Impairment.  Class X is impaired.

2.11    Agreement to Less Favorable Treatment

Any Creditor may agree to less favorable treatment than is provided for in the Plan.  The obligations of the Debtor under this Plan may be prepaid in full or in part without penalty.

2.12    Satisfaction of Claims

The treatment of and the consideration received by the holders of the Claims and Interests pursuant to this Article 2 of the Plan shall be in full satisfaction, release and discharge of their respective Claims against, or Interests in, the Debtor and the Estate.

ARTICLE 3    Means For Implementation and Post-Confirmation Operations of the Reorganized Debtor

3.01    Revenue from Operations; Equity and Loans

The Plan will be implemented from the Reorganized Debtor's cash on hand, the sale of non-core assets of the Reorganized Debtor, revenue from the sale of the Phase I and Phase II lots, revenue from the sale of the Undeveloped Property, revenues from the repayment from the HOA of the mortgages on the Gatehouse and the Golf Course, the repayment from sewer tap fees collected by the District of the value of the Debtor's wastewater assets and the Irrigation System to be conveyed to the District, and equity contributions or loans from the Proponent and its affiliates.  The Debtor represents that this Plan of Reorganization provides fair value for all claims of creditors and is in the best interest of creditors.  The Liquidation Analysis contained in the Disclosure Statement and the projections annexed thereto support the proposed treatment of Allowed Claims pursuant to Article 2 of the Plan.

3.02    Continuation of Business.

In accordance with, and subject to, the provisions of the Plan, the Reorganized Debtor, shall continue to conduct the day-to-day operations of its business.

3.03    Initial Management of the Reorganized Debtor.

The Debtor contemplates continued management through Louis S. Weltman for the necessary operation of the Reorganized Debtor's business.  The Disclosure Statement discloses the identity of affiliations of post-confirmation members, together with all other information required by section 1129(a)(5) of the Bankruptcy Code.

3.04    Executive Compensation.

The Disclosure Statement discloses that the compensation being paid to the Reorganized Debtor's executive management shall remain consistent with compensation paid prior to the Effective Date.

3.05.    Causes of Action.

Except as otherwise provided in the Plan and Disclosure Statement, all Actions (including Avoidance Actions) shall automatically be retained and preserved and will revest in the Reorganized Debtor.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Reorganized Debtor shall retain and have the exclusive right to enforce and prosecute Actions against any Entity.

3.06    Fee Requests

All Persons entitled to make Fee Requests in the Case shall file their Final Fee Requests and cause such Fee Requests to be ruled on by the Court on or before the date of the Confirmation Hearing.

3.07    Executory Contracts

Any lease or executory contract not assumed by order of the Bankruptcy Court or by the terms of the Plan and Confirmation Order confirmed are rejected.  The Debtor shall assume all of the leases related to the Bella Rosa Units.

**Proofs of Claim for Rejected Agreements.  Unless otherwise provided by order of the Bankruptcy Court entered before the Confirmation Date, any Claim against the Debtor arising from the rejection of any executory contract or unexpired lease agreement under this Plan must be filed with the Bankruptcy Court within 30 days after the date the Order approving the rejection was entered or on the last date set by the Bankruptcy Court for other parties to file a Proof of Claim, whichever is longer.**

ARTICLE 4    Unclassified Claims and Disputed Claims and Distributions

4.01    Administrative Claims

Each holder of an Allowed Administrative Claim (including Allowed Administrative Claims of Professionals) shall be paid (a) an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Administrative Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, on the later of (i) the Effective Date, or as soon thereafter as reasonably practicable, or (ii) as soon as practicable after the date of a Final Order Allowing such Administrative Claim, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

All Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Bankruptcy Case shall be paid by Reorganized Debtor (a) in the ordinary course of business in accordance with contract terms, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

4.02    U.S. Trustee's Fees

All unpaid fees and charges assessed against the Debtor under Chapter 123 of title 28, United States Code, 28 U.S.C. §1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the United States Trustee by the Reorganized Debtor by no later than thirty (30) days following the Effective Date.  At the time of such payment, the Reorganized Debtor shall provide to the United States Trustee an affidavit indicating the disbursements made by the Debtor for the relevant periods, if requested by the United States Trustee. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Cases shall be paid by the Reorganized Debtor, until the earlier of (i) the closing of the Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code.  Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).  At the time of each such payment, the Reorganized Debtor shall provide to the United States Trustee an affidavit indicating the disbursements for the relevant period, if requested by the United States Trustee.

4.03    Priority Tax Claims

Each Holder of an Allowed Unsecured Priority Tax Claim shall receive from the Reorganized Debtor, on account of such Allowed Unsecured Priority Tax Claim, regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code commencing on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Unsecured Priority Tax Claim. Notwithstanding the above, each Holder of an Allowed Unsecured Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Unsecured Priority Tax Claim and the Debtor or the Reorganized Debtor, as the case may be.  The Reorganized Debtor shall have the right to prepay such Allowed Unsecured Priority Tax Claims at any time, in whole or in part, without penalty or premium.

4.04    Timing of Distribution.

Except as set forth in the Plan, the distribution of Property will be made to Holders of Allowed Claims and Allowed Interests in accordance with the Plan.  If a Claim is not an Allowed Claim as of the applicable, distributions will be made only if and when the Claim is Allowed.

4.05    Delivery of Distributions.

The Reorganized Debtor will make distributions to Holders of Allowed Claims and Interests at the addresses set forth on the Proofs of Claim, if any, filed by such Holders or at the last known addresses of such Holders.  If any such Holder's distribution is returned as undeliverable, no further distribution will be made to such Holder unless and until the Reorganized Debtor is notified of such Holder's then current address, at which time all missed distributions will be made to such Holder, without interest.

4.06    Cash Payments.

Cash payments to be made pursuant to this Plan shall be made by wire transfer or checks drawn on a domestic bank, at the option of the Reorganized Debtor.

4.07    Interest on Claims.

Unless otherwise specifically provided for in this Plan, the Confirmation Order, (or any documents in connection therewith) or required by applicable bankruptcy law, Post-Petition Date interest shall not accrue or be paid on Claims (other than Allowed Secured Claims), and no Holder of a Claim (other than Allowed Secured Claims) will be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

4.08    No De Minimus Distributions.

Other than in the Final Distribution, no payment of Cash in an amount of less than $100.00 shall be made on account of any Allowed Claim.  Such undistributed amount will instead be held in escrow and made as part of the Final Distribution, which will be paid to each creditor with an Allowed Claim, regardless of the amount of each dividend.

4.09    Failure to Negotiate Checks.

Checks issued in respect of distributions under this Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance.  Any funds returned by reason of non-negotiated checks shall be held by the Reorganized Debtor until such time as they qualify for Unclaimed Property, or if earlier, a request for reissuance is received by the Reorganized Debtor.  Requests for reissuance of any such check shall be made, in writing, directly to the Reorganized Debtor by the Holder of the Allowed Claim with respect to which the check originally was issued.  All Claims for which void checks were issued, as well as the underlying distributions, will be forever barred, as against the Debtor, the Estate, and its Assets, however, any Claimants holding Claims for which void checks were issued may still pursue such Claims against Unclaimed Property, as set forth in the following paragraph.

4.10    Compliance with Tax Requirements.

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Reorganized Debtor shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Reorganized Debtor within thirty (30) days from the date of such request, the Reorganized Debtor may, at its option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

4.11    No Payment or Distribution Pending Allowance.

All references to Claims and amounts of Claims refer to the amount of the Claim allowed by operation of law, Final Order of the Bankruptcy Court or this Plan.   Accordingly, notwithstanding any other provision in this Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim, unless and until the Disputed Claim becomes an Allowed Claim.  No partial distributions will be made while an Objection is pending to part or all of a Claim.

4.12    Disputed Distribution.

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution, the Reorganized Debtor may, in lieu of making such distribution to such Holder, make such distribution (or any amount estimated pursuant to section 502(c) of the Bankruptcy Code) into a segregated account until the disposition thereof shall be determined by Final Order of the Bankruptcy Court (or other court of competent jurisdiction) or by written agreement among the interested parties to such dispute.

4.13    Estimation of Disputed Claims.

To effectuate distributions pursuant to this Plan and avoid undue delay in the administration of the Estate, the Reorganized Debtor shall have the right, at any time, to seek an order of the Bankruptcy Court, after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim and which hearing may be held on an expedited basis), estimating a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether the Debtor or Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such Objection.  All of these Objection and resolution procedures are cumulative and not necessarily exclusive of one another.  In addition to seeking estimation of Claims, the Reorganized Debtor may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Case had not been commenced, subject only to the terms of this Plan.  Claims may be subsequently compromised, settled, withdrawn or resolved by the Reorganized Debtor, pursuant to this Plan.

4.14    Resolution of Disputed Claims.

Subject to the conditions set forth in this Plan, the Reorganized Debtor will have the right (a) within 90 days from the date of Confirmation to initiate and prosecute any additional Objections to Claims, (b) to request estimation of each such Claim, (c) to litigate any Objection to Final Order, (d) to settle or to compromise any Claim, or (e) to withdraw any Objection to any Claim (other than an Allowed Claim or a Claim that is deemed to be allowed pursuant to this Plan or a Final Order).

4.15    Distributions in Complete Satisfaction.

The distributions and rights provided under this Plan will be in complete satisfaction and release, effective as of the Effective Date, of all Claims against and Interests in the Debtor's Estate and all liens upon any Property of the Estate. The Holders of liens satisfied and released under this Plan will execute and deliver, or cause to be executed and delivered, any and all documentation reasonably requested by the Reorganized Debtor evidencing the satisfaction, discharge and release of such liens.

ARTICLE 5    Effect of Confirmation

5.01    Terms Binding

Upon the Effective Date, all of the provisions of this Plan, including all appendices and other exhibits hereto, shall be binding on the Debtor, the Estate, all Creditors, and all other entities who are affected (or whose interests are affected) in any manner by the Plan.

5.02    Automatic Stay Provisions

The automatic stay provisions of Section 362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date, provided, however, that such automatic stay shall remain in force as to Disputed Claims until a Final Order has been entered in respect thereof.

ARTICLE 6    Miscellaneous

6.01    Modifications to Plan Prior to Confirmation

At any time prior to the Confirmation Date, the Proponent may modify the Plan, but may not modify the Plan so that the Plan as modified fails to meet the requirements of Sections 1122 and 1123 of the Code. A modified plan filed with the Court shall become the Plan.

6.02    Modifications to Plan After Confirmation

At any time after the Confirmation Date, and before Substantial Consummation, the Proponent may modify the Plan but may not modify the Plan so that the Plan as modified fails to meet the requirements of Sections 1122 and 1123 of the Code. The Plan as modified under this

Section becomes the Plan only if the Court, after notice and a hearing, confirms such Plan, as modified, under Section 1129 of the Code.

6.03    Remedy of Defects

After the Effective Date, the Proponent may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan.

6.04    Jurisdiction of Bankruptcy Court

Except as is otherwise provided in the Confirmation Order, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    Classification of any Claim, reexamination of any Claim which has been allowed for purposes of voting, and determination of any objection filed to any Claim. Failure to object to any Claim for the purpose of voting shall not be deemed to be a waiver of the right to object to the Claim in whole or in part.

(b)    Determination of all questions and disputes regarding the Plan, the Debtor or Property of the Estate and determination of all causes of action, controversies, disputes, or conflicts involving the Plan, any Creditor, the Debtor or Property of the Estate arising prior to or on the Effective Date whether or not subject to action pending as of the Confirmation Date including resolution of Disputed Claims.

(c)    Determination of all disputes arising after the Effective Date with respect to the interpretation of the Plan.

(d)    Determination of any Action.

(e)    Determination of any issue, violation, injunction, contempt, relief, or other proceeding as contemplated under Section 362 of the Bankruptcy Code.

(f)    Correction of any defect, curing of any omission of reconciliation of any inconsistency in the Plan or in the Confirmation Order as may be necessary or appropriate to carry out the purposes and intent of the Plan.

(g)    Modification of the Plan after the Confirmation Date pursuant to the provisions of the Plan, the Code and the Rules.

(h)    Interpretation of the Plan.

(i)    Entry of any order, including a mandatory injunction or restraining order, required to facilitate consummation of the Plan or to enable the Effective Date to occur; and reconsideration or vacation of the Confirmation Order in the event Substantial Consummation is rendered impossible.

(j)     Entry of a final decree closing the Case.

6.05    Withdrawal of the Plan.

The Debtor or Reorganized Debtor reserves the right, at any time prior to the Substantial Consummation of the Plan, to revoke or withdraw the Plan.  If the Plan is revoked or withdrawn or if Confirmation does not occur, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

6.06    Final Order.

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtor or Reorganized Debtor upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

6.07    Business Days.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.08    Severability.

Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which the provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Debtor reserves the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.

6.09    Governing Law.

EXCEPT TO THE EXTENT THAT (i) THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, OR (ii) THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN PROVIDE THAT THE LAW OF A DIFFERENT JURISDICTION SHALL GOVERN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE

STATE OF FLORIDA, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA OR THE UNITED STATES OF AMERICA.

6.10    Notices.

Any notice required or permitted to be provided under the Plan shall be in writing and served to the Debtor, c/o:

6.11    Filing of Additional Documents.

On or before substantial consummation of the Plan, the Debtor or Reorganized Debtor shall issue, execute, deliver, and file with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

6.12    Time.

Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of next succeeding day that is a Business Day.  Otherwise, the provisions of Bankruptcy Rule 9006 shall apply.

6.13    Saturday, Sunday or Legal Holiday.

If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.14    No Attorneys' Fees.

No attorneys' fees will be paid by the Debtor or Reorganized Debtor with respect to any Claim or Interest except as expressly specified herein or Allowed by a Final Order of the Bankruptcy Court.

6.15    Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

6.16    Preservation of Rights of Setoff.

The Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any

nature whatsoever that the Debtor may have against the Holder of such Claims; but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such Holder.

6.17    No Injunctive Relief.

No Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

6.18    No Admissions.

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtor with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

6.19    Entire Agreement.

The Plan sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents.  The Debtor shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

6.20    Waiver.

The Debtor reserves its right, in its sole discretion, to waive any provision of the Plan to the extent such provision is for the sole benefit of the Debtor and/or its Affiliates.

6.21    Savings Clause

Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

6.22    Vesting of Assets.

On the Effective Date and except as otherwise provided in the Plan, all the Property of the Estate will vest in the Reorganized Debtor free and clear of any and all Liens, Claims, and other interests of every kind and nature, including causes of action and claims for relief on account and in respect of the provisions of sections 362, 505, 510, 542, 544, 545, 547, 548, 549, 550, and 553 of the Code and any causes of action or claims for relief existing under state or other federal law. Pursuant to, among other authority, section 1123(b)(3)(B) of the Code, the Reorganized Debtor, for and on behalf of the Debtor's estate, shall have the power, authority and standing to prosecute, compromise or otherwise resolve such claims, with all proceeds derived therefrom, subject to the provisions of the Plan.  The Reorganized Debtor shall operate and manage the Debtor's property and make all Distributions in accordance with the terms of the Plan.

6.23    No Admissions.

The preparation and filing of this Plan and the Disclosure Statement were undertaken, in part, as a means of settling disputes among various parties in interest in the Case and is offered by the Proponent, in part, as an offer in compromise by the Proponent in the Plan to other parties in interest in the Case.  No statement or omission by Proponent in the Plan or the Disclosure Statement, including any statement concerning the estimated Allowed Amount of any Claim, shall preclude or estop the Proponent from objecting to any Claim, and no such statement or omission shall constitute, or be deemed to constitute, any type of admission, waiver or estoppel on the part of the Proponent, and nothing stated or unstated by the Proponent shall be admissible against the Proponent except in the hearings on the adequacy of the Disclosure Statement and the confirmation of the Plan.

6.24    Section 1146(a).

Pursuant to section 1146(a) of the Code, the making or delivery of an instrument of transfer under a plan confirmed in a chapter 11 bankruptcy case, may not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Refinancing or a sale of property is an essential part of this Plan. Therefore, pursuant to federal law under 11 U.S.C. § 1146(a), documents or instruments of transfer pertaining to a refinancing or sale  of the property that will inevitably require recording will be protected from otherwise applicable Florida law regarding the payment for documentary tax stamps.

ARTICLE 7    Notice of Intent to Request Cramdown

7.01    In the event that a sufficient number of holders of any impaired Class of Claims do not accept the Plan, the Proponent hereby gives notice that it will request, and does hereby request, confirmation of the Plan pursuant to 11 U.S.C. § 1129(b), commonly referred to as the "cramdown" provision of the Bankruptcy Code.  The Debtor hereby reserves the right to modify or vary the treatment of the Claims as to comply with 11 U.S.C. § 1129(b).

ARTICLE 8    Payment of US Trustee Fees

8.01    Notwithstanding any other provision of this Plan to the contrary, the Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6), within ten (10) days from the entry of an order confirming this Plan, for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period.  The Debtor, as a reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. §1930(a)(6), based upon post-confirmation disbursements made by the reorganized debtor, until the earlier of the closing of this case by the issuance of a final decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the reorganized debtor shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

## **CONFIRMATION REQUEST**

The Debtor hereby requests confirmation of the Plan pursuant to section 1129(a) or, in the event that the Plan is not accepted by each of those Classes of Claims entitled to vote, section 1129(b) of the Bankruptcy Code.

SOUTHEASTERN CONSULTING &
DEVELOPMENT COMPANY, INC.

By: *Louis S. Weltman*
      Louis S. Weltman, President

**EXHIBIT "B"**

## SOUTHEASTERN CONSULTING DEVELOPMENT CO., INC.

|  |  | YEAR 1 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | TOTAL |
| **LOT SALES:** | 241 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 6 | 6 | 50 |
| Interior | $35,000 | $105,000 | $105,000 | $70,000 | $70,000 | $70,000 | $105,000 | $105,000 | $105,000 | $105,000 | $105,000 | $175,000 | $175,000 | $1,295,000 |
| Golf | $45,000 | $0 | $0 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $90,000 | $45,000 | $45,000 | $495,000 |
| Lake | $60,000 | $0 | $0 | $0 | $0 | $60,000 | $0 | $0 | $0 | $60,000 | $0 | $0 | $0 | $120,000 |
| **Gross Revenues - Lot Sales** |  | $105,000 | $105,000 | $115,000 | $115,000 | $175,000 | $150,000 | $150,000 | $150,000 | $210,000 | $195,000 | $220,000 | $220,000 | $1,910,000 |
| Builder Discounts & Credits (1) | $5,000 | -$15,000 | -$15,000 | -$15,000 | -$15,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$12,500 | -$12,500 | -$15,000 | -$15,000 | -$155,000 |
| Commissions | 7% | -$7,350 | -$7,350 | -$8,050 | -$8,050 | -$12,250 | -$10,500 | -$10,500 | -$10,500 | -$14,700 | -$13,650 | -$15,400 | -$15,400 | -$133,700 |
| **Gross Cash From Lot Sales** |  | $82,650 | $82,650 | $91,950 | $91,950 | $152,750 | $129,500 | $129,500 | $129,500 | $182,800 | $168,850 | $189,600 | $189,600 | $1,621,300 |
| **DEBTOR'S % OF LOT SALES** | 25% | $20,663 | $20,663 | $22,988 | $22,988 | $38,188 | $32,375 | $32,375 | $32,375 | $45,700 | $42,213 | $47,400 | $47,400 | $405,325 |
| **REPAYMENT OF GOLF COURSE MTGE** | $1,000 | $3,000 | $3,000 | $3,000 | $3,000 | $4,000 | $4,000 | $4,000 | $4,000 | $5,000 | $5,000 | $6,000 | $6,000 | $50,000 |
| **SYSTEM ASSETS PAYMENT** | $18,145 | $54,435 | $54,435 | $54,435 | $54,435 | $72,580 | $72,580 | $72,580 | $72,580 | $90,725 | $90,725 | $108,870 | $108,870 | $907,250 |
| **REVENUES TO THE DEBTOR** |  | $78,098 | $78,098 | $80,423 | $80,423 | $114,768 | $108,955 | $108,955 | $108,955 | $141,425 | $137,938 | $162,270 | $162,270 | $1,362,575 |
| **OPERATING COSTS:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| CDD Op & Mtce Assessments | 241 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $6,516 | $78,438 |
| Prorations |  | -$892 | -$811 | -$730 | -$649 | -$757 | -$649 | -$541 | -$433 | -$406 | -$270 | -$162 | $0 | -$6,300 |
| Salaries |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Project Manager |  | $2,000 | $2,500 | $3,000 | $3,500 | $4,000 | $4,500 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $49,500 |
| Clerical |  | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $22,500 |
| Payroll Taxes |  | $249 | $287 | $325 | $363 | $402 | $440 | $574 | $574 | $574 | $574 | $574 | $574 | $5,508 |
| Property Taxes - Non-Plan Payment |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Utilities |  | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $6,000 |
| Auto |  | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $2,400 |
| Insurance |  | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $36,000 |
| Legal & Accounting |  | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $2,400 |
| Office Supplies |  | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $3,000 |
| Repairs & Maintenance |  | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $3,600 |
| Telephone |  | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $3,000 |
| **Sub-Total** |  | $8,199 | $8,737 | $9,275 | $9,813 | $10,352 | $10,890 | $12,774 | $12,774 | $12,774 | $12,774 | $12,774 | $12,774 | $133,908 |
| **FUNDS AVAILABLE FOR PLAN PMNTS (2)** |  | $69,899 | $69,361 | $71,147 | $70,609 | $104,416 | $98,065 | $96,181 | $96,181 | $128,651 | $125,164 | $149,496 | $149,496 | $1,228,667 |
| **PLAN PAYMENTS:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Property taxes (3) |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Heritage Plantation CDD (4) |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HP Land (5) |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trustmark (6) | $74,034 | $74,034 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $74,034 |
| Judgment and Deficiency Claims | $142,310 | $1,800 | $1,800 | $1,800 | $1,800 | $2,400 | $2,400 | $2,400 | $2,400 | $3,000 | $3,000 | $3,600 | $3,600 | $30,000 |
| Heritage Plantation HOA | $200,000 | $1,200 | $1,200 | $1,200 | $1,200 | $1,600 | $1,600 | $1,600 | $1,600 | $2,000 | $2,000 | $2,400 | $2,400 | $20,000 |
| Auburn Water System | $164,293 | $548 | $548 | $548 | $548 | $548 | $548 | $548 | $548 | $548 | $548 | $548 | $548 | $6,572 |
| Trade Creditors | $47,007 | $157 | $157 | $157 | $157 | $157 | $157 | $157 | $157 | $157 | $157 | $157 | $157 | $1,880 |
| Convenience Class | $67,850 | $3,393 | $0 | $0 | $0 | $0 | $0 | $3,393 | $0 | $0 | $0 | $0 | $0 | $2,714 |
| **Total Plan Payments** |  | $81,131 | $3,704 | $3,704 | $3,704 | $4,704 | $4,704 | $8,097 | $4,704 | $5,704 | $5,704 | $6,704 | $6,704 | $135,200 |
| **CASH FLOW FROM OPERATIONS** |  | ($11,232) | $65,656 | $67,443 | $66,905 | $99,712 | $93,361 | $88,084 | $91,477 | $122,947 | $119,459 | $142,792 | $142,792 | $1,093,467 |
| **BEGINNING CASH AND EQUIVALENTS (7)** |  | $974,034 | $962,802 | $1,028,458 | $1,095,901 | $1,162,806 | $1,262,518 | $1,355,879 | $1,443,963 | $1,535,440 | $1,658,387 | $1,777,846 | $1,920,638 | $974,034 |
| **CAPITAL CONTRIBUTIONS/LOANS** |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **CASH FLOW FROM OPERATIONS** |  | ($11,232) | $65,656 | $67,443 | $66,905 | $99,712 | $93,361 | $88,084 | $91,477 | $122,947 | $119,459 | $142,792 | $142,792 | $1,093,467 |
| **ENDING CASH** |  | $962,802 | $1,028,458 | $1,095,901 | $1,162,806 | $1,262,518 | $1,355,879 | $1,443,963 | $1,535,440 | $1,658,387 | $1,777,846 | $1,920,638 | $2,063,430 | $2,067,501 |

# SOUTHEASTERN CONSULTING DEVELOPMENT CO., INC.

(1) Incentives are at 100% of transactions for Months 1-3 and 50% of transactions for months 4-12 when incentives terminate.

(2) Debtor's Funds are exclusive of 75% of revenues attributable to the Class I Claims

(3) Class I Claiims shall receive 75% of revenues from lot sales; this amount is excluded from the Debtor's Plan Payments

(4) Thje Debtor shall make no payments to the District; the Class II Claimant shall receive $6,908.81 for each lot sold pursuant to payments made by the purchase of each lot

(5) HP Land's distributions shall commence in future years based on the sale of its collateral following the sell-through of the Phase I and Phase II lots

(6) Trustmark shall be paid $74,,034.00 through the distribution of a mortgage on the Gatehouse; the Association is the Mortgagor

(7) Includes cash and equivalents from the Proponent of $900,000, plus the Gatehouse Mortgage ($74,024); excludes System Assets and Golf Course Mortgage ($1,000,000)

# SOUTHEASTERN CONSULTING DEVELOPMENT CO., INC.

| | | YEAR 2 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | TOTAL |
| **LOT SALES:** | 241 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 7 | 7 | 7 | 75 |
| Interior | $35,000 | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 | $210,000 | $210,000 | $2,170,000 |
| Golf | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $540,000 |
| Lake | $60,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $60,000 | $0 | $0 | $60,000 |
| Gross Revenues - Lot Sales | | $220,000 | $220,000 | $220,000 | $220,000 | $220,000 | $220,000 | $220,000 | $220,000 | $220,000 | $280,000 | $255,000 | $255,000 | $2,770,000 |
| Builder Discounts & Credits (1) | $5,000 | | | | | | | | | | | | | $0 |
| Commissions | 7% | -$15,400 | -$15,400 | -$15,400 | -$15,400 | -$15,400 | -$15,400 | -$15,400 | -$15,400 | -$15,400 | -$19,600 | -$17,850 | -$17,850 | -$193,900 |
| **Gross Cash From Lot Sales** | | $204,600 | $204,600 | $204,600 | $204,600 | $204,600 | $204,600 | $204,600 | $204,600 | $204,600 | $260,400 | $237,150 | $237,150 | $2,576,100 |
| **DEBTOR'S % OF LOT SALES** | 25% | $51,150 | $51,150 | $51,150 | $51,150 | $51,150 | $51,150 | $51,150 | $51,150 | $51,150 | $65,100 | $59,288 | $59,288 | $644,025 |
| **REPAYMENT OF GOLF COURSE MTGE** | $1,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $7,000 | $7,000 | $7,000 | $75,000 |
| **SYSTEM ASSETS PAYMENT** | $18,145 | $108,870 | $108,870 | $108,870 | $108,870 | $108,870 | $108,870 | $108,870 | $108,870 | $108,870 | $127,015 | $127,015 | $127,015 | $1,360,875 |
| **REVENUES TO THE DEBTOR** | | $166,020 | $166,020 | $166,020 | $166,020 | $166,020 | $166,020 | $166,020 | $166,020 | $166,020 | $199,115 | $193,303 | $193,303 | $2,079,900 |
| **OPERATING COSTS:** | | | | | | | | | | | | | | |
| CDD Op & Mtce Assessments | 241 | | | | | | | | | | | | | |
| Prorations | | | | | | | | | | | | | | |
| Salaries | | | | | | | | | | | | | | |
| Project Manager | | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $60,000 |
| Clerical | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $30,000 |
| Payroll Taxes | | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $6,885 |
| Property Taxes - Non-Plan Payment | | | | | | | | | | | | | | |
| Utilities | | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $6,000 |
| Auto | | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $2,400 |
| Insurance | | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $36,000 |
| Legal & Accounting | | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $9,000 |
| Office Supplies | | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $3,000 |
| Repairs & Maintenance | | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $3,600 |
| Telephone | | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $3,600 |
| **Sub-Total** | | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $13,374 | $160,485 |
| **FUNDS AVAILABLE FOR PLAN PMNTS (2)** | | $152,646 | $152,646 | $152,646 | $152,646 | $152,646 | $152,646 | $152,646 | $152,646 | $152,646 | $185,741 | $179,929 | $179,929 | $1,919,415 |
| **PLAN PAYMENTS:** | | | | | | | | | | | | | | |
| Property taxes (3) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Heritage Plantation CDD (4) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HP Land (5) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trustmark (6) | $74,034 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Judgment and Deficiency Claims | $142,310 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $4,200 | $4,200 | $4,200 | $45,000 |
| Heritage Plantation HOA | $200,000 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,800 | $2,800 | $2,800 | $30,000 |
| Auburn Water System | $164,293 | $548 | $24,018 | $469 | $469 | $469 | $469 | $469 | $469 | $469 | $469 | $469 | $469 | $29,260 |
| Trade Creditors | $47,007 | $157 | $6,872 | $134 | $134 | $134 | $134 | $134 | $134 | $134 | $134 | $134 | $134 | $8,372 |
| Convenience Class | $67,850 | $16,963 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $16,963 |
| Total Plan Payments | | $23,667 | $36,891 | $6,604 | $6,604 | $6,604 | $6,604 | $6,604 | $6,604 | $6,604 | $7,604 | $7,604 | $7,604 | $129,595 |
| **CASH FLOW FROM OPERATIONS** | | $128,979 | $115,756 | $146,043 | $146,043 | $146,043 | $146,043 | $146,043 | $146,043 | $146,043 | $178,138 | $172,325 | $172,325 | $1,789,820 |
| **BEGINNING CASH AND EQUIVALENTS (7)** | | $2,063,430 | $2,192,409 | $2,308,165 | $2,454,207 | $2,600,250 | $2,746,292 | $2,892,335 | $3,038,377 | $3,184,420 | $3,330,462 | $3,508,600 | $3,680,925 | $2,063,430 |
| **CAPITAL CONTRIBUTIONS/LOANS** | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **CASH FLOW FROM OPERATIONS** | | $128,979 | $115,756 | $146,043 | $146,043 | $146,043 | $146,043 | $146,043 | $146,043 | $146,043 | $178,138 | $172,325 | $172,325 | $1,789,820 |
| **ENDING CASH** | | $2,192,409 | $2,308,165 | $2,454,207 | $2,600,250 | $2,746,292 | $2,892,335 | $3,038,377 | $3,184,420 | $3,330,462 | $3,508,600 | $3,680,925 | $3,853,250 | $3,853,250 |

# SOUTHEASTERN CONSULTING DEVELOPMENT CO., INC.

(1)  Incentives are at 100% of transactions for Months 1-3 and 50% of transactions for months 4-12 when incentives terminate.

(2)  Debtor's Funds are exclusive of 75% of revenues attributable to the Class I Claims

(3)  Class I Claiims shall receive 75% of revenues from lot sales; this amount is excluded from the Debtor's Plan Payments

(4)  Thje Debtor shall make no payments to the District; the Class II Claimant shall receive $6,908.81 for each lot sold pursuant to payments made by the purchase of each lot

(5)  HP Land's distributions shall commence in future years based on the sale of its collateral following the sell-through of the Phase I and Phase II lots

(6)  Trustmark shall be paid $74,,034.00 through the distribution of a mortgage on the Gatehouse; the Association is the Mortgagor

(7)  Includes cash and equivalents from the Proponent of $900,000, plus the Gatehouse Mortgage ($74,024); excludes System Assets and Golf Course Mortgage ($1,000,000)

# SOUTHEASTERN CONSULTING DEVELOPMENT CO., INC.

| | | YEAR 3 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | TOTAL |
| LOT SALES: | 241 | 7 | 7 | 7 | 7 | 8 | 8 | 8 | 9 | 9 | 10 | 10 | 10 | 100 |
| Interior | $35,000 | $210,000 | $210,000 | $210,000 | $210,000 | $210,000 | $210,000 | $210,000 | $245,000 | $245,000 | $210,000 | $245,000 | $245,000 | $2,660,000 |
| Golf | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $90,000 | $90,000 | $90,000 | $90,000 | $90,000 | $90,000 | $135,000 | $135,000 | $990,000 |
| Lake | $60,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $60,000 | $0 | $0 | $60,000 |
| Gross Revenues - Lot Sales | | $255,000 | $255,000 | $255,000 | $255,000 | $300,000 | $300,000 | $300,000 | $335,000 | $335,000 | $360,000 | $380,000 | $380,000 | $3,710,000 |
| Builder Discounts & Credits (1) | $5,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Commissions | 7% | -$17,850 | -$17,850 | -$17,850 | -$17,850 | -$21,000 | -$21,000 | -$21,000 | -$23,450 | -$23,450 | -$25,200 | -$26,600 | -$26,600 | -$259,700 |
| Gross Cash From Lot Sales | | $237,150 | $237,150 | $237,150 | $237,150 | $279,000 | $279,000 | $279,000 | $311,550 | $311,550 | $334,800 | $353,400 | $353,400 | $3,450,300 |
| DEBTOR'S % OF LOT SALES | 25% | $59,288 | $59,288 | $59,288 | $59,288 | $69,750 | $69,750 | $69,750 | $77,888 | $77,888 | $83,700 | $88,350 | $88,350 | $862,575 |
| REPAYMENT OF GOLF COURSE MTGE | $1,000 | $7,000 | $7,000 | $7,000 | $7,000 | $8,000 | $8,000 | $8,000 | $9,000 | $9,000 | $10,000 | $10,000 | $10,000 | $100,000 |
| SYSTEM ASSETS PAYMENT | $18,145 | $127,015 | $127,015 | $127,015 | $127,015 | $145,160 | $145,160 | $145,160 | $163,305 | $163,305 | $181,450 | $181,450 | $181,450 | $1,814,500 |
| REVENUES TO THE DEBTOR | | $193,303 | $193,303 | $193,303 | $193,303 | $222,910 | $222,910 | $222,910 | $250,193 | $250,193 | $275,150 | $279,800 | $279,800 | $2,777,075 |
| OPERATING COSTS: | | | | | | | | | | | | | | |
| CDD Op & Mtce Assessments | 241 | | | | | | | | | | | | | |
| Prorations | | | | | | | | | | | | | | |
| Salaries | | | | | | | | | | | | | | |
| Project Manager | | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $60,000 |
| Clerical | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $30,000 |
| Payroll Taxes | | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $574 | $6,885 |
| Property Taxes - Non-Plan Payment | | | | | | | | | | | | | | |
| Utilities | | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $6,000 |
| Auto | | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $2,400 |
| Insurance | | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $36,000 |
| Legal & Accounting | | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $9,000 |
| Office Supplies | | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $3,000 |
| Repairs & Maintenance | | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $3,600 |
| Telephone | | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $4,800 |
| Sub-Total | | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $13,474 | $161,685 |
| FUNDS AVAILABLE FOR PLAN PMNTS (2) | | $179,829 | $179,829 | $179,829 | $179,829 | $209,436 | $209,436 | $209,436 | $236,719 | $236,719 | $261,676 | $266,326 | $266,326 | $2,615,390 |
| PLAN PAYMENTS: | | | | | | | | | | | | | | |
| Property taxes (3) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Heritage Plantation CDD (4) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HP Land (5) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trustmark (6) | $74,034 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Judgment and Deficiency Claims | $142,310 | $4,200 | $4,200 | $4,200 | $4,200 | $4,800 | $4,800 | $4,800 | $5,400 | $5,400 | $6,000 | $6,000 | $6,000 | $60,000 |
| Heritage Plantation HOA | $200,000 | $2,800 | $2,800 | $2,800 | $2,800 | $3,200 | $3,200 | $3,200 | $3,600 | $3,600 | $4,000 | $4,000 | $4,000 | $40,000 |
| Auburn Water System | $164,293 | $468 | $23,938 | $391 | $391 | $391 | $391 | $391 | $391 | $391 | $391 | $391 | $391 | $28,318 |
| Trade Creditors | $47,007 | $134 | $6,849 | $112 | $112 | $112 | $112 | $112 | $112 | $112 | $112 | $112 | $112 | $8,103 |
| Convenience Class | $67,850 | $44,103 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $44,103 |
| Total Plan Payments | | $51,705 | $37,788 | $7,503 | $7,503 | $8,503 | $8,503 | $8,503 | $9,503 | $9,503 | $10,503 | $10,503 | $10,503 | $180,523 |
| CASH FLOW FROM OPERATIONS | | $128,124 | $142,041 | $172,326 | $172,326 | $200,933 | $200,933 | $200,933 | $227,216 | $227,216 | $251,173 | $255,823 | $255,823 | $2,434,867 |
| BEGINNING CASH AND EQUIVALENTS (7) | | $3,853,250 | $3,981,374 | $4,123,415 | $4,295,741 | $4,468,067 | $4,669,000 | $4,869,933 | $5,070,866 | $5,298,082 | $5,525,297 | $5,776,471 | $6,032,294 | $3,853,250 |
| CAPITAL CONTRIBUTIONS/LOANS | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| CASH FLOW FROM OPERATIONS | | $128,124 | $142,041 | $172,326 | $172,326 | $200,933 | $200,933 | $200,933 | $227,216 | $227,216 | $251,173 | $255,823 | $255,823 | $2,434,867 |
| ENDING CASH | | $3,981,374 | $4,123,415 | $4,295,741 | $4,468,067 | $4,669,000 | $4,869,933 | $5,070,866 | $5,298,082 | $5,525,297 | $5,776,471 | $6,032,294 | $6,288,117 | $6,288,117 |

# SOUTHEASTERN CONSULTING DEVELOPMENT CO., INC.

(1)   Incentives are at 100% of transactions for Months 1-3 and 50% of transactions for months 4-12 when incentives terminate.

(2)   Debtor's Funds are exclusive of 75% of revenues attributable to the Class I Claims

(3)   Class I Claiims shall receive 75% of revenues from lot sales; this amount is excluded from the Debtor's Plan Payments

(4)   Thje Debtor shall make no payments to the District; the Class II Claimant shall receive $6,908.81 for each lot sold pursuant to payments made by the purchase of each lot

(5)   HP Land's distributions shall commence in future years based on the sale of its collateral following the sell-through of the Phase I and Phase II lots

(6)   Trustmark shall be paid $74,,034.00 through the distribution of a mortgage on the Gatehouse; the Association is the Mortgagor

(7)   Includes cash and equivalents from the Proponent of $900,000, plus the Gatehouse Mortgage ($74,024); excludes System Assets and Golf Course Mortgage ($1,000,000)