UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:

SOUTHEASTERN CONSULTING &                          Case No. 11-bk-40398-KSS
DEVELOPMENT COMPANY, INC.,                         Chapter 11

     Debtor.

_____/

**FIFTH AMENDED DISCLOSURE STATEMENT
WITH RESPECT TO FIFTH AMENDED PLAN OF REORGANIZATION
<u>FOR SOUTHEASTERN CONSULTING & DEVELOPMENT COMPANY, INC.</u>**

David S. Jennis - Florida Bar No. 775940          Jason M. Osborn
Kathleen L. DiSanto - Florida Bar No. 58512       ASB No. 4122A580
Jennis & Bowen, P.L.                               Osborn Group, LLC
400 N. Ashley Dr., Ste. 2540                       308 Magnolia Ave., Ste. 102
Tampa, FL 33602                                    Fairhope, AL 36532
Telephone: (813) 229-1700                          Telephone: (251) 929-5050
Facsimile: (813) 229-1707                          Facsimile: (888) 227-1214
Email: djennis@jennisbowen.com                     Email: josborn@osborngroupllc.com
Email: kdisanto@jennisbowen.com                    **COUNSEL FOR STEPHEN C. RIGGS,**
**COUNSEL FOR STEPHEN C. RIGGS, III**             **III AND HERITAGE FFR, LLC**
**AND HERITAGE FFR, LLC**

Dated: December 21, 2015

## I.      INTRODUCTION

STEPHEN C. RIGGS, III ("Riggs") and HERITAGE FFR, LLC ("Heritage") (collectively, the "Proponents") provide this Disclosure Statement to all known creditors of the Debtor, SOUTHEASTERN CONSULTING & DEVELOPMENT COMPANY, INC. ("Debtor") in order to disclose the information deemed to be material, important, and necessary for the creditors to arrive at a reasonably informed decision in exercising their right to abstain from voting or to vote for acceptance or rejection of the Fifth Amended Plan of Reorganization (the "Plan") proposed by the Proponents. A copy of the Plan accompanies this Disclosure Statement as **Exhibit "A."**

Capitalized terms used herein have the meanings assigned to them in the Definitions section in the Plan or as otherwise assigned. Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain holders of Claims against and Interests in the Debtor in accordance with the requirements of Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Code" or the "Bankruptcy Code"). Section 1125 of the Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the debtor's creditors and interest holders, to make an informed judgment whether to accept or reject a plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

**This Disclosure Statement and the Plan are an integral package, and they must be considered together for the reader to be adequately informed. This introduction is qualified in its entirety by the remaining portions of this Disclosure Statement (including its Exhibits or Schedules), and this Disclosure Statement in turn is qualified in its entirety by the Plan. This Disclosure Statement contains only a summary of the Plan. You are strongly urged to review the Plan, a copy of which is provided herewith, before casting a Ballot.**

**No representations concerning the Debtor or the Proponents (particularly as to the values of the Debtor's property) are authorized other than as set forth in this Disclosure Statement. You should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in this Disclosure Statement.**

**Certain information contained in this Disclosure Statement was obtained from the prior Disclosure Statements that had been filed by the Debtor. To the extent possible, such information has been verified by the Proponents. The information contained in this Disclosure Statement, including any exhibits concerning the financial condition of the Debtor, has not been subjected to an audit or independent review except as expressly set forth herein. The Proponents have endeavored in good faith to be accurate in this Disclosure Statement.**

The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement unless another time is specified. There is no guaranty that facts will not change after this Disclosure Statement is filed; and it must be assumed that some facts will indeed change from that time until the hearing on the approval of the Disclosure Statement (discussed below), and thereafter during the periods in which the Debtor makes payments under the Plan.

This Disclosure Statement was prepared in accordance with Section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring claims against, interests in, or securities of the Debtor should evaluate this Disclosure Statement only in light of the purpose for which it was prepared. This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission and the Securities and Exchange Commission has not passed upon the accuracy or adequacy of the statements contained herein. Nor may this Disclosure Statement be construed to be advice on the tax, securities, or other legal effects of the Plan. You should, therefore, consult with your own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby.

## II.  <u>OVERVIEW OF CHAPTER 11</u>

Chapter 11 comprises the chapter of the Code primarily used for business reorganization. Formulating a plan to restructure a debtor's finances forms a fundamental purpose of a case under chapter 11 of the Code. Businesses also sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the debtor seeks to reorganize or liquidate, a chapter 11 plan sets forth and governs the treatment and rights creditors and interest holders will receive with respect to their claims against and equity interests in a debtor's bankruptcy estate.

The Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject the plan. The Code conclusively presumes that holders of unimpaired claims or equity interests under a proposed plan have accepted the plan and need not vote on it. The Claims in Classes 1 – 18 and 20 of this Plan are Impaired and may vote either to accept or reject the Plan. The Proponents have enclosed a Ballot with this Disclosure Statement to solicit the votes of the Creditors in Classes 1 – 18 and 20. Those Creditors may vote on the Plan by completing the enclosed Ballot and mailing it to the following address:

**Counsel for the Proponents**

| | |
|---|---|
| David S. Jennis / Kathleen L. DiSanto | Jason M. Osborn |
| Jennis & Bowen, P.L. | Osborn Law Group |
| 400 N. Ashley Drive, Suite #2540 | 308 Magnolia Avenue, Suite 102 |
| Tampa, Florida  33602 | Fairhope, Alabama  36532-2449 |

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan. You may <u>not</u> cast Ballots or vote orally or by facsimile. **For your Ballot to**

be considered by the Bankruptcy Court, it must be received at the above address by 5:00 p.m. (prevailing Eastern time) by the date fixed by the Bankruptcy Court on the accompanying scheduling order (the "Voting Deadline"). If you are a Creditor in Classes 1-19, or 21 and you did not receive a Ballot with this Disclosure Statement, please contact:

**Counsel for the Proponents**

David S. Jennis / Kathleen L. DiSanto
Jennis & Bowen, P.L.
400 N. Ashley Drive, Suite #2540
Tampa, Florida  33602
Telephone: (813) 229-1700

A ballot that does not indicate acceptance or rejection of a plan will not be considered. An impaired class of claims accepts a plan if at least 2/3 in amount and more than 1/2 in number of the allowed claims in the class that actually vote are cast in favor of the plan. A class of interests accepts a plan if at least 2/3 in amount of the allowed interests of such class that actually vote are cast in favor of the plan. Whether or not you vote, you will be bound by the terms and treatment set forth in the Plan if the Bankruptcy Court confirms the Plan. The Bankruptcy Court may disallow any vote accepting or rejecting the Plan if the vote is not cast in good faith.

Once it is determined which impaired classes have accepted a plan, the Bankruptcy Court will determine whether the plan may be confirmed. For a plan to be confirmed, the Code requires, among other things, that the plan be proposed in **good faith** and comply with the other applicable provisions of chapter 11 of the Code, including a requirement that at least one class of impaired claims accept the plan, and that confirmation of the plan is not likely to be followed by the need for further financial reorganization. The Bankruptcy Court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Code have been met. The Proponents believe that the Plan satisfies all of the requirements for confirmation.

One requirement for confirmation of a plan is called the "**best interests test**." Notwithstanding acceptance of the plan by each impaired class of claims, in order to confirm a plan, if even one member of an impaired class votes to reject the plan, the Bankruptcy Court must determine that the plan is in the best interests of each holder of a claim or interest in such class. The best interests test requires that the Bankruptcy Court find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the Effective Date of the Plan, at least equal to the value of the distribution that each such class member would have received if the debtor's assets were liquidated under chapter 7 of the Code on such date.

The Bankruptcy Code also requires that, in order to confirm a plan, the Bankruptcy Court must find that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor ("**financial feasibility test**"). For a plan to meet this test, the Bankruptcy Court must find that the Debtor's estate and the Reorganized Debtor possess the capital and should generate the other resources to meet their respective obligations under the Plan. The Proponents believe that following confirmation of the Plan, the Reorganized

Debtor will be able to fully perform all obligations under the Plan without any need for liquidation or further financial reorganization.

The Bankruptcy Court may confirm a plan notwithstanding the plan's rejection by some impaired classes, if the Bankruptcy Court finds that at least one impaired class of claims (not including any acceptances by "insiders" as defined in section 101(31) of the Code) has accepted the plan and that the plan satisfies certain additional conditions.  This provision, found in section 1129(b) of the Code, is generally referred to as the "cramdown" provision.  Pursuant thereto, the Bankruptcy Court may confirm a plan over the rejection by a class of secured claims if the plan is fair and equitable and satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Code (otherwise known as "**cram down**").  Likewise, the Bankruptcy Court may confirm a plan over the rejection by a class of unsecured claims if the plan is fair and equitable and if the non-accepting claimants will receive the full value of their claims, or (even if the non-accepting claimants receive less than full value), if no class of junior priority will receive or retain anything on account of its pre-petition claims or interests.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW.  IF YOU DO NOT UNDERSTAND THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY.  THE PROPONENTS EXPECT THAT THE DEBTOR MAY HAVE TO RELY UPON THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE CODE IN ORDER TO CONFIRM THE PLAN.**

The Court has set a hearing on confirmation of the Plan for December 10, 2015, at 1:15 p.m., prevailing Eastern time, at United States Bankruptcy Court, 110 East Park Avenue, Tallahassee, Florida 32301, Second Floor Courtroom.  Creditors may vote on the Plan by filling out and mailing the accompanying ballot form to the Bankruptcy Court.  Your Ballot must be filed on or before December 3, 2015, at 5:00 p.m. (prevailing Eastern time).

## III.  <u>BACKGROUND</u>

### A.    Corporate History

The Debtor is a Florida corporation and was incorporated by Riggs in 2001.  From 2001 until 2011, Riggs served as President of the Debtor.  On May 1, 2011, The Debtor and Riggs entered into an Interim Management and Restructuring Services Agreement ("<u>IMSA</u>") with Phoenix Realty Partners, Inc. ("<u>Phoenix</u>").  Pursuant to the IMSA, Phoenix was retained to assist with a reorganization of the Debtor.  Upon the execution of the IMSA, Riggs resigned as President and sole director of the Debtor.  As the shareholder of the Debtor, Riggs appointed Louis S. Weltman ("<u>Weltman</u>") and Douglas E. Turner ("<u>Turner</u>") as the two (2) new officers and directors of the Debtor.  Weltman was appointed President of the Debtor, and Turner was appointed Vice President.  Turner has since resigned.  There are no other officers or directors of the Debtor.  Following the filing of the initial plan and disclosure statement by the Proponents, Weltman resigned as President, and Riggs was appointed President of the Debtor.

**B.**      **Overview of Business Operations and Description of the Debtor's Property**

The Debtor owns and developed a master-planned residential community known as "Heritage Plantation" in Crestview, Florida.  Heritage Plantation ("Heritage Plantation" or the "Development" or the "Project") encompasses approximately 990 acres and is situated on the west side of State Road No. 85 near the town of Auburn, Florida.  Located north of Bill Lundy Road and south of Senterfitt Road and approximately eight (8) miles north of Interstate 10, the Development is in Sections 2, 3, 4, and 34, Township 4 and 5 North, Range 23 West in the north end of Okaloosa County in an area that has experienced rapid and continuing growth over the past twenty (20) years.  Highway 85 traverses the Development and connects to both Interstate 10 and Highway 90 which is approximately 8.3 miles south of the Development.

The Debtor's property within the Development was separated into various components, for purposes of financing and development.   From a development perspective, Heritage Plantation currently consists of:  (i) Phase I, consisting of 115 developed single family residential lots; (ii) Phase II, consisting of 125 developed single family residential lots; (iii) the Golf Course Property (which was initially planned and developed as a golf course but is currently inoperable and consists of approximately 180 acres subject to a conservation easement); and (iv) approximately 530 acres of Undeveloped Land reserved for future development.  The aggregate of 240 lots in Phase I and Phase II still owned by SCDC are collectively referred to in the Plan and this Disclosure Statement as the SCDC Lots.  The SCDC Lots are subject to (a) the secured claim of the OCTC for prepetition ad valorem and non-ad valorem property taxes and assessments, (b) the secured claims of the CDD for past and accelerated debt service assessments and O&M Assessments reflected in the CDD Judgment, (c) any prepetition O&M Assessments asserted against the SCDC Lots that are not included in the CDD Judgment, and (d) any post-petition O&M Assessments.  The SCDC Lots are subject to a different debt structure and secure different obligations than the other developable or assessable land within the District.

The Undeveloped Land contained with the District is comprised of five separate parcels that are associated with separate parcel identification numbers as delineated by the OCTC.  To aid in the description of the Undeveloped Land, the Proponents have attached the parcel maps available on the OCTC's website as **Composite Exhibit "B."**  The Main Parcel is a roughly 400 acre parcel of land, which includes approximately 224 acres of "developable acreage" that is presently undeveloped land and envelopes the Phase I Lots and Phase II Lots, The Golf Course comprises the remaining 180 acres of the Main Parcel.  The East Parcel is a roughly 19 acre parcel of land is located to the east of the Main Parcel, which was intended to be used for a community sports complex with soccer fields and baseball fields.  The "L-shaped" lot located to the north of the Main Parcel and referred to in the Plan as the North Parcel is approximately 120 acres.  The Northwest Parcel and West Parcel are roughly 75 acres and 125 acres respectively, and form the western boundary of the Main Parcel.  At the inception of the Development, the North Parcel, the Northwest Parcel, and the West Parcel were to ultimately be platted to create lots for additional homes.

The Debtor also owns two separate parcels of land that are not within Development, which have collectively been defined as the Non-District Parcels in the Plan.  The parcel maps available on the OCTC's website for the Non-District Parcels are also included in **Composite Exhibit "B."**

The Development is within five and one half (5.5) miles to existing grocery stores, pharmacies, restaurants, the US Post Office and many banks.  North Okaloosa Medical Center is eight (8) miles south of the Development.  There are two major employers in the area: Crestview Aerospace, located six (6) miles away, and Eglin Air Force Base, located twenty (20) miles away from the Development.  Also, the Development is seven (7) miles away from the local Crestview [Bob Sikes] Airport (10,000 foot long runway) and approximately thirty (30) miles away from the Destin Fort - Walton Beach Airport.  The beach community Destin, Florida and the Gulf of Mexico beaches are approximately thirty-eight (38) miles away.  Heritage Plantation is 5.5 miles from Crestview High School and Davidson Middle School.

Heritage Plantation was designed and constructed as a golf course community approved to include approximately 780 residential units consisting of 205 golf course units, 54 lakefront units and 521 non-golf course units, subject to a final amendment of the Development Agreement between the Debtor and the Board of County Commissioners of Okaloosa County, Florida.  The amenities package and related resources includes an eighteen (18) hole championship golf course, a 10,000 square foot meeting space and an eco-friendly system to convert waste into "re-use" water and dispose of bio-solids.  Heritage Plantation was planned to include a 25,000 square foot clubhouse with a pro shop, restaurant, tennis courts; swimming pool; bike and walking trails; approximately 10 community parks scattered around the development; a community center with a fitness center and day spa; jogging paths; children's playgrounds; and soccer fields.  Residents of Heritage Plantation drive through the meeting space, a 9,500 square foot entrance building/sales center, when entering and exiting the development (the "Gatehouse").

1.    Zoning Ordinance; Development Agreement and Amended Development Agreement

Heritage Plantation was rezoned from Agricultural to Residential Suburban Single (RSS) pursuant to Ordinance No. 04-53 on September 7, 2004 and Ordinance No. 05-31 on March 1, 2005 (collectively, the "Zoning Ordinance").  In addition to the Zoning Ordinance, the Development is also governed by a development agreement from Okaloosa County dated May 17, 2005 (the "Development Agreement").  The Development Agreement establishes certain development uses and rights; reserves traffic capacity; requires certain agency approvals and permits; and determines the public facilities and services that will serve the Development.  The Development Agreement, as amended, allows for a maximum single-family residential density of 900 dwelling units, golf course and other recreational facilities.  The Debtor is currently in compliance with all terms and conditions of the Development Agreement and Zoning Ordinance.

2.    Lot/Product Offerings

Subject to the confirmation of the Plan, the Debtor will have a diverse mix of lot types available for sale.  The Debtor has sold and will continue to sell developed lots directly to end users as well as to builders, who will in turn sell finished homes to end users.  Currently, SCDC owns 240 lots that are available for sale.

The Proponents do not expect the Debtor will develop additional lots until Phase I and Phase II are substantially sold.  Post-confirmation, the Debtor may elect not to develop any

additional lots.  In Phase I and Phase II, the Proponents anticipate that the Debtor will sell on average twenty-five (25) home sites each year until all of the Debtor's existing lot inventory is exhausted.  These anticipated absorption rates are based upon estimates and assumptions made by the Proponents that are inherently uncertain, though considered reasonable by the Proponents, and are subject to significant business, economic and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond the control of the Proponents.  As a result, there can be no assurance such absorption rates will occur or be realized in the time frames anticipated.

> 3.    <u>Infrastructure</u>

On May 31, 2005, the Debtor caused the formation of the Heritage Plantation Community Development District (the "<u>CDD</u>" or the "<u>District</u>") pursuant to Florida Statute 190 (the "<u>Act</u>").  The District's geographic boundaries encompass most of the Development and include approximately 913 of the Development's 990 acres.  As provided for in the Act, the CDD's Board duly adopted Resolutions 2005-20, 2006-06, 2006-09 and 2007-01 (collectively, the "<u>Resolutions</u>"), which authorized and approved, among other things, the Master Trust Indenture dated as of November 1, 2005, between the CDD and the U.S. Bank, National Association, as Indenture Trustee, and the issuance of special assessment revenue bonds in one or more series under the Master Trust Indenture.  The CDD issued and sold special assessment revenue bonds pursuant to the Resolutions and the District Master Indenture, and related resolutions and documents.  The District was planned to be developed in several phases according to the Development Agreement/Master Plan that has been approved by Okaloosa County.  At the time of the filing of this Disclosure Statement, Infrastructure Improvements for Phases I and II have been completed.  The Phase I and Phase II final plats have been recorded.  Bond proceeds were utilized to finance improvements enjoyed by the public including the SR 85 turn lanes, traffic light, divided entry boulevard, major storm drainage piping, and basins.  Bond proceeds also financed onsite internal public improvements within the platting limits, including roadways, sidewalks, stormwater inlets, and piping.

> (a)    *Potable Water*

Concurrency and capacity for potable water services have been reserved for Phases I and II of the Project.  Because the potable water services are or will be provided by a private company (e.g., Auburn Water System), the CDD did not finance onsite or offsite potable water and domestic wastewater construction.  Such improvements, as well as security and landscaping, were completed by the Debtor.  Potable water improvements for Phase I of the Project have been transferred to and shall be maintained by Auburn Water System.  The Phase II water distribution system has been completed and inspected for acceptance by Auburn, but has not been transferred pending payment of a maintenance bond by the Debtor to Auburn.

> (b)    *Sanitary Sewer*

The Debtor funded the design, permitting, and construction of the on-site sanitary sewer infrastructure, lift stations, off-site transmission lines, and re-use water line and the irrigation system, all of which comprise the Wastewater System Assets.  Pursuant to the Development Agreement, the Debtor was also responsible for (i) building a wastewater treatment plant (the

"Wastewater Treatment Plant") and related improvements (ii) collecting wastewater on the Heritage Plantation property and (iii) building a transmission system to send raw waste to the Wastewater Treatment Plant and return "re-use water" to the Development and link to the Development's retention ponds and irrigation system in order to provide irrigation to the common area, the District, and the Lots.

In March 2007, the Debtor's wholly-owned subsidiary, Water Reclamation of NWF, LLC, completed acquisition and construction of the first phase of the Wastewater Treatment Plant to service up to 125 residential units. In and around May 2008, WRNWF defaulted on certain of its debt obligations. On August 13, 2009, after the entry of a final judgment of foreclosure, WRNWF lost its assets through foreclosure in that certain civil action styled *Richard A. Carter v. Water Reclamation of NWF, LLC, et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2008-CA-004835. On or about December 18, 2012, Phoenix purchased the former assets of WRNWF, and pursuant to the Settlement Agreement between the Riggs Parties and the Weltman Parties,[1] Phoenix has agreed to convey such property, including but not limited to the 100% membership interests Water Reclamation of NWF, LLC and the Carter Property, as more specifically described in the Settlement Agreement, to the Proponents or their designee free and clear of liens upon the payment of the settlement amount of $500,000.00 to NWJ Gator Investments, LLC ("NWJ Gator").

Currently, the Debtor is unable to provide sanitary sewer services to the Development. The Wastewater Treatment Plant is in a state of serious disrepair and requires significant rehabilitation and reconstruction. The Proponents contemplate acquisition of the Wastewater Treatment Plant in accordance with the Settlement Agreement between the Riggs Parties and the Weltman Parties. Upon acquisition of the Wastewater Treatment Plant, the Reorganized Debtor will repair and replace such of the System Assets to ensure that the Project is served by operating wastewater and sanitary sewer service facilities. The revenues generated by the provision of wastewater and sanitary sewer service will be dedicated to funding certain of the Debtor's obligations under the Plan. Upon confirmation of the Plan, based on the transactions contemplated by the Settlement Agreement, the Debtor's inability to provide wastewater and sanitary sewer services will be remedied.

*(c)    Assessments*

As of the Petition Date, all lot owners within the District were subject to annual long-term assessments, of approximately $1,200.00 per year, which was an amount levied by the CDD for the retirement of the CDD's Series of bonds. The SCDC Lots are also subject to debt assessments in connection with the Capital Improvement Revenue Bonds, Series 2006B bonds, upon which the Developer was required to make interest only payments and which were to be satisfied with a balloon payment at the time the lot was sold to a third party. All lots within the District were also subject to annual O&M Assessments that have averaged approximately $400 for the operation and maintenance of the District, but which are subject to change depending upon the costs of operating and maintaining the property within the District. The Undeveloped

---

[1] This Disclosure Statement summarizes relevant portions of the Weltman Settlement, and a complete copy of the Settlement Agreement is attached as **Exhibit "C,"** the terms of which are incorporated as if fully set forth herein.

Land within the District was also subject to O&M Assessments based on a formula established by the CDD. The operation and maintenance assessment will be subject to fluctuation based upon the budget the CDD adopts in any given year. The foregoing statements are intended to simply describe the assessment structure in existence as of the Petition Date. The Plan does not in any way modify or limit the CDD's statutory ability to levy long-term debt assessments for future debt or O&M Assessments for future operations and maintenance expenditures going forward on a prospective basis if the CDD complies with applicable statutory provisions.

## C.    Valuation of the Debtor's Real Property Holdings

The chart below summarizes the values assigned to the various components of real property owned by SCDC as set forth in the Appraisal and the potential claims and liens of the OCTC and CDD that may be asserted against such property:

| Plan Description | Property Description | Estimated Value | Prepetition Claims Asserted as Secured against Property | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | OCTC[1] | CDD | HP Land | Trustmark |
| SCDC Lots | 240 platted lots | $110,000.00 | $1,275,000 (estimated) | $13,000,000 (estimated) | $16,155,895 | $5,105,978.04 |
| Main Parcel – Golf Couse Collateral | 180 acres of undevelopable conservation areas | $0.00 | $8,517.01 | $109,552.52 | $16,155,895 | $5,105,978.04 |
| Main Parcel – Developable Acreage | 224 developable acres | $34,720.00 | | | | |
| East Parcel | Approximately 19 acres of undevelopable land utilized for sports fields | $0.00 | $2,755.60 | $5,405.50 | $16,155,895 | $5,105,978.04 |
| North Parcel | 119 acres of developable land | $18,445.00 | $5,717.12 | $20,647.02 | $16,155,895 | $5,105,978.04 |
| Northwest Parcel | 75 acres of developable land | $11,625.00 | $834.02 | $16,345.56 | $16,155,895 | $5,105,978.04 |
| West Parcel | 125 acres of developable land | $19,375.00 | $7,895.53 | $35,789.42 | $16,155,895 | $5,105,978.04 |
| Non-District Parcels | 36 acres of undevelopable land | $5,580.00 | $3,146.02 | None | $16,155,895 | $5,105,978.04 |
| Entry Building | Gatehouse | $0.00[2] | Unknown | None | None | $2,620,215.33 |
| | TOTAL ESTIMATED VALUE: | $199,745 | | | | |

[1] The amounts reflected in this column for the Undeveloped Land only include ad valorem and non-ad valorem tax assessments by the OCTC. It does not include any interest, fees, costs, penalties, or amounts attributable to the Undeveloped Land. All interest, fees, costs, and other amounts have been attributed to the SCDC Lots.

[2] Trustmark believes the value of the Gatehouse is at least $600,000.00 based on a post-petition appraisal. For the purposes of plan confirmation and distribution, as part of settlement to consensually resolve Trustmark's claims, the Proponents have agreed to treat the Gatehouse as having a fair market value of $250,000.

**D.      Proofs of Claim Filed in the Debtor's Case**

The Bankruptcy Court established September 14, 2011, as the deadline for creditors to file Proofs of Claim in this chapter 11 Bankruptcy Case.  As of that date, 23 Proofs of Claim had been filed, as follows[2]:

| CREDITOR | CLAIM NUMBER | TOTAL CLAIM AMOUNT | SECURED CLAIM AMOUNT | UNSECURED CLAIM AMOUNT |
|---|---|---|---|---|
| Marbas USA | 1 | $1,127.00 | $0.00 | $1,127.00 |
| Gulf Associates Scorecard Company | 2 | $895.90 | $0.00 | $895.90 |
| Hyatt & Stubblefield, P.C. | 3 | $25,632.77 | $0.00 | $25,632.77 |
| Internal Revenue Service | 4 | $4,776.11 | $0.00 | $4,776.11 |
| Okaloosa County Tax Collector | 5 | $902,025.10 | $902,025.10 | $0.00 |
| Beard Equipment Co. | 6 | $2,137.64 | $0.00 | $2,137.64 |
| John Deere Financial, f.s.b. | 7 | $22,691.17 | $0.00 | $22,691.17 |
| Deere Credit, Inc. | 8 | $78,913.98 | $0.00 | $78,913.98 |
| Deere Credit, Inc. | 9 | $40,915.64 | $0.00 | $40,915.64 |
| Deere Credit, Inc. | 10 | $110,905.68 | $0.00 | $110,905.68 |
| Deere Credit, Inc. | 11 | $49,247.99 | $0.00 | $49,247.99 |
| Deere Credit, Inc. | 12 | $44,539.34 | $0.00 | $44,539.34 |
| Deere Credit, Inc. | 13 | $75,162.25 | $0.00 | $75,162.25 |
| Deere Credit, Inc. | 14 | $116,000.57 | $0.00 | $116,000.57 |
| Heritage Plantation Community Development District | 15 | $380,509.81 | $0.00 | $380,509.81 |
| Heritage Plantation Community Development District | 16 | $19,305,816.00 | $0.00 | $19,305,816.00 |
| Heritage Plantation Community Development District | 17 | $13,209,946.90 | $13,209,946.90 | $0.00 |
| Branch Banking and Trust Company | 18 | $16,155,895.00 | $16,155,895.00 | $0.00 |
| Dixie PGA Section | 19 | $1,800.00 | $0.00 | $1,800.00 |
| Trustmark National Bank | 20 | $198,212.84 | $0.00 | $198,212.84 |
| Trustmark National Bank | 21 | $2,620,215.33 | $0.00 | $2,620,215.33 |
| Trustmark National Bank | 22 | $5,105,978.04 | $0.00 | $5,105,978.04 |
| First Florida Bank | 23 | $1,212,987.33 | $800,000.00 | $412,987.33 |
| **Totals Timely Filed POCs** | | **$59,666,332.39** | **$31,067,867.00** | **$28,598,465.39** |

Heritage Plantations Homeowners' Association, Inc., also filed a Proof of Claim (Claim No. 24-1), but such claim was filed on January 11, 2012, well beyond the claims bar date.  Accordingly, the Proponents believe that such claim should be disallowed in its entirety.

General unsecured claims totaling approximately $596,243.74 were scheduled by the Debtor and were not marked as disputed, contingent, or unliquidated.  To the extent such claims are not subsumed by a filed proof of claim, such scheduled claims are deemed to be Allowed general unsecured claims.  The Reorganized Debtor and the Proponents reserve all rights to object to such scheduled claims.

---

[2] Some of the claims have been subsequently amended after the deadline for creditors to file Proofs of Claim, some as recently as this week.  The amended claims are not reflected in the chart.

**E.      The Debtor's Prepetition Secured Creditors**

The Debtor has the following prepetition secured creditors:  (i) Ben Anderson, Okaloosa County Tax Collector ("OCTC"); (ii) Branch Banking & Trust ("BB&T"); (iii) Trustmark National Bank ("Trustmark"); (iv) John Deere Credit; (v) First Florida Bank; and (vi) Heritage Plantation Community Development District (the "CDD") (collectively the "Prepetition Secured Creditors").  As set forth below, each of the Prepetition Secured Creditors asserts a mortgage or other lien on certain property included in the Development and owned by the Debtor.   The mortgage and other liens asserted by the Prepetition Secured Creditors significantly overlap as the Prepetition Secured Creditors financed the same parcels of land and improvements except as to the Gatehouse.

1.      OCTC

OCTC is the constitutional tax collector for Okaloosa County, Florida.  On June 16, 2011, OCTC filed Claim No. 5-1 in the amount of Eight Hundred Seventy-Five Thousand Eight Hundred Five and 89/100 Dollars ($875,805.89), for ad valorem real property taxes pursuant to Fla. Stat. § 197.122.  On October 7, 2013, OCTC filed Claim No. 5-2 in the amount of Nine Hundred Two Thousand Twenty-Five and 10/100 Dollars ($902,025.10), for ad valorem real property taxes pursuant to Fla. Stat. § 197.122.  OCTC Proofs of Claim assert claims for ad valorem tax years 2008, 2009, 2010, 2011, 2012, and 2013.  The OCTC intends to supplement or amend its Proofs of Claim to include additional Claims for tax year 2014 and for additional attorneys' fees and costs.  OCTC contends that its entire claim is secured by a first priority statutory lien.

2.      CDD

The CDD filed three (3) proofs of claim in this chapter 11 case:  (1) Claim No. 15-1 in the amount of $380,509.81 related to unsecured contractual obligations; (2) Claim No. 16-1 in the amount of $19,305,816.00 related to unsecured contractual obligations; and (3) Claim No. 17-1 asserting a secured claim in the amount of $13,209,946.90 related to the CDD's Final Judgment of Foreclosure dated as of November 23, 2010, entered in that certain civil action styled *Heritage Plantation Community Development District, v. Southeastern Consulting & Development, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 09-CA-007620, and recorded in Official Records Book 2962, Page 4950, of the Public Records of Okaloosa County, Florida.

3.      Trustmark

On September 14, 2011, Trustmark National Bank ("Trustmark") filed three (3) Proofs of Claim (Claim Nos. 20-1, 21-1, and 22-1) in these chapter 11 proceedings in the aggregate amount of Seven Million Nine Hundred and Twenty-four Thousand Four Hundred and Six Dollars and 10/00 ($7,924,406.10), comprised of an unsecured claim in the amount of $198,212.84, an unsecured claim in the amount of $2,620,215.33 and a secured claim in the amount of $5,105,978.04, respectively.   Trustmark's claims are secured by liens of varying priority allegedly encumbering certain real property and improvements of the Debtor. Trustmark's lien priority varies with the different collateral, as follows:

(a)    Trustmark holds a first lien on the 115 Phase I Lots, subject to the liens of OCTC and the CDD;

(b)    Trustmark holds a second lien on the 125 Phase II Lots, subject to the liens of OCTC, the CDD, and BB&T;

(c)    Trustmark holds a second lien on the Golf Course and the Undeveloped Land, subject to the liens of OCTC, the CDD, and BB&T; and

(d)    Trustmark holds a first lien on the Gatehouse.

4.    First Florida

On September 14, 2011, First Florida filed Proof of Claim No. 23-1 in these chapter 11 proceedings in the aggregate amount of One Million Two Hundred Twelve Thousand Nine Hundred Eighty-Seven and 33/100 Dollars ($1,212,987.33), comprised of an alleged secured claim in the amount of Eight Hundred Thousand and No/100 Dollars ($800,000.00) and an unsecured claim of Four Hundred Twelve Thousand Nine Hundred Eighty-Seven and 33/100 Dollars ($412,987.33).  First Florida asserted "Mortgage" as its sole basis for perfection; however, First Florida holds a recorded judgment lien dated as of July 16, 2010, and recorded in Official Records Book 2969, Page 4537, in the Public Records of Okaloosa County, Florida, as well as Judgment Lien Certificate Number J110000377667, which was filed on January 21, 2011.  On or about August 16, 2010, First Florida was the winning bidder at the foreclosure sale related to the collateral securing the Debtor's obligations to First Florida.  The certificate of title for such sale was recorded on September 2, 2010, in Official Records Book 2950, Page 2250, in the Public Records of Okaloosa County, Florida.  First Florida neither sought nor obtained a deficiency judgment against the Debtor.  First Florida's only lien rights attach to the Debtor's assets by virtue of the judgment lien discussed in this paragraph.

5.    BB&T and HP Land

On September 14, 2011, BB&T filed Proof of Claim No. 18-1 in these chapter 11 proceedings in the aggregate amount of Sixteen Million One Hundred Fifty-Five Thousand Eight Hundred Ninety-Five and No/100 Dollars ($16,155,895.00), comprised of unknown secured and unsecured claims.  BB&T asserted "Judgment Lien" as its sole basis for perfection.  BB&T holds a recorded judgment lien dated as of March 31, 2010, and recorded in Official Records Book 2930, Page 1551, in the Public Records of Okaloosa County, Florida (the "BB&T Judgment").  The BB&T Judgment included two awards: (1) a judgment for monetary damages in the amount of $15,066,150.84, and (2) a judgment of foreclosure.  With respect to the award for monetary damages, the BB&T Judgment provided that "the foregoing amount shall bear interest at the statutory rate.  Execution shall issue forth with for this document and all amounts stated herein." (Claim No. 18-1, Part at 4).  No party has recorded a certified copy of the BB&T Judgment.

On or about November 22, 2011, BB&T executed that certain Assignment of Security Interests by BB&T in favor of HP Land, LLC, which was recorded in Official Records Book 3022, Page 3713, in the Public Records of Okaloosa County.  BB&T purported to assign all of its rights with respect to the various security instruments executed and delivered by the Debtor in favor of BB&T.  Thus, HP Land, LLC, took assignment of the various mortgages, mortgage

modification agreements, and financing statements in favor of BB&T; however, the Assignment of Security Instruments makes no referenced to the BB&T Judgment.  Likewise, no other recorded instrument evidences assignment of the BB&T Judgment from BB&T to HP Land, LLC.  On July 6, 2015, HP Land filed a Notice of Transfer of Claim (Doc. No. 492) with respect to BB&T's claims in the Bankruptcy Case.  To the extent BB&T or HP Land have any lien rights, their alleged lien priority varies with the different collateral, as follows:

        (a)      BB&T or HP Land holds a first lien on the 125 Phase II Lots, subject to the liens of OCTC and the CDD;

        (b)      BB&T or HP Land holds a second lien on the 116 Phase II Lots, subject to the liens of OCTC, the CDD, and Trustmark; and

        (c)      BB&T or HP Land holds a first lien on the Golf Course and the Undeveloped Land, subject to the liens of OCTC.

On or about April 25, 2012, the Debtor filed its Motion to Approve Settlement by and between Debtor and HP Land, LLC, as Successor in Interest to Branch Banking & Trust Company (the "HP Land Settlement Motion").  (Doc. No. 47).  According to the HP Land Settlement Motion, the Debtor and HP Land, LLC, executed that certain Term Sheet By and Between Southeastern Consulting & Development Company, Inc., and HP Land, LLC Dated January 11, 2012 (the "HP Land Term Sheet"), pursuant to which the Debtor and HP Land, LLC, allegedly agreed to modify certain of the Debtor's debt obligations secured by the instruments referenced in the Assignment of Security Interests by BB&T in favor of HP Land, LLC.  In addition, the HP Land Term Sheet purported to authorize HP Land, LLC, "to enter on the lands of the Debtor to harvest merchantable timber and vegetation, and on the platted lots, to clear lots of vegetation and trees in accordance with applicable covenants and contracts between the Parties."  (Doc. No. 47, Exh. 1, ¶ 7 at 11).  Such authorization "benefits the Debtor's plans for development and is in the ordinary course of Debtor's business as a subdivision developer."  *Id*.  The Term Sheet required plan approval within 1 year of execution.  (Doc. No. 47, ¶ 4 at 10).

The Bankruptcy Court never approved the HP Land Settlement Motion or, consequently, the HP Land Term Sheet; however, on information and belief, HP Land, LLC, improperly and without Bankruptcy Court approval, entered the lands of the Debtor and harvested timber and vegetation.  The timber and vegetation harvested by HP Land, LLC, were sold by HP Land, LLC, and HP Land, LLC, holds the proceeds for such sales in the approximate amount of Three Hundred Sixty-Four Thousand and No/100 Dollars ($364,000.00).  In the absence of Bankruptcy Court approval of HP Land, LLC's actions, HP Land, LLC has violated the automatic stay provided in Section 362 of the Bankruptcy Code.  Thus, the Debtor retains a claim against HP Land, LLC, in connection with the proceeds of the timber mining completed by HP Land without approval of the U.S. Bankruptcy Court.

Over three years after the filing of the HP Land Settlement Motion, the Proponents and the Debtor on one hand and HP Land and the HP Land Principals on the other hand (collectively, the "HP Land Settlement Parties") reached a compromise regarding (i) the outstanding disputes regarding the Unauthorized Timber Transaction and any other claims asserted by SCDC (the "SCDC Claims"), (ii) the disputes regarding HP Land's secured status and the claims asserted by

HP Land against the Debtor (the "HP Land Claims"), and (iii) non-bankruptcy claims against one or more of the Riggs Parties (the "HP Land Principals' Claims").  The Proponents and the Debtor do not intend to file a separate motion seeking approval of the HP Land Settlement and will instead seek approval of the settlement in conjunction with confirmation of the Plan.  To resolve all claims, defenses, and disputes between or among the HP Land Settlement Parties with respect to the (i) SCDC Claims, (ii) the HP Land Claims, and (iii) the HP Land Principals' Claims and in full satisfaction of the Secured Claims of HP Land in Classes 8, 9, 10, and 11 of the Plan.

Upon the Effective Date of the Plan, SCDC shall convey any remaining portion of the HP Land Settlement Property not previously conveyed to HP Land subject to outstanding ad valorem taxes in full satisfaction of HP Land's Class 8, 9, 10, and 11 secured claims.  Upon the Effective Date of the Plan, HP Land shall be granted relief from the automatic stay under Section 362 of the Bankruptcy Code without further order of the Bankruptcy Court to permit HP Land to enforce all *in rem* rights and remedies available to it with respect to only the HP Land Settlement Property.  HP Land shall retain but waive distribution on account of any unsecured claim.  Upon the filing of the Plan, HP Land shall withdraw its Notice of 1111(b) Election (Doc. No. 481).

HP Land shall (a) cooperate with the Proponents, (b) not interfere with the submission and approval of the Plan, (c) upon approval of the Disclosure Statement and modification of the Plan as contemplated by the HP Land Settlement, vote in favor of the Plan with respect to all classes in which HP Land is or may be entitled to vote, including but not limited to any unsecured claims; and (d) waive any right of distribution under the Plan on account of any unsecured claim HP Land has asserted or may assert or any other right to payment or distribution as expressly provided herein or in the Plan.

Upon the Effective Date, the HP Land Settlement Parties shall execute mutual releases in a form and substance reasonably agreeable to the HP Land Settlement Parties, which shall release all claims by each of the HP Land Settlement Parties to the HP Land Settlement upon any order by the Bankruptcy Court approving the HP Land Settlement becoming final and non-appealable, including, without limitation, the SCDC Claims, the HP Land Claims, and the HP Land Principals' Claims, except for their respective rights and obligations under the HP Land Settlement or such other agreements as shall or may be entered into pursuant to the terms of the HP Land Settlement.

6.    John Deere

On October 24, 2011, John Deere Financial, f.s.b., f/k/a FPC Financial, f.s.b., and Deere Credit, Inc., filed eight (8) Proofs of Claim (Claim Nos. 7-1 through and including 14-1) in these chapter 11 proceedings in the aggregate amount of Five Hundred Thirty-Eight Thousand Three Hundred Seventy-Six and 62/100 Dollars ($538,376.62), comprised entirely of unsecured claims. The claims asserted by John Deere all related to equipment leases between John Deere and the Debtor, pursuant to which John Deere leased to the Debtor or financed on behalf of the Debtor certain personal property, including tractors, mowers, and other maintenance equipment, which have long since been repossessed.  Neither John Deere Financial, f.s.b, nor Deere Credit, Inc., obtained judgments against the Debtor.

**F.    The Debtor's Prepetition Judgment Creditors**

In addition to the claims and judgments of its prepetition secured creditors, the Debtor has the following prepetition judgment creditors:

1.    The Water Spigot, Inc., by virtue of that certain Final Judgment dated as of June 24, 2009, and recorded in Official Records Book 3165, Page 233, of the Public Records of Bay County, Florida, and in Official Records Book 2896, Page 209, o the Public Records of Okaloosa County, Florida, and that certain Electronic Judgment Lien Certificate Number J10000910361, filed on September 14, 2010;

2.    ADM Alliance Nutrition, Inc., by virtue of that certain Default Final Judgment dated as of August 30, 2010, and recorded in Official Records Book 2953, Page 3267, of the Public Records of Okaloosa County, Florida, and that certain Electronic Judgment Lien Certificate Number J10000942554, filed on September 27, 2010;

3.    Yamaha Motor Corporation, U.S.A., by virtue of that certain Final Default Judgment dated as of July 22, 2009, and recorded in Official Records Book 2898, Page 1011, of the Public Records of Okaloosa County, Florida;

4.    The McPherson Companies, Inc., by virtue of that certain Final Judgment as to Southeastern Consulting & Development Company and Stephen C. Riggs, dated as of February 22, 2010, and recorded in Official Records Book 2926, Page 1667, of the Public Records of Okaloosa County, Florida; and

5.    Auto-Owners Insurance Company, by virtue of that certain Default Final Judgment dated as of May 13, 2010, and recorded in Official Records Book 2947, Page 2769, of the Public Records of Okaloosa County, Florida.

**G.    Summary of Reasons for Filing Petition**

1.    <u>Adverse Market Conditions</u>

From December 2007 through June 2009, the global economy suffered a recession largely blamed on subprime lending practices and related financial crisis throughout the United States.  (http://www.nber.org/cycles/sept2010.html).  According to the National Bureau of Economic Research ("<u>NBER</u>"), the recession beginning in December 2007 was "the longest of any recession since World War II."  NBER concluded that the trough of the recession occurred during December 2009, thus paving the way for economic recovery over the next several years.  One of many victims of the recession of 2007-2009 was the Debtor.

Prior to and during the early stages of the recession, the Debtor's primary business was the development and sale of Lots within the Development.  As market conditions deteriorated throughout 2007, many of the Debtor's lenders and trade creditors refused to extend any additional credit or modify existing loan facilities or credit relationships.  In the absence of (1) revenues from sales and operations, (2) modifications of existing credit relationships, or (3) funding from the sole equity holder of the Debtor, the Debtor was unable to pay its debts as and when the same became due.  In short, the Debtor could not sell its lot inventory, could not fund

its capital requirements through existing operations, and could not raise additional money. As a result, the Debtor defaulted on its obligations to its creditors, resulting in significant prepetition litigation.

2.      Prepetition Litigation

The Debtor was the Defendant in numerous lawsuits arising principally from defaults under various loans and other credit related obligations as described in the preceding paragraphs, as follows:

(a)      *Trustmark National Bank v. Southeastern Consulting & Development Company, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2009-CA-003395;

(b)      *Trustmark National Bank v. Southeastern Consulting & Development Company, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2010-CA-000837;

(c)      *First Florida Bank f/k/a Destin First Bank v. Southeastern Consulting & Development Company, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2010-CA-639;

(d)      *Branch Banking and Trust Company v. Southeastern Consulting & Development Company, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2009-CA-005919;

(e)      *Heritage Plantation Community Development District v. Southeastern Consulting & Development Company, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2009-CA-7620;

(f)      *The Water Spigot, Inc. v. Southeastern Consulting & Development Company, Inc.*; Circuit Court of Bay County, Florida, Case No. 2009-1330-CC;

(g)      *The McPherson Companies, Inc., as assignee of T-Gill Fuels, Inc. v. Southeastern Consulting & Development Company, Inc., et al.*, County Court of Okaloosa County, Florida, Case No. 2010-SC-000169;

(h)      *Deere Credit, Inc. v. Southeastern Consulting & Development Company a/k/a Southeastern Consulting & Development Co., et al.*, County Court of Okaloosa County, Florida, Case No. 2010-CA-61.

(i)      *Auto Owners Insurance Company v. Southeastern Consulting & Development Company*, County Court of Okaloosa County, Florida, Case No. 2010-SC-000484;

(j)      *ADM Alliance Nutrition, Inc., Archer-Daniels-Midland Company v. Southeastern Consulting & Development Company*, County Court of Okaloosa County, Florida, Case No. 2010-CC-00708; and

(k)    *Yamaha Motor Corporation, U.S.A. v. Southeastern Consulting and Development Company*, Circuit Court of Okaloosa County, Florida, Case No. 2009-CA-002509.

Riggs personally guaranteed nearly all of the Debtor's debt obligations.  As a result of the numerous lawsuits and judgments entered against the Debtor and against him personally, Riggs filed a petition under chapter 11 of the Bankruptcy Code on February 16, 2010, in *In re Stephen C. Riggs, III*, United States Bankruptcy Court for the Northern District of Florida, Case No. Case No. 8:10-bk-30236-WSS.

**H.    Significant Events During the Bankruptcy Case**

On May 17, 2011, the Debtor filed its petition in this case.  (Doc. No. 1)  On May 18, 2011, the Debtor filed an Application for Approval of Employment of Berger Singerman, P.A. as Counsel to the Debtor, *Nunc Pro Tunc* to the Petition Date, which was granted on June 21, 2011.  (Doc. Nos. 8, 28)  No accountant has been approved for employment in this bankruptcy case.  To date, the Debtor has filed five (5) separate disclosure statements (Doc. Nos. 74, 230, 240, 286, and 335), and four (4) separate iterations of its plan of reorganization (Doc. Nos. 75, 231, 241, and 336).  None of the Debtor's disclosure statements or plans has been approved.

To describe the Debtor's bankruptcy case as litigious would be gross understatement.  On December 13, 2012, Heritage FFR filed an adversary proceeding against the Debtor, Weltman, the CDD, the Indenture Trustee, and others in *Heritage FFR, LLC v. Southeastern Consulting & Development Company, Inc., et al.*, United States Bankruptcy Court for the Northern District of Florida, Adversary Proceeding No. 12-04028.  On December 27, 2013, Heritage FFR filed suit against Weltman, Phoenix, and others in *Heritage FFR, LLC v. Louis S. Weltman, et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2013-CA-005293.  On March 26, 2014, Riggs filed suit against Weltman in *Stephen C. Riggs, III v. Louis S. Weltman*, Circuit Court of Okaloosa County, Florida, Case No. 2013-CA-005293.  Each of the foregoing cases arose from or was related to the control and management of the Debtor and its operations during this chapter 11 Bankruptcy Case.

In addition, and while not directly related to this case, Michael Gibson ("Gibson"), a landowner in the Development, has filed two separate lawsuits:  (1) *Michael O. Gibson v. Heritage Plantation Homeowners Association, Inc., et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2013 CA 001719; and (2) *Michael O. Gibson v. Heritage Plantation Community Development District, et al.*, Circuit Court of Okaloosa County, Florida, Case No. 2013-CA-002008.  In each of the cases, Gibson has asserted rights and claims related to the control, management, and authority of both the homeowners' association and the CDD to take or refrain from taking certain actions.  Both of the cases filed by Gibson relate to the ultimate control of the Debtor, which holds the key to voting control for both the homeowners' association and the CDD.

On April 22, 2014, Weltman and Phoenix both filed petitions under chapter 11 of the Bankruptcy Code.  Those cases were styled *In re Louis Solomon Weltman*, United States Bankruptcy Court for the Southern District of Florida, Case No. 14-19155-PGH, and *In re Phoenix Realty Partners, Inc.*, United States Bankruptcy Court for the Southern District of

Florida, Case No. 14-19156-PGH, respectively.  On May 7, 2014, Riggs and Heritage FFR filed an Emergency Motion to Transfer Venue of Weltman's and Phoenix's Bankruptcy Cases (Doc. No. 256), seeking to transfer the Weltman bankruptcy case and the Phoenix bankruptcy case from the Southern District of Florida to the Northern District pursuant to Fed. R. Bankr. P. 1014(b).  On May 29, 2014, this Court entered an order granting the Emergency Motion to Transfer Venue and transferring the Weltman and Phoenix bankruptcy cases from the Southern District of Florida to the Northern District of Florida.  (Doc. No. 280).

On February 18, 2015, the Debtor, Riggs, Heritage FFR, Weltman, Phoenix, Highland Land Company, LLC, and NWJ Gator, entered into that certain Settlement, Non-Disparagement, and General Release Agreement (the "Settlement Agreement"), substantially resolving most outstanding disputes among them, including, without limitation, the "control issues" in the cases filed by Riggs and Heritage FFR in Florida state court and the Adversary Proceeding filed by Heritage FFR (and joined by Riggs) in this case, and numerous related matters in this case, the Weltman bankruptcy case, and the Phoenix bankruptcy case.  The Settlement Agreement required Riggs and Heritage FFR to file a Plan of Reorganization for the Debtor no later than March 30, 2015 (the "Plan Filing Deadline").  The Settlement Agreement also required Weltman to resign as President of the Debtor at such time as Riggs and Heritage FFR filed their plan.  The Bankruptcy Court approved the Settlement on March 20, 2015 (Doc. No. 412).  On March 30, 2015, the Debtor filed a Stipulation for Amendment to Settlement, Non-Disparagement, and General Release Agreement and Motion to Extend Plan Filing Deadline, extending the Plan Filing Deadline from March 30, 2015, through and including April 3, 2015.  (Doc. No. 416).  If Riggs and Heritage FFR are unable to confirm a plan of reorganization by the deadlines set forth in the Settlement Agreement, Section 8(a) of the Settlement Agreement contemplates Riggs and Phoenix each owning 5,000 shares of stock in SCDC and the cancellation of all other shares, so that Riggs and Phoenix each own 50% of SCDC.  Certain of these deadlines have been further extended by agreement of the parties to the Weltman Settlement.

On April 3, 2015, the Proponents filed *Stephen C. Riggs, III, Heritage FFR, LLC, and Affable, Inc.'s Plan of Reorganization for Southeastern Consulting & Development Company, Inc.* (Doc. No. 418) and *Disclosure Statement with Respect to Plan of Reorganization for Southeastern Consulting & Development Company, Inc.* (Doc. No. 419) (the "Initial Disclosure Statement"), which were subsequently amended by the Proponents on several occasions.  Over the course of the past seven months, the Proponents have filed a total of five (5) plans and five (5) disclosure statements.  On July 15, 2015, the Proponents filed *Stephen C. Riggs, III, Heritage FFR, LLC, and Affable, Inc.'s Third Amended Plan of Reorganization for Southeastern Consulting & Development Company, Inc.* (Doc. No. 503) (the "Third Amended Plan") and *Third Amended Disclosure Statement with Respect to Amended Plan of Reorganization for Southeastern Consulting & Development Company, Inc.* (Doc. No. 495) (the "Third Amended Disclosure Statement").

At a hearing on May 28, 2015, the Bankruptcy Court conducted a hearing to consider final approval of the Initial Disclosure Statement.  The Bankruptcy Court established a number of other deadlines at the hearing, including deadlines for parties to make an election pursuant to Section 1111(b) of the Bankruptcy Code.  To the extent that any party desired to make an election pursuant to Section 1111(b) of the Bankruptcy Code, such party was required to file a

notice on ("Section 1111(b) Notice") on or before July 1, 2015, and any objections to a Section 1111(b) Notice were to be filed on or before July 6, 2015 ("Section 1111(b) Objection").

The CDD and HP Land filed Section 1111(b) Notices, and the Proponents objected to both notices.  With respect to the CDD, the Proponents objected to the CDD's Section 1111(b) election because the Proponents believe the CDD's interest in the SCDC Lots and the Undeveloped Land is of inconsequential value and more than half of the claims in the classes on account of which the CDD attempted to make the Section 1111(b) election did not make the election, as the OCTC has not and has indicated it will not make a Section 1111(b) election on account of its claims.  The Proponents raised similar objections with respect to the Section 1111(b) election made by HP Land.  The Bankruptcy Court conducted a continued hearing on the Section 1111(b) Notices and Section 1111(b) Objections on July 22, 2015, at 9:00 a.m., in addition to a hearing on final approval of the Third Amended Disclosure Statement.

At the hearing on July 22, 2015, the Bankruptcy Court granted final approval of the Third Amended Disclosure Statement and found that the Third Amended Disclosure Statement complied with the requirements of Section 1125 of the Bankruptcy Code.  (Doc. No. 521).  The Bankruptcy Court also set a further briefing schedule with respect to the 1111(b) issues.  The Bankruptcy Court ultimately overruled the Proponents' objections to the CDD's 1111(b) election.  (Doc. No. 554).  As a result, the Proponents withdrew the Third Amended Plan and the Third Amended Disclosure Statement.  (Doc. No. 549).

On September 25, 2015, a status conference was held and continued to October 29, 2015. Following the continued status conference, on November 3, 2015, the Bankruptcy Court entered the *Order (I) Establishing the Deadline for Proponents to file Amendments to Plan and Disclosure Statement, (II) Establishing Deadline for Objections to Amendments, (III) Establishing the Deadline for Serving the Solicitation Package, and (IV) Setting Hearing on Confirmation of the Plan* (Doc. No. 562) (the "Confirmation Deadlines Order").  Through the Confirmation Deadlines Order, the Bankruptcy Court established November 18, 2015, as the deadline for the Proponents to either amend the Third Amended Plan and Third Amended Disclosure Statement or to file a fourth amended plan or to file a fourth amended plan and fourth disclosure statement to incorporate any settlement with the CDD, the Bondholders, and the Indenture Trustee (the "Amendment Deadline") and required that any objections to the amended disclosure statement be served and filed within fourteen (14) days of the Amendment Deadline (the "Disclosure Statement Objection Deadline").  The Confirmation Deadlines Order required the Proponents to serve the solicitation package by no later than November 20, 2015.  In addition, the Confirmation Deadlines Order provided that written ballots accepting or rejecting the Plan shall be submitted no later than December 3, 2015, and that any objections to confirmation of the Plan shall be filed and served by the same date.  Finally, the Bankruptcy Court scheduled a hearing to consider confirmation of the Plan, including timely filed objections to the Plan or the Disclosure Statement, for December 10, 2015, at 1:15 p.m..  The Proponents subsequently sought a seek a brief one (1) day extension of the Amendment Deadline to file the Plan and Disclosure Statement, through and including November 19, 2015, and a corresponding extension of the Disclosure Statement Objection Deadline, to allow the Proponents to finalizing their negotiations with the CDD and the bondholders to incorporate what are anticipated by the Proponents to be consensual plan treatments of the CDD's claims.

## IV.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

Under the Plan, the Proponents have established the various Classes of Creditors and Interest Holders pursuant to Section 1122 of the Bankruptcy Code.  The Plan places the various Claims and Interests in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class or the treatment of such Claims or Interests is substantially similar.  In general, the proponent of a chapter 11 plan has broad discretion to classify Claims and Interests in the plan according to the particular facts and circumstances of each case.  *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990).

Pursuant to the Bankruptcy Code, the Proponents have not classified Administrative Expense Claims and Priority Tax Claims under the Plan.  Holders of other Claims and Interests are classified in the Plan as follows:

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| Class 1 | OCTC Section 1129(a)(9)(D) Secured Tax Claim (SCDC Lots) | Impaired | Yes |
| Class 2 | OCTC Section 1129(a)(9)(D) Secured Tax Claim (Undeveloped Land) | Impaired | Yes |
| Class 3 | OCTC Section 1129(a)(9)(D) Secured Tax Claim (Non-District Parcels) | Impaired | Yes |
| Class 4 | OCTC Non-Priority Secured Claim (SCDC Lots) | Impaired | Yes |
| Class 5 | OCTC Non-Priority Secured Claim (Undeveloped Land) | Impaired | Yes |
| Class 6 | Secured Claim of CDD (CDD Debt Special Assessment Lien) | Impaired | Yes |
| Class 7 | Secured Claim of CDD (CDD O&M Debt Assessments) | Impaired | Yes |
| Class 8 | Secured Claim of HP Land (Phase I Lots) | Impaired | Yes |
| Class 9 | Secured Claim of HP Land (Phase II Lots) | Impaired | Yes |
| Class 10 | Secured Claim of HP Land (Undeveloped Land) | Impaired | Yes |
| Class 11 | Secured Claim of HP Land (Non-District Parcels) | Impaired | Yes |
| Class 12 | Secured Claim of Trustmark (Phase I Lots) | Impaired | Yes |
| Class 13 | Secured Claim of Trustmark (Phase II Lots) | Impaired | Yes |
| Class 14 | Secured Claim of Trustmark (Gatehouse) | Impaired | Yes |

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| Class 15 | Secured Claim of First Florida Bank (Judgment Lien) | Impaired | Yes |
| Class 16 | Secured Claim of HP HOA | Impaired | Yes |
| Class 17 | Claims of Trade Creditor Judgment Lien Holders | Impaired | Yes |
| Class 18 | Unsecured Claim of Okaloosa County, Florida, Inc. | Impaired | Yes |
| Class 19 | Unsecured Claims of Weltman and Phoenix | Impaired | No |
| Class 20 | Claims of General Unsecured Creditors | Impaired | Yes |
| Class 21 | Claims of Equity Security Holders | Impaired | No |

The Proponents believe these classifications do not discriminate unfairly, that Claims in each Class are substantially similar to each other, the separate classifications are based on the nature of the respective Claims and Interests, and they are justified under the Bankruptcy Code and applicable law.

Section 1122 of the Bankruptcy Code provides that "a plan may place a claim . . . in a particular class only if such claim . . . is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). While not expressly set forth in Section 1122(a), "[t]he general rule regarding classification is that all creditors of equal rank with claims against the same property [are] placed in the same class." *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991); *see also In re Scherk*, 152 F.2d 747, 751 (10th Cir. 1945) ("All creditors of equal rank with claims against the same property *should* be placed in the same class."). In *Greystone*, the Fifth Circuit echoed this rule by noting that "ordinarily substantially similar claims, those which share common priority and rights against the debt's estate, should be placed in the same class." *Phoenix Mutual Life Ins. Co. v. Greystone III J.V. (In re Greystone J.V.)*, 995 F.2d 1274, 1278 (5th Cir. 1991). Accordingly, there appear to be three rules with respect to the classification of claims under Section 1122: (1) claims may be placed in the same class only if they are substantially similar, i.e. dissimilar claims may not be placed in the same class; (2) substantially similar claims, i.e. claims of equal rank against the same property, should be placed in the same class; and (3) similar claims can be placed into different classes only if the proponent can "demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering." *In re Porcelli*, 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004).

The table below summarizes the classification and treatment of the Claims and Interests under the Plan.

In all Classes, Claimants have the ability to consent to a treatment of their Claim that is different than that proposed under the Plan if such modification does not have a material adverse impact on other Creditor Classes. Additionally, the Proponents may modify, with the Bankruptcy Court's approval, the treatment currently proposed in the Plan. Any estimated Claim

amounts are calculated as of the date of this Disclosure Statement. Estimated percentage recoveries are also set forth below for certain Classes of Claims.

      For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Proponents have not yet fully analyzed all Proofs of Claim filed in the Reorganization Case to determine whether the amounts stated in such Proofs of Claim are accurate. The estimated Claim amounts set forth below are consolidated amounts based upon the Proponents' review of the Debtor's books and records and of certain Proofs of Claim, and may include estimates of a number of Claims that are contingent, Disputed, and/or unliquidated.

| Class Description | Summary of Treatment Under Plan |
|---|---|
| Administrative Expense Claims<br><br>(Estimated Distribution Amount: Paid in full) | **In General -** This is the Class of Administrative Claims allowable under Section 503 and entitled to priority under Section 507(a)(2) of the Bankruptcy Code. Unless the Holder agrees to different treatment, all Administrative Claims, other than Ordinary Course Administrative Claims, will be paid from the Effective Date Disbursement in full, in Cash on the later of (a) the Effective Date on or as soon as practicable thereafter, or (b) if an Administrative Claim is not Allowed as of the Effective Date, then within fifteen (15) days after such Administrative Claim shall become, if at all, an Allowed Administrative Claim. |
| Professional Compensation and Expense Reimbursement Claims<br><br>(Estimated Distribution Amount: $68,669.40) | The fees and costs of counsel for the Debtor, to the extent previously or subsequently approved by order of the Bankruptcy Court, shall be paid on the Effective Date as provided under the Settlement Agreement. The Substantial Contribution Claim shall be paid by the Plan Funder on the Effective Date as provided under Section 3.2 below. No other claim for compensation for services rendered to the Debtor or reimbursement of expenses incurred through and including the Confirmation Date, including any claims that are or could be asserted under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be Allowed or paid as an Administrative Expense Claim.<br><br>Pursuant to the *Order Granting Application for Allowance and Payment of Administrative Claim of Mediator, Leonard Gilbert* (Doc. No. 512), Leonard Gilbert (the "Mediator") was awarded an Administrative Expense Claim in the amount of $16,679.40. The order provided that the Debtor/Proponents shall pay the Mediator's Administrative Expense Claim within fifteen (15) days of Confirmation if not paid sooner. Since the entry of the order, the Mediator has been paid $3,010 by the mediation parties, reducing the Administrative Expense Claim to $13,669.40.<br><br>Pursuant to the Weltman Settlement approved by the Bankruptcy Court, Weltman is responsible for the payment of any administrative expense claim owed to Leonard Gilbert and the law firm of Holland & Knight in connection with the services rendered by Mr. Gilbert as a judicial mediator. The order approving the Mediator's Administrative Expense Claim also provided that to the extent that the Debtor, the Reorganized Debtor, any of the Proponents, or Affable, Inc. pay any portion of the mediation fees awarded to the Mediator that are: (i) owed by Weltman directly in the amount of $1,505.00, or (ii) up to $12,164.00 of the amount owed by the Debtor but for which Weltman |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | is responsible for paying under the terms of the Weltman Settlement, the Debtor, the Reorganized Debtor, or any of the Proponents, as the case may be, are authorized to offset the $500,000 purchase price to be paid by Stephen C. Riggs, III and Heritage FFR, LLC to NWJ Gator or Phoenix in exchange for Carter Property and other consideration under the terms of the Settlement Agreement in an amount equal to the mediation fees described in (i) and (ii) that are paid by the Debtor, the Reorganized Debtor, or any of the Proponents on behalf of Weltman. |
| Substantial Contribution Claims<br><br>(Estimated Distribution Amount: $475,000) | The Allowed Substantial Contribution Claims of the Proponents as defined in Section 1.2.106 of this Plan shall be paid as a condition precedent to the occurrence of Effective Date and shall be paid Effective Date.  To the extent required under Section 1129(a)(4) of the Bankruptcy Code, the payments to be made by the Plan Funder on account of the Substantial Contribution Claims is subject to the approval of the Bankruptcy Court as to the reasonableness of such amounts.<br><br>A portion of the payment made by the Plan Funder on account of the Substantial Contribution Claims will be retained by Riggs to reimburse Riggs for amounts previously paid to counsel for the Proponents in connection with or incident to this chapter 11 case, which amount shall not exceed $115,000. |
| Priority Tax Claims<br><br>(Estimated Distribution Amount: $767.00) | Priority Tax Claims are Claims of Governmental Units or Persons holding tax deeds or similar instruments issued by a Governmental Unit on account of unpaid taxes that are not Secured Claims and are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.<br><br>Any Allowed Priority Tax Claims will be paid in full on the latter of the Effective Date of this Plan or fifteen (15) days after such Priority Tax Claim becomes an Allowed Claim, in Cash, or upon such other terms as may be agreed upon by the Holder of the Claim and the Debtor.  More specifically, the Allowed, Unsecured Priority Tax Claim of Internal Revenue Service will be paid in full in the amount of $767.27 on the latter of the Effective Date of this Plan or fifteen (15) days after such Priority Tax Claim becomes an Allowed Claim, in Cash, or upon such other terms as the Reorganized Debtor and the Holder of such Claim may agree pursuant to 11 U.S.C. § 507(a)(8)(c).<br><br>Priority Tax Claims are not classified, are to be treated as required by the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on the Plan. |
| Post-Petition Administrative Claims of OCTC<br><br>(Estimated Distribution Amount: $79,105.00) | **2012-2013 Post-Petition Administrative Claims of OCTC.**   The Holder of the 2012-2013 Post-Petition Administrative Claims of OCTC shall be paid in full in the amount of $62,851.66 on the Effective Date of the Plan.<br><br>**2014 Post-Petition Administrative Claims of OCTC.**  The Holder of the 2014 Post-Petition Administrative Claims of OCTC shall be paid in full in the amount of $27,474.44, including any amounts which may be awarded by the Bankruptcy Court, on the Effective Date of the Plan.<br><br>**2015 Post-Petition Administrative Claims of OCTC.**  The 2015 Post-Petition Administrative Claims of OCTC shall be paid in the ordinary course of the Reorganized Debtor's business on or before March 31, |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | 2016. |
| CDD Post-Petition Claims | The CDD Post-Petition Claims shall be paid and satisfied by the payment of the portion of the CDD O&M Payment that is attributable to the unpaid O&M Assessments on the District property owned by the Debtor and represents those portions of the CDD Payables that were incurred or paid by the CDD after the Petition Date that is further allocated to CDD Post-Petition Claim as set forth in Class 7 below. |
| United States Trustee Fees | All fees required to be paid by 28 U.S.C. § 1930(a)(6) ("U.S. Trustee Fees") will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code. Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid by the Reorganized Debtor on the Effective Date from the Effective Date Disbursement.  Any U.S. Trustee Fees owed for periods occurring after the Effective Date will be paid by the Reorganized Debtor. |
| Post-Petition Administrative Expense Claims of Phoenix Realty Partners, Inc., and Louis Weltman | Phoenix's and Weltman's Administrative Expense Claims shall be disallowed pursuant to Sections 101(31), 502(a), and 502(b)(4) of the Bankruptcy Code. |
| Class 1 - OCTC Section 1129(a)(9)(D) Secured Tax Claim (SCDC Lots) | The Allowed amount of the Class 1 Claim secured by the SCDC Lots shall be an amount equal to the ad valorem property taxes assessed against the SCDC lots, plus the amount of any Fire Tax for the years 2010 and 2011, but exclusive of any other non-ad valorem taxes or assessments, all as reflected in the tax bills or tax rolls for the years 2010 and 2011, plus any interest accruing at the statutory rate only on such ad valorem taxes from the date upon which such ad valorem property taxes were first due and payable and subject to accrual of interest under applicable non-bankruptcy law through the Effective Date of the Plan.  The amount of such payment, including the calculation of the statutory interest to be paid on account of the Allowed Class 1 Claim as provided in this is Section 4.1.1.1 shall be stipulated between the Proponents and the OCTC, or in the event the Proponents and the OCTC cannot stipulate, determined by the Bankruptcy Court.  The Holder of the Class 1 Claim shall be paid the amount of its Allowed Class 1 Claim secured by the SCDC Lots on the Effective Date.  The payment of the Allowed Amount of the Allowed Class 1 Claim as provided herein, together with the payments on account of the Allowed Class 4 Claims as provided in Section 4.1.4.1 below and the OCTC's Allowed  Administrative Expense Claims as provided in Section 3.4, will be in full satisfaction of any and all Claims or Liens for taxes, assessments, or other amounts asserted against the SCDC Lots by the OCTC, or OCTC Certificate Holder with respect to the SCDC Lots and upon payment of such amounts, the SCDC Lots shall vest in the Reorganized Debtor free and clear of any Claim or Lien for real property taxes, other taxes, or assessments, except as otherwise provided in the Plan with respect to the any Lien securing the Class 6 Claims of the CDD that were or could have been asserted by the OCTC or any OCTC Certificate Holder for any year prior to 2015. <br><br> The OCTC shall retain any Liens(s) on the SCDC Lots securing its Claim, up to the Allowed amount of its Class 1 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date |

| Class Description | Summary of Treatment Under Plan |
|---|---|
|  | but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Class 1 Secured Claim is fully paid as provided in this Plan. Upon payment of the Allowed Class 1 Secured Claim as provided under the Plan, any Lien securing such Claim shall be released and discharged from the property securing such Claim.<br><br>Class 1 is Impaired under the Plan, and the Holder of the Class 1 Claim is entitled to vote to accept or reject the Plan. |
| Class 2 - OCTC Section 1129(a)(9)(D) Secured Tax Claim (Undeveloped Land) | The Allowed amount of the Class 2 Claim secured by the Undeveloped Land shall be an amount equal to the ad valorem property taxes assessed against the Undeveloped Land, plus the amount of any Fire Tax for the years 2010 and 2011, but exclusive of any other non-ad valorem taxes or assessments, all as reflected in the tax bills or tax rolls for the years 2010 and 2011, plus any interest accruing at the statutory rate only on such ad valorem taxes from the date upon which such ad valorem property taxes were first due and payable and subject to accrual of interest under applicable non-bankruptcy law through the Effective Date of the Plan. The amount of such payment, including the calculation of the statutory interest to be paid on account of the Allowed Class 2 Claim as provided in this is Section 4.1.2.1 shall as stipulated between the Proponents and the OCTC, or in the event the Proponents and the OCTC cannot stipulate, determined by the Bankruptcy Court. The Holder of the Class 2 Claim shall be paid the amount of its Allowed Class 2 Claim secured by the Undeveloped Land on the Effective Date. The payment of the Allowed Amount of the Allowed Class 2 Claim as provided herein, together with the payments on account of the OCTC's Allowed Administrative Expense Claims as provided in Section 3.4, will be in full satisfaction of any and all Claims or Liens for taxes, assessments, or other amounts asserted against the Undeveloped Land by the OCTC, or OCTC Certificate Holder with respect to the Undeveloped Land and upon payment of such amounts, the Undeveloped Land shall vest in the Reorganized Debtor free and clear of any Claim or Lien for real property taxes, other taxes, or assessments that were or could have been asserted by the OCTC or any OCTC Certificate Holder for any year prior to 2015.<br><br>The OCTC shall retain any Liens(s) on the Undeveloped Land securing its Claim, up to the Allowed amount of its Allowed Class 2 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Class 2 Secured Claim is fully paid as provided in this Plan. Upon payment of the Allowed Class 2 Secured Claim as provided under the Plan, any Lien securing such Claim shall be released and discharged from the property securing such Claim.<br><br>Class 2 is Impaired under the Plan, and the Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan. |
| Class 3 - OCTC Section 1129(a)(9)(D) Secured Tax Claim (Non-District Parcels) | The Allowed amount of the Class 3 Claim secured by the Non-District Parcels shall be an amount equal to the ad valorem property taxes assessed against the Non-District Parcels, plus the amount of any Fire |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Tax for the years 2010 and 2011, but exclusive of any other non-ad valorem taxes or assessments, all as reflected in the tax bills or tax rolls for the years 2010 and 2011, plus any interest accruing at the statutory rate only on such ad valorem taxes from the date upon which such ad valorem property taxes were first due and payable and subject to accrual of interest under applicable non-bankruptcy law through the Effective Date of the Plan.  The amount of such payment, including the calculation of the statutory interest to be paid on account of the Allowed Class 3 Claim as provided in this is Section 4.1.3.1 shall as stipulated between the Proponents and the OCTC, or in the event the Proponents and the OCTC cannot stipulate, determined by the Bankruptcy Court.  The Holder of the Class 3 Claim shall be paid the amount of its Allowed Class 3 Claim secured by the Non-District Parcels on the Effective Date.  The payment of the Allowed Amount of the Allowed Class 3 Claim as provided herein, together with the payments on account of the OCTC's Allowed  Administrative Expense Claims as provided in Section 3.4, will be in full satisfaction of any and all Claims or Liens for taxes, assessments, or other amounts asserted against the Non-District Parcels by the OCTC, or OCTC Certificate Holder with respect to the Non-District Parcels and upon payment of such amounts, the Non-District Parcels shall vest in the Reorganized Debtor free and clear of any Claim or Lien for real property taxes, other taxes, or assessments that were or could have been asserted by the OCTC or any OCTC Certificate Holder for any year prior to 2015. <br><br> The OCTC shall retain any Liens(s) on the Non-District Parcels securing its Claim, up to the Allowed amount of its Allowed Class 3 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Class 3 Secured Claim is fully paid as provided in this Plan.  Upon payment of the Allowed Class 3 Secured Claim as provided under the Plan, any Lien securing such Claim shall be released and discharged from the property securing such Claim. <br><br> Class 3 is Impaired under the Plan, and the Holder of the Class 3 Claim is entitled to vote to accept or reject the Plan. |
| Class 4 - OCTC Non-Priority Secured Claim (SCDC Lots) | The Allowed Amount of the Class 4 Claim shall be the amount equal to $539,139.00, less amounts paid to (i) the OCTC on account of its Allowed Administrative Expense Claims as provided in Section 3.4 and (ii) Holders of Claims in Classes 1, 2, and 3 as provided in Sections 4.1.1.1, 4.1.2.1, and 4.1.3.1, as stipulated by the Proponents and the OCTC or in the event the Proponents and the OCTC cannot stipulate, determined by the Bankruptcy Court.  The Holder of the Class 4 Claim shall be paid the amount of its Allowed Class 4 Claim secured by the SCDC Lots on the Effective Date.  The payment of the Allowed Amount of the Allowed Class 4 Claim as provided herein, together with the payments on account of the Allowed Class 1 Claims as provided in Section 4.1.1.1 above and the OCTC's Allowed  Administrative Expense Claims as provided in Section 3.4, will be in full satisfaction of any and all Claims or Liens for taxes, assessments, or other amounts asserted against the SCDC Lots by the OCTC, or OCTC Certificate Holder with respect to the SCDC Lots and |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | upon payment of such amounts, the SCDC Lots shall vest in the Reorganized Debtor free and clear of any Claim or Lien for real property taxes, other taxes, or assessments, except as otherwise provided in the Plan with respect to the any Lien securing the Class 6 Claims of the CDD that were or could have been asserted by the OCTC or any OCTC Certificate Holder for any year prior to 2015. Notwithstanding the fact that the Allowed Class 4 Claim may include non-ad valorem property taxes or assessments, any claim of the CDD for O&M Assessments that were assessed by the OCTC but not collected by the OCTC will satisfied through the treatment of the CDD's Claims in Class 6 and 7, and the CDD will not seek payment on account of any O&M Assessments from the OCTC.<br><br>The OCTC shall retain any Liens(s) on the SCDC Lots securing its Claim, up to the Allowed amount of its Class 4 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Class 4 Secured Claim is fully paid as provided in this Plan. Upon payment of the Allowed Class 4 Secured Claim as provided under the Plan, any Lien securing such Claim shall be released and discharged from the property securing such Claim.<br><br>Class 4 is Impaired under the Plan, and the Holder of the Class 4 Claim is entitled to vote to accept or reject the Plan. |
| Class 5 - OCTC Non-Priority Secured Claim (Undeveloped Land)) | The Allowed Amount of the Class 5 Claim, if any, shall be as stipulated by the Proponents and the OCTC or in the event the Proponents and the OCTC cannot stipulate, determined by the Bankruptcy Court. The Holder of the Class 5 Claim shall be paid the amount of its Allowed Class 5 Claim secured by the Undeveloped Land, if any, on the Effective Date. The payment of the Allowed Amount of the Allowed Class 5 Claim, if any, as provided herein, together with the payments on account of the Allowed Class 2 Claims as provided in Section 4.1.2.1 above and the OCTC's Allowed Administrative Expense Claims as provided in Section 3.4, will be in full satisfaction of any and all Claims or Liens for taxes, assessments, or other amounts asserted against the Undeveloped Land by the OCTC, or OCTC Certificate Holder with respect to the Undeveloped Land and upon payment of such amounts, the Undeveloped Land shall vest in the Reorganized Debtor free and clear of any Claim or Lien for real property taxes, other taxes, or assessments that were or could have been asserted by the OCTC or any OCTC Certificate Holder for any year prior to 2015. Notwithstanding the fact that the Allowed Class 5 Claim, if any, may include non-ad valorem property taxes or assessments, any claim of the CDD for O&M Assessments that were assessed by the OCTC but not collected by the OCTC will satisfied through the treatment of the CDD's Claims in Class 6 and 7, and the CDD will not seek payment on account of any O&M Assessments from the OCTC.<br><br>The OCTC shall retain any Liens(s) on the Undeveloped Land securing its Claim, up to the Allowed amount of its Class 5 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Class 5 Secured Claim is fully paid as provided in this Plan. Upon payment of the Allowed Class 5 Secured Claim as provided under the Plan, any Lien securing such Claim shall be released and discharged from the property securing such Claim.<br><br>Class 5 is Impaired under the Plan, and the Holder of the Class 5 Claim is entitled to vote to accept or reject the Plan. |
| Class 6 - Secured Claim of CDD (CDD Debt Special Assessment Lien) | The Allowed Class 6 Secured Claim of the CDD for unpaid principal and accrued interest secured by the debt special assessment liens, any related penalties, court costs, and attorney's fees secured by the SCDC Lots, to the extent included as part of the CDD Judgment Debt or otherwise asserted as a Lien against the SCDC Lots, shall be treated through the Bond Restructuring Transaction described in Section 4.2.1.2 of the Plan.<br><br>**Bond Restructuring Transaction.** The Reorganized Debtor or the Plan Funder will purchase 100 percent of the Existing Bonds on the Effective Date. The Existing Bonds will subsequently be replaced by the Restructured Bonds which will be bifurcated, and the CDD may reallocate the CDD Special Assessment Debt across the SCDC Lots and the Undeveloped Land on such terms as may be agreed by the Bondholders, the CDD, and the Reorganized Debtor. The Bondholders, the CDD, and the Reorganized Debtor may agree to further restructure the Restructured Bonds, including but not limited to cancellation of all or any portion of the Restructured Bonds applicable to the SCDC Lots and the Undeveloped Land to reduce any the assessments that may be levied on the SCDC Lots and the Undeveloped Land to enhance the marketability of the Project.<br><br>The CDD Special Assessment Debt shall be decelerated upon the Effective Date. To the extent that the Confirmation Order is not sufficient to decelerate the CDD Special Assessment Debt, in connection with and to facilitate the Bond Restructuring Transaction, the CDD will take all steps necessary to vacate the CDD Judgment and dismiss the underlying foreclosure proceeding and, as of the Effective Date, the CDD is granted relief from the automatic stay without further order of the Bankruptcy Court to accomplish the same. Subsequent to the CDD Judgment being vacated, the CDD will adopt resolutions decelerating the debt special assessments.<br><br>The CDD shall retain any Liens(s) on the SCDC Lots and the Undeveloped Land securing any Allowed Class 6 Secured Claim, up to the Allowed amount of any Class 6 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date.<br><br>Class 6 is Impaired under the Plan, and the Holder of the Class 6 Claim is entitled to vote to accept or reject the Plan. |
| Class 7 - Secured Claim of the CDD (O&M Debt Assessments) | The amount of any Allowed Class 7 Secured Claim, together with the CDD Post-Petition Claim, shall be stipulated in the amount of the CDD Payables.<br><br>On the Effective Date, in full satisfaction of the Allowed Class 7 |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Secured Claim and the CDD Post-Petition Claim, the Plan Funder will pay on the Effective Date the amount of all currently outstanding and documented CDD Payables in the amount of $389,123.46, and the CDD shall adopt a resolution reducing the outstanding O&M Assessments, except those contained in the unsold tax certificates, against all of the property within the District to the amount of the CDD Payables.    The Reorganized Debtor will also enter into a budget funding agreement with the CDD to provide O&M funds to the CDD for the remainder of the CDD's fiscal year 2015-2016.<br><br>The CDD shall retain any Liens(s) on the SCDC Lots and Undeveloped Land securing any Allowed Class 7 Secured Claim, up to the Allowed amount of any Class 7 Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date, until such Allowed Class 7 Secured Claim is fully paid as provided in this Plan.<br><br>Class 7 is Impaired under the Plan, and the Holder of the Class 7 Claim is entitled to vote to accept or reject the Plan. |
| Class 8 - Secured Claim of HP Land (Phase I Lots) | The following treatment is to compromise and resolve all claims, defenses, and disputes between or among the HP Land Settlement Parties with respect to the (i) SCDC Claims, (ii) HP Land Claims, and (iii) the HP Land Principals' Claims.   Upon the Effective Date, the Debtor shall convey any portion of the HP Land Settlement Property not previously conveyed to HP Land subject to any outstanding ad valorem taxes in full satisfaction of HP Land's Class 8, 9, 10, and 11 Secured Claims.  Upon the Effective Date, HP Land shall be granted relief from the automatic stay under Section 362 of the Bankruptcy Code without further order of the Bankruptcy Court to permit HP Land to enforce all *in rem* rights and remedies available to it with respect to only the HP Land Settlement Property.  HP Land shall retain but waive distribution on account of any unsecured claim.<br><br>HP Land shall (a) cooperate with the Proponents, (b) not interfere with the submission and approval of the Plan, (c) upon approval of the Disclosure Statement and modification of the Plan as contemplated by the HP Land Settlement, vote in favor of the Plan with respect to all classes in which HP Land is or may be entitled to vote, including but not limited to any unsecured claims; and (d) waive any right of distribution under the Plan on account of any unsecured claim HP Land has asserted or may assert or any other right to payment or distribution as expressly provided herein or in the Plan.<br><br>Upon the Effective Date, the HP Land Settlement Parties shall execute mutual releases in a form and substance reasonably agreeable to the HP Land Settlement Parties, which shall release all claims by each of the HP Land Settlement Parties to the HP Land Settlement upon any order by the Bankruptcy Court approving the HP Land Settlement becoming final and non-appealable, including, without limitation, the SCDC Claims, the HP Land Claims, and the HP Land Principals' Claims, except for their respective rights and obligations under the HP Land Settlement or such other agreements as shall or may be entered into pursuant to the terms of the HP Land Settlement.<br><br>Upon the filing of this Plan, HP Land will be deemed to have |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | withdrawn its notice of 1111(b) election (Doc. No. 481).<br><br>The Holder shall retain any Liens(s) on the Phase I Lots securing its Claim, up to the Allowed amount of its Secured Claim, if any, and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan.<br><br>Class 8 is Impaired under the Plan, and the Holder of the Class 8 Claim is entitled to vote to accept or reject the Plan. |
| Class 9 - Secured Claim of HP Land (Phase II Lots) | The following treatment is to compromise and resolve all claims, defenses, and disputes between or among the HP Land Settlement Parties with respect to the (i) SCDC Claims, (ii) HP Land Claims, and (iii) the HP Land Principals' Claims.  Upon the Effective Date, the Debtor shall convey any portion of the HP Land Settlement Property not previously conveyed to HP Land subject to any outstanding ad valorem taxes in full satisfaction of HP Land's Class 8, 9, 10, and 11 Secured Claims.  Upon the Effective Date, HP Land shall be granted relief from the automatic stay under Section 362 of the Bankruptcy Code without further order of the Bankruptcy Court to permit HP Land to enforce all *in rem* rights and remedies available to it with respect to only the HP Land Settlement Property.  HP Land shall retain but waive distribution on account of any unsecured claim.<br><br>HP Land shall (a) cooperate with the Proponents, (b) not interfere with the submission and approval of the Plan, (c) upon approval of the Disclosure Statement and modification of the Plan as contemplated by the HP Land Settlement, vote in favor of the Plan with respect to all classes in which HP Land is or may be entitled to vote, including but not limited to any unsecured claims; and (d) waive any right of distribution under the Plan on account of any unsecured claim HP Land has asserted or may assert or any other right to payment or distribution as expressly provided herein or in the Plan.<br><br>Upon the Effective Date, the HP Land Settlement Parties shall execute mutual releases in a form and substance reasonably agreeable to the HP Land Settlement Parties, which shall release all claims by each of the HP Land Settlement Parties to the HP Land Settlement upon any order by the Bankruptcy Court approving the HP Land Settlement becoming final and non-appealable, including, without limitation, the SCDC Claims, the HP Land Claims, and the HP Land Principals' Claims, except for their respective rights and obligations under the HP Land Settlement or such other agreements as shall or may be entered into pursuant to the terms of the HP Land Settlement.<br><br>Upon the filing of this Plan, HP Land will be deemed to have withdrawn its notice of 1111(b) election (Doc. No. 481).<br><br>The Holder shall retain any Liens(s) on the Phase II Lots securing its Claim, up to the Allowed amount of its Secured Claim, if any, and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | such Allowed Secured Claim is fully paid as provided in this Plan. Class 9 is Impaired under the Plan, and the Holder of the Class 9 Claim is entitled to vote to accept or reject the Plan. |
| Class 10 - Secured Claim of HP Land (Undeveloped Land) | The following treatment is to compromise and resolve all claims, defenses, and disputes between or among the HP Land Settlement Parties with respect to the (i) SCDC Claims, (ii) HP Land Claims, and (iii) the HP Land Principals' Claims.  Upon the Effective Date, the Debtor shall convey any portion of the HP Land Settlement Property not previously conveyed to HP Land subject to any outstanding ad valorem taxes in full satisfaction of HP Land's Class 8, 9, 10, and 11 Secured Claims.  Upon the Effective Date, HP Land shall be granted relief from the automatic stay under Section 362 of the Bankruptcy Code without further order of the Bankruptcy Court to permit HP Land to enforce all *in rem* rights and remedies available to it with respect to only the HP Land Settlement Property.  HP Land shall retain but waive distribution on account of any unsecured claim. HP Land shall (a) cooperate with the Proponents, (b) not interfere with the submission and approval of the Plan, (c) upon approval of the Disclosure Statement and modification of the Plan as contemplated by the HP Land Settlement, vote in favor of the Plan with respect to all classes in which HP Land is or may be entitled to vote, including but not limited to any unsecured claims; and (d) waive any right of distribution under the Plan on account of any unsecured claim HP Land has asserted or may assert or any other right to payment or distribution as expressly provided herein or in the Plan. Upon the Effective Date, the HP Land Settlement Parties shall execute mutual releases in a form and substance reasonably agreeable to the HP Land Settlement Parties, which shall release all claims by each of the HP Land Settlement Parties to the HP Land Settlement upon any order by the Bankruptcy Court approving the HP Land Settlement becoming final and non-appealable, including, without limitation, the SCDC Claims, the HP Land Claims, and the HP Land Principals' Claims, except for their respective rights and obligations under the HP Land Settlement or such other agreements as shall or may be entered into pursuant to the terms of the HP Land Settlement. Upon the filing of this Plan, HP Land will be deemed to have withdrawn its notice of 1111(b) election (Doc. No. 481). The Holder shall retain any Liens(s) on the Phase II Lots securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan Class 10 is Impaired under the Plan, and the Holder of the Class 10 Claim is entitled to vote to accept or reject the Plan. |
| Class 11 - Secured Claim of HP Land (Non-District Parcels) | The following treatment is to compromise and resolve all claims, defenses, and disputes between or among the HP Land Settlement Parties with respect to the (i) SCDC Claims, (ii) HP Land Claims, and (iii) the HP Land Principals' Claims.  Upon the Effective Date, the |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Debtor shall convey any portion of the HP Land Settlement Property not previously conveyed to HP Land subject to any outstanding ad valorem taxes in full satisfaction of HP Land's Class 8, 9, 10, and 11 Secured Claims.  Upon the Effective Date, HP Land shall be granted relief from the automatic stay under Section 362 of the Bankruptcy Code without further order of the Bankruptcy Court to permit HP Land to enforce all *in rem* rights and remedies available to it with respect to only the HP Land Settlement Property.  HP Land shall retain but waive distribution on account of any unsecured claim. |
| | HP Land shall (a) cooperate with the Proponents, (b) not interfere with the submission and approval of the Plan, (c) upon approval of the Disclosure Statement and modification of the Plan as contemplated by the HP Land Settlement, vote in favor of the Plan with respect to all classes in which HP Land is or may be entitled to vote, including but not limited to any unsecured claims; and (d) waive any right of distribution under the Plan on account of any unsecured claim HP Land has asserted or may assert or any other right to payment or distribution as expressly provided herein or in the Plan. |
| | Upon the Effective Date, the HP Land Settlement Parties shall execute mutual releases in a form and substance reasonably agreeable to the HP Land Settlement Parties, which shall release all claims by each of the HP Land Settlement Parties to the HP Land Settlement upon any order by the Bankruptcy Court approving the HP Land Settlement becoming final and non-appealable, including, without limitation, the SCDC Claims, the HP Land Claims, and the HP Land Principals' Claims, except for their respective rights and obligations under the HP Land Settlement or such other agreements as shall or may be entered into pursuant to the terms of the HP Land Settlement. |
| | Upon the filing of this Plan, HP Land will be deemed to have withdrawn its notice of 1111(b) election (Doc. No. 481). |
| | The Holder shall retain any Liens(s) on the Phase II Lots securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan. |
| | Class 11 is Impaired under the Plan, and the Holder of the Class 11 Claim is entitled to vote to accept or reject the Plan. |
| Class 12 - Secured Claim of Trustmark (Phase I Lots) | The amount of any Allowed Class 12 Claim shall be (a) as stipulated by the Proponents and the Holder of the Class 12 Claim or (b) as determined by the Bankruptcy Court, pursuant to Section 506(a) of the Bankruptcy Code.  Absent stipulation as to the value of the collateral securing any Allowed Class 12 Secured Claim, the Proponents will seek to value the Phase I Lots.  As provided in Section 506(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3012, the Confirmation Hearing shall be a hearing to determine the secured status and value of all Claims, Liens, or other interests in the Phase I Lots. |
| | The Holder of the Class 12 Claim shall receive the Trustmark Payment on the later of the Effective Date of the Plan or fifteen (15) days after such Class 12 Claim shall become an Allowed Claim, or upon such |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | other terms as the Proponents and the Holder of the Class 12 Claim may agree. The Trustmark Payment shall be in full and final settlement of the Allowed Class 12, 13, and 14 Secured Claims of Trustmark. Upon such payment, the Holder of the Class 12 Claims shall release any and all of its mortgage lien(s) and/or judgment lien(s) with respect to the Debtor's Property. |
| | The Holder shall retain any Liens(s) on the Phase I Lots securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan. |
| | Class 12 is Impaired under the Plan, and the Holder of the Class 12 Claim is entitled to vote to accept or reject the Plan. |
| Class 13 - Secured Claim of Trustmark (Phase II Lots) | The amount of any Allowed Class 13 Claim shall be (a) as stipulated by the Proponents and the Holder of the Class 13 Claim or (b) as determined by the Bankruptcy Court, pursuant to Section 506(a) of the Bankruptcy Code. Absent stipulation as to the value of the collateral securing any Allowed Class 13 Secured Claim, the Proponents will seek to value the Phase II Lots. As provided in Section 506(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3012, the Confirmation Hearing shall be a hearing to determine the secured status and value of all Claims, Liens, or other interests in the Phase II Lots. |
| | The Holder of the Class 13 Claim shall receive the Trustmark Payment on the later of the Effective Date of the Plan or fifteen (15) days after such Class 13 Claim shall become an Allowed Claim, or upon such other terms as the Proponents and the Holder of the Class 13 Claim may agree. The Trustmark Payment shall be in full and final settlement of the Allowed Class 12, 13, and 14 Secured Claims of Trustmark. Upon such payment, the Holder of the Class 13 Claims shall release any and all of its mortgage lien(s) and/or judgment lien(s) with respect to the Debtor's Property. |
| | The Holder shall retain any Liens(s) on the Phase II Lots securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan. |
| | Class 13 is Impaired under the Plan, and the Holder of the Class 13 Claim is entitled to vote to accept or reject the Plan. |
| Class 14 - Trustmark Secured Claim of Trustmark (Gatehouse) | The Holder of the Class 14 Claim shall receive the Trustmark Payment on the later of the Effective Date of the Plan or fifteen (15) days after such Class 14 Claim shall become an Allowed Claim, or upon such other terms as the Proponents and the Holder of the Class 14 Claim may agree. The Trustmark Payment shall be in full and final settlement of the Allowed Class 12, 13, and 14 Secured Claims of Trustmark. Upon such payment, the Holder of the Class 14 Claims shall release any and all of its mortgage lien(s) and/or judgment lien(s) with respect |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | to the Debtor's Property.<br><br>The Holder shall retain any Liens(s) on the Gatehouse securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan.<br><br>Class 14 is Impaired under the Plan, and the Holder of the Class 14 Claim is entitled to vote to accept or reject the Plan. |
| Class 15 - Secured Claim of First Florida Bank (Judgment Lien) | The Holder of the Class 15 Claim shall be paid on the later of the Effective Date of the Plan or fifteen (15) days after such the Class 15 Claim shall become an Allowed Claim, the amount of Twenty Thousand and No/100 Dollars ($20,000.00), or upon such other terms as the Proponents and the Holder of the Class 15 Claim may agree. Such payment shall be in full and final settlement of the Class 15 Claim.  Upon such payment, The Holder of the Class 15 Claim shall release any mortgage lien(s) and/or judgment lien(s) against the Property of the Estate.<br><br>The Holder shall retain any Liens(s) on the SCDC Property securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured Claim is fully paid as provided in this Plan.<br><br>Class 15 is Impaired under the Plan, and the Holder of the Class 15 Claim is entitled to vote to accept or reject the Plan. |
| Class 16 - Secured Claim of HP HOA | The Claim of the Holder of the Class 16 Claim shall be disallowed pursuant to Section 502(b)(9) of the Bankruptcy Code.<br><br>Any Lien of HP HOA is extinguished upon the Effective Date.<br><br>Class 16 is Impaired under the Plan, and the Holder of the Class 16 Claim is entitled to vote to accept or reject the Plan. |
| Class 17 - Claims of Trade Creditor Judgment Lien Holders | The Holders of Class 17 Claims shall be paid on the later of the Effective Date of the Plan or fifteen (15) days after such the Class 17 Claims shall become an Allowed Claims, or upon such other terms as the Proponents and the Holders of the Class 17 Claims may agree, an amount not to exceed the aggregate amount of $16,138.01.  Each Holder of a Class 17 Claim shall receive its Pro Rata Distribution for such aggregate amount.  Such payment shall be in full and final settlement of the Class 17 Claims.  Upon payment to it, each Holder of a Class 17 Claim shall release any and all of its or their mortgage lien(s) or judgment lien(s) with respect to the Debtor's Property.<br><br>The Holder shall retain any Liens(s) securing its Claim, up to the Allowed amount of its Secured Claim and only to the same extent, validity, and priority as existed on the Petition Date but not on any property acquired by the Debtor subsequent to the Petition Date except to the extent such Lien would continue in such property pursuant to Section 552(b)(2) of the Bankruptcy Code, until such Allowed Secured |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Claim is fully paid as provided in this Plan. |
| | Claim 17 is Impaired under the Plan, and the Holder of the Class 17 Claim is entitled to vote to accept or reject the Plan. |
| Class 18 - Unsecured Claim of Okaloosa County, Florida, Inc. | The Claim of the Holder of the Class 18 as the Proponents and the Holder of the Class 18 Claim may agree, including, without limitation, ratification of the Development Agreement, amendment to the Development Agreement, and other appropriate treatment. |
| | Class 18 is Impaired under the Plan, and the Holder of the Class 18 Claim is entitled to vote to accept or reject the Plan. |
| Class 19 - Unsecured Claims of Weltman and Phoenix | Pursuant to the Settlement Agreement, the Unsecured Claims of the Holders of the Class 19 Claims (i) shall be disallowed pursuant to Sections 502(d) and 1129(b)(2)(C) of the Bankruptcy Code, and the alleged contracts giving rise to the Class 19 Claims shall, upon confirmation, be rejected pursuant to Sections 1123(b)(2) and 365 of the Bankruptcy Code, and any damages arising therefrom shall be disallowed as shown above. |
| | Class 19 is Impaired under the Plan, but the Holder of the Class 19 Claim is not entitled to vote to accept or reject the Plan. |
| Class 20 - Claims of General Unsecured Creditors | The Holders of Allowed Class 20 Claims shall share Pro Rata in $50,000.00, funded by the Plan Funder on the Effective Date, with distributions of such amount commencing on the later of the Effective Date of the Plan or fifteen (15) days after such Class 20 Claim shall become an Allowed Claims. |
| | Class 20 is Impaired under the Plan, and the Holder of the Class 20 Claim is entitled to vote to accept or reject the Plan. |
| Class 21 - Claims of Equity Security Holders | Existing equity interests in the Debtor shall be cancelled on the Effective Date, and 100% of the new shares of stock in the Reorganized Debtor shall be issued to Phillips Capital Partners, Inc., or to such other Person or Entity designated by the Plan Funder, in exchange for and in recognition of the Plan Funding provided by the Plan Funder. |
| | Class 21 is Impaired under the Plan, and the Holders of Class 21 Claims are presumed to have rejected the Plan. |

The amount of Allowed Administrative Claims that must be paid prior to or on the Effective Date could vary significantly depending on a number of factors, including the duration of this Bankruptcy Case. Unsecured Claims shall be calculated in amounts estimated as of the Petition Date. For other Claims, the calculation date is not necessarily the Effective Date of the Plan. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied.

## V.    SUMMARY OF THE PLAN

### A.    Purpose of the Plan

As required by the Bankruptcy Code, the Plan places Claims in various classes and describes the treatment each class will receive.  The Plan also states whether each class of Claims is impaired or unimpaired.

### B.    Revenue and Financing Components of the Plan

The Reorganized Debtor will obtain funds necessary to pay the payments to be made on the Effective Date under the terms of this Plan through funds provided by the Plan Funder.  Exit financing, revenues generated from sales of Lots, and revenues derived from wastewater and sanitary sewer services will provide adequate operating capital for the Reorganized Debtor's day-to-day business operations.

The Plan Funder will contribute, loan, or advance sufficient funds to ensure the Effective Date Disbursement can be made.  At a minimum, the Effective Date Disbursements are expected to total over $1,500,000.00.  The Effective Date Disbursements include, but are not limited to the following:

| Creditor | Amount |
|---|---|
| Professional Compensation and Expense Claims | $55,000 |
| Mediator's Administrative Expense Claim | $13,669.40 |
| Substantial Contribution Claims | $475,000 |
| Priority Tax Claims | $767 |
| Post-Petition Administrative Expense Claims of the OCTC | $100,791.41 |
| U.S. Trustee Fees | Undetermined |
| OCTC Secured Claims – Classes 1-5 | $438,347.59 |
| CDD – Class 7 | $389,123.46 |
| Trustmark – Classes 12-14 | $250,000 |
| First Florida Bank  - Class 15 | $20,000 |
| Trade Creditor Judgment Lienholders – Class 17 | $16,138 |
| General Unsecured Creditors – Class 20 | $50,000 |
| Weltman Phoenix Settlement Payment | $500,000* |

*Less any amounts paid by the Plan Funder or the Debtor to satisfy the Mediator's Administrative Expense Claim.

THE PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

## VI.    CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS, REVESTING OF ASSETS

### A.    Allowed Claims, Distribution Rights, and Objections to Claims

#### 1.    Allowance Requirement

Only Holders of Allowed Claims are entitled to receive Distributions under the Plan.  An Allowed Administrative Expense Claim is all or any portion of an Administrative Expense Claim (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) that was incurred by the Debtor in the ordinary course of business during the Reorganization Case.  A post-petition obligation that is contingent or Disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity or common law, is not considered to be an obligation that is payable in the ordinary course of business.

An Allowed Claim (other than an Administrative Expense Claim) is such Claim or any portion thereof (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and non-contingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled, withdrawn, or denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

In no event will those Administrative Expense Claims or those other Claims subject to disallowance under Section 502(d) of the Bankruptcy Code be deemed to be Allowed Claims.

#### 2.    Interest on Claims; Dividends; Attorneys' Fees

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest, costs, and attorney's fees will not accrue or be paid on Claims, and no Holder of a Claim will be entitled to interest, costs, or attorneys' fees accruing on or after the Petition Date on any Claim or Equity Interest.

#### 3.    Making of Distributions

Reorganized Debtor, shall, following the Effective Date, be responsible for making (or causing to be made) Distributions under the Plan.  Unless otherwise ordered by the Court, Distributions to Holders of Allowed Claims will be made by the Reorganized Debtor (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in

the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Reorganized Debtor after the date of any related Proof of Claim, or after the date of the Schedules if no Proof of Claim was filed.

If any Holder's Distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such Holder, but no further Distributions to such Holder will be made unless and until the Reorganized Debtor are notified of such Holder's then current address, at which time all missed Distributions will be made to such Holder, without interest. Unless otherwise agreed by the Reorganized Debtor, amounts with respect to undeliverable Distributions made by the Reorganized Debtor will be returned to and for the benefit of the Reorganized Debtor.

All Claims for undeliverable Distributions must be made within the later of six (6) months after the Effective Date or six (6) months after Distribution is made to such Holder; after which date all Unclaimed Property will revert to the Reorganized Debtor free of any restrictions thereon and the Claims of any Holder or successor to such Holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

4.      Means of Cash Payment

The Plan provides that Cash payments made pursuant to the Plan will be in U.S. funds, by the means agreed to by the payor and the payee, including by check, and/or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor will determine in its sole discretion. For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

5.      Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

6.      De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor will not be required to distribute, and will not distribute, Cash to the Holder of any Allowed Claim if the amount of Cash to be distributed on account of such Claim is less than one hundred dollars ($100.00). Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than one hundred dollars ($100.00) will have such Claim discharged and will be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor, or their respective property. Any Cash not distributed pursuant to this provision will be the property of the Reorganized Debtor, free of any Liens, Claims, Interests, or restrictions thereon.

7.    <u>Reserves for Disputed Claims; Distributions on Account Thereof</u>

The Plan contemplates the establishment and maintenance of the Disputed Claims Reserves on account of Unsecured Claims that are Disputed Claims as of the Effective Date.  No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

With respect to any Administrative Expense Claim, other than an Administrative Expense Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or that was incurred by the Debtor in the ordinary course of business during the Reorganization Case, a Disputed Claim is a Claim that is contingent or Disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity, or common law.

With respect to any Claim that is not an Administrative Expense Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Disputed Claim is a Claim: (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or Disputed; (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or which is otherwise Disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (d) for damages based upon the rejection by a Debtor of an Executory Contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (e) that is Disputed under the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Reorganized Debtor will, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim to the extent of funds available in the Disputed Claims Reserve.  Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class.  Such Distributions will be based solely upon the amount of the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

8.    Objection Procedures

All objections to Claims, other than Claims that are deemed to be Disputed Claims, must be filed and served on the Holders of such Claims by the Claims Objection Deadline.  Objections to Claims (other than Administrative Claims), shall be filed on the later of ninety (90) days after the Effective Date, or (b) ninety (90) days after the applicable Proof of Claim is filed.  If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, unless such Proof of Claim asserts a Claim that is deemed to be a Disputed Claim, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.

9.    Estimation of Contingent or Unliquidated Claims

The Debtor or the Reorganized Debtor, with the consent of the Proponents, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor, the Proponents, or the Reorganized Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as applicable and as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, the Proponents, or the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanisms.

10.    Impact of Disputed Claims on Unsecured Claims Recovery

The Debtor or the Reorganized Debtor, with the consent of the Proponents, may seek one or more Final Orders of the Bankruptcy Court disallowing certain Claims.  However, to protect the rights of Holders of such Disputed Claims, the Plan proposes to establish a Disputed Claims Reserve.  The Debtor or the Reorganized Debtor, with the consent of the Proponents, will estimate and/or seek to determine a maximum potentially allowable amount for all Disputed Claims, obtaining orders of the Bankruptcy Court where necessary to estimate or fix the maximum amount.  It would be the Proponents' expectation that many of the Disputed Claims will be disallowed in whole or part, and that the funds placed in the Disputed Claims Reserve on their account will not be distributed to the Holders of such Claims and the funds reallocated to other uses.

11.    Maximum Distributions for Claims

No Holder of a Claim will receive a recovery that is valued as of the Effective Date to exceed 100% of such Holder's Allowed Claim.  Likewise, no Holder of a Claim shall receive a recovery that exceeds 100% of such Holder's Allowed Claim as of the Effective Date resulting

from a decrease in the amount of Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims as determined on the Effective Date and/or an increase in the amount of Cash available to the Debtor to satisfy such Claims as determined on the Effective Date.

12.    Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of Setoff or recoupment.

**B.    Disposition of Executory Contracts and Unexpired Leases**

The Plan provides for the deemed rejection of all Executory Contracts that have not been otherwise disposed of previously.  Specifically, except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor will be deemed to have rejected each pre-petition Executory Contract and unexpired lease to which it is a party unless such contract or lease (a) was previously assumed or rejected upon motion by a Final Order, (b) is specifically identified for assumption in the Plan and/or Plan Documents, or (c) is the subject of any pending motion, including a motion to assume, to assume on modified terms, to reject, or to make any other disposition filed by the Proponents on or before the Effective Date.   The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the assumptions or rejections, as the case may be, of pre-petition Executory Contracts and unexpired leases described above, as of the Effective Date.

1.    Rejection Damages Bar Date for Rejections Pursuant to Plan

If the rejection of an Executory Contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized Debtor within thirty (30) days after the earlier of (a) the date of the entry of the order by the Bankruptcy Court authorizing the rejection of such executory contract or unexpired lease, or (b) the Confirmation Date.   The foregoing applies only to Claims arising from the rejection of an Executory Contract or unexpired lease; any other Claims held by a party to a rejected contract or lease will have been evidenced by a Proof of Claim filed by earlier applicable bar dates or will be barred and unenforceable.

2.    Cure with Respect to Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract and unexpired lease specifically identified to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by Cure.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the

Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided however, that the Reorganized Debtor will be authorized to reject any Executory Contract or unexpired lease to the extent the Reorganized Debtor, in the exercise of its sound business judgment, conclude that the amount of the Cure obligation, as determined by such Final Order, renders assumption of such Executory Contract or unexpired lease unfavorable to the Reorganized Debtor. **THE PROPONENTS DO NOT BELIEVE ANY CURE IS REQUIRED WITH RESPECT TO ANY EXECUTORY CONTRACTS OR LEASES THAT WILL BE ASSUMED AND IF A CREDITOR TO AN ASSUMED CONTRACT FAILS TO ASSERT A DIFFERENT CURE AMOUNT PRIOR TO THE CONFIRMATION DATE, UNDER THE PLAN, SUCH CREDITOR SHALL BE FOREVER BARRED FROM ASSERTING A CURE CLAIM.**

## C.      Vesting of Assets; Release of Liens

The property of the Debtor's Estate, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of or abandoned pursuant to the Plan, will vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of the Reorganized Debtor will be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided under the Plan.

## VII.      POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT, AND OPERATION, DISCHARGE INJUNCTIONS

### A.      Continued Corporate Existence

The Plan provides that Debtor will remain in existence for at least 120 days after the Effective Date in accordance with the applicable laws in the respective jurisdictions in which it is incorporated.

### B.      Post-Consummation Governance Documents

The governing corporate documents for the Debtor or the Reorganized Debtor may be amended as necessary to include a provision prohibiting the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

### C.      Officers and Directors of Reorganized Debtor

The following individuals will serve as Officers and Directors for the Reorganized Debtor: Joe Dobson, president; Brian Clapp, vice president; and Michael Riggle, secretary and treasurer.

**D.**     **Corporate Action**

On the Effective Date, the adoption and filing of any articles of incorporation, the appointment of directors and officers of Reorganized Debtor, and all actions contemplated by the Plan will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtor or Reorganized Debtor and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or directors of the Debtor or Reorganized Debtor. On the Effective Date the appropriate officers or directors of the Reorganized Debtor will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations, or consents, except for express consents required under the Plan.

1.     Discharge and Discharge Injunction

Confirmation of the Plan effects a discharge of all Claims against the Debtor. As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such Debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such Debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such Debt is or has been Disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such Debt accepted the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtor or the Reorganized Debtor, directly or indirectly, any other or further Claims, Debts, rights, causes of action, Claims for relief, liabilities, or Equity Interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

In furtherance of the discharge of Claims, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other Debt or liability that is discharged or an Interest or other right of an Equity Security Holder that is terminated pursuant to the terms of the

Plan, are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, and their respective subsidiaries or their property on account of any such discharged Claims, Debts, or liabilities: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a Setoff, right of subrogation, or recoupment of any kind against any Debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

## VIII.  PREFERENCES, FRAUDULENT CONVEYANCES, AND OTHER CAUSES OF ACTIONS

Under the Plan, all Claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person ("Causes of Action") unless released pursuant to order of the Bankruptcy Court entered prior to confirmation are retained by the Debtor after confirmation of the Plan (except to the extent such Claims are expressly released under the Plan). The Debtor or the Proponents may also elect, prior to confirmation, to pursue litigation against any Person (and/or any related guarantees) arising out of a debt to the Debtor. The Plan provides that except as otherwise provided in the Plan or the Confirmation Order, or in any contract instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtor or Reorganized Debtor will retain all of the respective Causes of Action that the Debtor or Reorganized Debtor may hold against any Person. The Debtor or Reorganized Debtor will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Causes of Action. The Debtor or Reorganized Debtor or their respective successor(s) may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

Causes of Action include potential avoidance or other bankruptcy Causes of Action. As the deadline for commencing preference actions is two (2) years after the Petition Date and more than two years have elapsed since the Petition Date, the Proponents do not anticipate that the pursuit of preference or other avoidance actions will yield recoveries that will materially impact or enhance value or be of material benefit to Creditors. A decision with respect to whether to pursue such transfers will be made by the new Officers and Directors.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, Reorganized Debtor shall retain and have the exclusive right, subject to the consent of the Proponents, to enforce any and all Causes of Action and rights of the Debtor that arose both before and after the Petition Date, including the rights and powers of a trustee and debtor-in-possession and all causes of action granted pursuant to and still existing (if any) under Sections 502, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code ("Avoidance Actions"), other than those expressly released, compromised, or assigned as part of or pursuant to the Plan. In addition, Causes of Action include non-bankruptcy Claims, rights of action, suits, or proceedings that arise in the

ordinary course of the Debtor's business.  The Proponents have not completed their analysis of available Avoidance Actions or the merits of any Causes of Action or Avoidance Actions.

If, as a result of the pursuit of any Causes of Action, a Claim would arise from a recovery pursuant to Section 550 of the Bankruptcy Code after Distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of the Plan, the Reorganized Debtor, with the consent of the Proponents, will be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim, thereby effectively treating the Claim through the reduction.

## IX.    RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND ANY SUPPLEMENTS TO THIS DISCLOSURE STATEMENT) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    General Bankruptcy Risk Factors

1.    Parties In Interest May Object to the Proponents' Classification of Claims or Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Proponents cannot assure you that the Bankruptcy Court will reach the same conclusion.

2.    The Possible Loss of Favorable Tax Attributes

Although the Proponents do not believe that implementation of the Plan will itself result in significant tax liability, the proposed transactions could potentially reduce any favorable tax attributes that the Debtor may otherwise be entitled to.  The reduction of, and potential limitations on the Debtor's ability to use such favorable tax attributes could adversely affect the Reorganized Debtor's financial position in future years.

3.    The Proponents May Not Be Able to Secure Confirmation of the Plan

The Proponents cannot assure that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, the Proponents cannot assure you that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of a Claim or Equity Interest might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the

Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any statutory requirements for confirmation had not been met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and that value of Distributions to non-accepting Holders of Claims and Interests within a particular class under the plan will not be less than the value of Distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. The Proponents believe that the Plan will not be followed by a need for further financial reorganization and that Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all Administrative Expense Claims and the costs and uncertainty associated with any such chapter 7 case.

4.    Conditions to Confirmation and Effective Date

Article 10 of the Plan contains several conditions to both Confirmation and the occurrence of the Effective Date, specifically that (a) the Confirmation Order shall have been entered by the Bankruptcy Court, duly entered on the docket for the Bankruptcy Case by the Clerk of the Bankruptcy Court, and shall have become a Final Order, (b) the Plan Funder shall file a notice of a Bankruptcy Rule 3020 deposit containing a certification of the availability of funds needed to make the Effective Date Disbursement, and (c) the purchase of the Existing Bonds by the Reorganized Debtor or the Plan Funder shall have occurred and closed pursuant to the agreement between the Bondholders and the Reorganized Debtor or the Plan Funder. The Effective Date shall occur by no later than December 31, 2015, or such other date as may be agreed to by (i) the Indenture Trustee and (ii) the Reorganized Debtor or the Plan Funder. Failure to satisfy any of these conditions could impact the Proponents' and the Debtor's ability to confirm and/or consummate the Plan. By way of example and not limitation, one of the conditions precedent to the occurrence of the Effective Date is the certification from the Plan Funder regarding the Bankruptcy Rule 3020 deposit. Certain of Weltman's obligations under the Settlement Agreement are conditioned upon the tender of the $500,000.00 "Purchase Price" to NWJ Gator as contemplated by the Settlement Agreement. While the Plan contemplates payment of the Purchase Price on the Effective Date from the Effective Date Disbursement, if the payment was not made for some unknown reason, the Reorganized Debtor would likely be unable to effectuate the Plan.

## B.    Uncertainty of Projections

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated

litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor, and some or all of which may not materialize.  The Projections are primarily based on "rolling forward" the Debtor's pre-confirmation balance sheet with adjustments made for the anticipated impact of the financial restructuring under the Plan.  The Projections do not reflect possible additional adjustments that may be required and/or warranted under applicable laws, rules, or regulations such as those promulgated by the Internal Revenue Service or associated with Generally Accepted Accounting Principles.

To the extent that any assumptions are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Proponents, the assumptions and estimates are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor.  Some or all of the assumptions may not be realized and that actual results may vary.  Financial information contained in the Projections should not be regarded as a representation or warranty by the Proponents or any other Person that such projections can or will be achieved.

## C.    **Operational Risk Factors**

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from chapter 11, including but not limited to the following:  the Debtor's ability to improve profitability; the Debtor's response to the entry of new competitors into its markets; the Debtor's ability to reduce the level of operating losses experienced in recent years; the Debtor's ability to upgrade its information systems and implement new technology and business processes; difficulty collecting foreign accounts receivable; the Debtor's ability to successfully implement effective business continuity; changes in federal, state or local laws or regulations; general economic conditions in the Debtor's operating regions; increases in labor and employee benefit costs, such as health care and related expenses; and changes in accounting standards, taxation requirements, and bankruptcy laws.

## X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    **General**

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below.  This discussion of the federal income tax consequences of the Plan under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code"), is provided for informational purposes only.  While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties.  Moreover, the consequences to a Holder of Claims and Equity Interests may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of taxpayers holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations.  In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.  This Disclosure Statement does not

contain any discussion of the tax consequences related to the Bond Restructuring Transaction and ownership of the bonds as set forth in the Plan.

**THE PROPONENTS' BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.  HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES.**

**B.**      **Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests.**

The U.S. federal income tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place.  In addition, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying claim.  A holder who purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

1.      Accrued but Unpaid Interest.

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such a holder generally recognizes a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

2.      Consequences to Holders of Secured Claims.

A Holder of a Secured Claim who receives the collateral securing such Claim, or a Holder of any type of Claim or who receives Cash or other property (including an Equity Interest in the Debtor) with respect to such Claim, pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes equal to the difference between the fair market value of the collateral or other property, or the amount of Cash, as the case may be, received in exchange therefore and such Holder's adjusted tax basis in the Claim.

A Holder of a Claim who receives deferred Cash payments and realizes gain thereon may be eligible to report gain from such Cash payments under the installment method, which generally will result in the recognition of gain as deferred Cash payments are received, unless such Holder affirmatively elects out of the installment method. A Holder of an Allowed Claim who receives deferred Cash payments and recognizes loss thereon would not be eligible to report that loss under the installment method. Holders of Claims who receive deferred Cash payments should consult their tax advisors regarding the application of the installment method, the determination of the amount of gain or loss to be recognized, and the imputed interest rules.

3.      Consequences to Holders of Priority Claims.

Any Cash Payments received by Holders of Claims that are treated as compensation for the performance of services for U.S. federal income tax purposes may be treated as ordinary income and will be subject to federal income tax withholding and other applicable withholding rules.

4.      Consequences to Holders of Unsecured Claims.

To the extent the Holder of an Allowed General Unsecured Claim receives less than full payment on account of such Claim, the Holder of such Claim may be entitled to assert a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim.

To the extent that any amount received by a Holder of an Allowed Unsecured Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of an Allowed Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the

extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor.  Such loss may be ordinary, but the tax law is unclear on this point.

## C.    **Backup Withholding and Reporting**

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments subject to federal taxes, if any, and will comply with all applicable reporting requirements of the IRC.

## D.    **IRS Circular 230 Notice**

Any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the IRC or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

## XI.    **FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**

## A.    **Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

The Plan Funding from the Plan Funder should be sufficient to pay the amounts due under the Plan on the Effective Date.  The Reorganized Debtor should have adequate cash flow to pay and service its debt obligations and to fund its operations.  Accordingly, the Proponents believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

## B.    **Liquidation Analysis**

Even if a plan is accepted by each class of creditors and equity security holders, in order to confirm a plan of reorganization, the Bankruptcy Court must independently determine that the plan is in the best interests of all classes of creditors and equity security holders impaired by the plan.  The "best interests" test requires that the Bankruptcy Court find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate what members of each impaired class of creditors and equity security holders would receive if a debtor were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of the collateral and, then, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and its chapter 11 case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in this chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are Allowed in the chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case.  The liquidation itself could trigger certain priority claims, such as claims for severance pay, and could accelerate other priority payments that otherwise would be due in the ordinary course of business, such as litigation costs and claims arising from the wind-down of the debtor's operations during the chapter 7 case.  Those administrative and priority claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay general claims or to make any Distribution in respect of Equity Interests.

The Proponents believe that a chapter 7 liquidation would result in recoveries substantially less than the recoveries expected to be received pursuant to the Plan and that these reduced recoveries would be received at a much later time.  Additional administrative expenses would result from the appointment of a trustee or trustees and corresponding professionals.  Furthermore, the Proponents believe that substantial additional Claims would result from cessation of its operations.

Attached hereto as **Exhibit "D"** is the Liquidation Analysis for the Debtor assuming a hypothetical chapter 7 liquidation in which a court-appointed trustee liquidates the company's assets pursuant to an orderly liquidation.

The Liquidation Analysis is based on a number of estimates and assumptions which, while considered reasonable, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor or any chapter 7 trustee.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtor were, in fact, to undergo such a chapter 7 liquidation, and actual results could vary materially from those shown here.   In addition, any liquidation would necessarily take place in the future under circumstances which presently cannot be predicted.  Accordingly, if the Debtor's estate was in fact liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth below and no representation or warranty can be or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation.

## XII.   SUMMARY, RECOMMENDATION, AND CONCLUSION

The Plan provides for an orderly and prompt Distribution to Holders of Allowed Claims and the satisfaction of all asserted Claims and Interests.  In the opinion of the Proponents, the Plan provides for a larger Distribution to the Debtor's Creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller Distributions to Holders of Allowed Claims than proposed under the Plan.

***[Remainder of This Page Intentionally Left Blank]***

*Accordingly, the Proponents recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan*.

Dated: December 21, 2015

Stephen C. Riggs, III and Heritage FFR, LLC

By: /s/ Stephen C. Riggs
      Stephen C. Riggs, III, individually, and
      manager of Heritage FFR, LLC